**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHER DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| for use and benefit of A&C CONSTRUCTION & | ) | |
| INSTALLATION, CO. WLL | ) | |
| | ) | No. 1:17-cv-04307 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Assigned Judge: |
| | ) | Harry D. Leinenweber |
| ZURICH AMERICAN INSURANCE COMPANY | ) | |
| and THE INSURANCE COMPANY OF THE | ) | Designated Magistrate: |
| STATE OF PENNSYLVANIA, | ) | Judge Maria Valdez |
| | ) | |
| Defendants. | ) | |


**PLAINTIFF'S RESPONSE TO DEFENDANTS'**
**MOTION TO STAY PROCEEDINGS PENDING ARBITRATION**

## I.      INTRODUCTION

The motion by Defendants Zurich American Insurance Company and the Insurance Company of the State of Pennsylvania (together "Defendants") to stay this lawsuit pending the completion of an arbitration between A&C Construction & Installation, CO. WLL ("A&C") and non-party Black Cat Engineering & Construction WLL ("Black Cat") should be denied.  The arbitration is between different parties and relates to only one of the two subcontracts under which A&C performed the work at issue in this litigation.  Indeed, the subcontract at issue in the arbitration represents only 15% of A&C's total contractual scope of work.  Further, the arbitration will likely be concluded by the end of this year, long before this Court may be required to make any dispositive decisions in this case.  There is no reason to further delay discovery in this matter while the arbitration regarding a small portion of the scope of work at issue is concluded.

Nor can a stay of this lawsuit be justified in favor of litigation between A&C and non-party Black Cat pending in Qatar.  The Qatar lawsuit is not a parallel proceeding, as it involves different parties, different substantive law and different claims and defenses.  Even if it were a parallel proceeding, the Qatar litigation does not present the sort of exceptional circumstances that might warrant this Court's abstention of its jurisdictional duties.  Therefore the motion to stay should be denied.

## II.     BACKGROUND

In this lawsuit, A&C seeks payment for work performed on an air base in Qatar under two second-tier subcontracts: (1) a January 31, 2013 Subcontract Alliance Agreement for mechanical, electrical and plumbing services, attached as Exhibit C to the Amended Complaint (the "MEP Agreement"); and (2) a July 1, 2013 Subcontract Alliance Agreement for fire

suppression services, attached as Exhibit D to the Amended Complaint (the "Fire Suppression Agreement"). The contract amount set forth in the MEP Agreement is $8.4 million (85% of the total). The contract amount in the Fire Suppression Agreement is $1.4 million (15% of the total).

### A. Project Overview

A&C began performing work under the MEP Agreement and Fire Suppression Agreement in 2013. A&C's work was hampered by delays and inefficiencies that were outside its control, including AMEC's failure to adequately process material and drawing submittals and U.S. Army Corps of Engineers ("USACE's") failure to ensure timely access to the project site.

AMEC agreed that project delays required an adjustment to the contract value for the Project, and submitted a Request for Equitable Adjustment ("REA") to the USACE, requesting that the government increase AMEC's contract amount by over $18 million.[1] A&C was asked to submit its claims for inclusion in this REA and, upon information and belief, the REA includes a request by AMEC for additional amounts for A&C's increased labor and materials.

On December 16, 2015, Black Cat purported to terminate the smaller Fire Suppression Agreement "for convenience" and not for cause. Black Cat never terminated the more substantive MEP Agreement, but made it impossible for A&C to continue to adequately perform under the MEP Agreement.

### B. The ICC Arbitration

On May 12, 2016, A&C filed a Request for Arbitration under the Arbitration Rules for the International Chamber of Commerce (the "ICC Arbitration"), alleging that Black Cat was not

---

[1] A&C has served both AMEC and USACE with subpoenas in this case. However, AMEC has refused to produce the REA, or any other documents in this litigation. AMEC has also instructed USACE to withhold the REA. A&C is aware of the amount of the REA only because USACE produced some correspondence related to the REA.

entitled to terminate the Fire Suppression Agreement for convenience without paying A&C its anticipated profits under that agreement.

The more substantial MEP Agreement is not at issue in the ICC Arbitration. As set forth in the final Terms of Reference in the ICC Arbitration, the claims at issue in that arbitration relate exclusively to Black Cat's purported termination of the Fire Suppression Agreement for convenience. (Terms of Reference attached as Exhibit 1.)[2]

The only two parties to the ICC Arbitration are A&C and Black Cat. Black Cat is represented in the ICC Arbitration by Squire Patton Boggs, the same firm representing Defendants in this litigation.

On April 18, 2018, the tribunal in the ICC Arbitration issued a Partial Final Award in which it determined that the Fire Suppression Agreement prohibited Black Cat from terminating A&C for convenience without paying A&C its anticipated profits. (Partial Final Award attached hereto as Exhibit 2.) In A&C's view, this ruling (on a preliminary legal issue) is dispositive of the question of Black Cat's liability to A&C for termination of the Fire Suppression Agreement and all that remains to be determined is the quantum of damages.

A&C expects that the ICC Arbitration will be completed and that a final award will be issued before the end of this year. At present, discovery is scheduled to be completed by September 27, 2018. (ICC Arbitration, Procedural Order #7, attached hereto as Exhibit 3.) After this, the tribunal will either issue a final award based upon the parties' submissions, or it may schedule a hearing. In either event, the Tribunal has recently ordered that "given the size of the claim and the duration that this matter has subsisted (over 2 years from the Request for

---

[2] Under the ICC Rules of Arbitration, "no party shall make any claims which fall outside the limits of the Terms of Reference unless it has been authorized to do so by the arbitral tribunal" and the tribunal in the ICC Arbitration has not authorized any additional claims. (ICC Rules of Arbitration, Article 23(4).)

Arbitration), a procedure should be adopted which resolves the remaining issues in a fair and expeditious manner." (*Id.* at ¶ 4.)[3]  A&C expects that an award will issue before the end of 2018.

### C.     The Qatar Litigation

In early 2017, Black Cat filed an action in court in Qatar, alleging that A&C breached the MEP Agreement (the "Qatar Litigation") and caused Black Cat to incur damages.  The Qatar Litigation was filed in January 2017.  Black Cat and A&C are the only parties to that lawsuit.

A&C requested that the Qatar Litigation be dismissed because the MEP Agreement included a binding arbitration provision.  On February 26, 2018, the Qatar Court denied A&C's request.  A&C has appealed this decision to Qatar's Court of Appeals.  Qatar's courts are presently in their summer recess (which lasts all of July, August and September).  Black Cat's response to A&C's opening appellate submission is due October 7, 2018.   The decision of the Court of Appeals will be further appealable to Qatar's Court of Cassation.

### D.     This Litigation

A&C filed this litigation on June 7, 2017, seeking to recover approximately $8.5 million under The Miller Act, 40 U.S.C. §§ 3131-3134 (the "Miller Act") for the work A&C performed on the Project.  The only defendants in this litigation are the sureties for AMEC on the Miller Act payment bond.

Although discovery in this case has begun, not much progress has been made.  A&C has produced thousands of pages of documents, but Defendants have produced no more than a few hundred responsive documents.  The documents critical to this case (including evidence of the

---

[3] Black Cat has employed numerous tactics to delay the ICC Arbitration, including a challenge to the first arbitrator appointed by the ICC (who subsequently resigned), a challenge to the jurisdiction of the ICC, and two challenges of the second arbitrator appointed by the ICC.  Neither the Tribunal nor the ICC Court has found any merit in Black Cat's dilatory tactics, and the tribunal has already twice awarded A&C its attorneys' fees incurred in responding to them.

underlying delays and the REA submitted by AMEC to the USACE requesting additional money for A&C's work) are in the possession, custody, or control of AMEC, the prime contractor on the project. Therefore, A&C served AMEC with a subpoena for documents on February 15, 2018. AMEC responded with a motion to quash and has refused to produce any documents until that motion is ruled upon by the Court.[4] The depositions of key AMEC personnel that had been scheduled for dates in July and August have been postponed by agreement until after the Court rules on AMEC's motion to quash and AMEC produces its documents. Further, Defendants have refused to produce representatives until after A&C produces its representative deponent, who is presently tentatively scheduled to travel from Lebanon for his deposition on August 24, 2018 (provided his visa issues by then). Because of these issues, A&C moves concurrently herewith to extend the August 31, 2018 discovery cutoff date to November 30, 2018.

In short, A&C does not anticipate that this Court will be asked to rule on any dispositive issue in this case until some time in 2019.

## III. ARGUMENT

Neither the ICC Arbitration nor the Qatar Litigation, both of which are between A&C and Black Cat (a non-party to this case), justifies staying the instant proceedings.

### A. This case should not be stayed pending a final award in the ICC Arbitration.

Notably, in all of the cases cited by Defendants, Miller Act claims were stayed pending the resolution of arbitration to which the prime contractor (the principal on the Miller Act bond) was a party. (*See, e.g.*, Motion at 4-5 (citing *U.S. v. Bencor-Petriford,* No. 3:06-CV-439-TS, 2007 WL 1725468 (N.D. Ind. June 11, 2007) (primary contractor was a party in both litigation and arbitration brought by first-tier subcontractor); *WMS Gaming, Inc. v. IGT*, 31 F. Supp. 3d

---

[4] AMEC's motion to quash was fully briefed as of May 31, 2018, but the Court struck the June 15, 2018 hearing date from the docket.

974, 977 (N.D. Ill. 2014) (non-Miller-Act case in which arbitration and litigation involved the same parties)).) Here, AMEC (the prime contractor and Defendants' principal) is not a party to the ICC Arbitration brought by A&C (a second-tier subcontractor) against Black Cat (a first-tier subcontractor). Thus, unlike the cases relied upon by Defendants, this case does not involve both arbitrable and non-arbitrable claims. (Motion at 5, 8 (citing *U.S. ex rel. Vining Corp. v. Carothers Constr. Inc.*, No. 5;09-cv-438 (CAR), 2010 WL 1931100, at *4-5 (M.D. Ga. May 12, 2010); *U.S. ex rel. John Jamar Constr. Servs. v. Travelers Cas. & Sur. Co. of Am.*, No. CIV-A. H-14-3363, 2015 WL 757858, at **3, 6-7 (S.D. Tex. Feb. 23, 2015)).) All the claims in this action are non-arbitrable. Further, staying this litigation will not promote judicial economy, will not present the risk of inconsistent results, and will prejudice A&C.

1.     <u>A stay will not promote judicial economy</u>

A temporary stay of this litigation pending the completion of the ICC Arbitration would not promote judicial economy, as whatever happens in the ICC Arbitration this case will ultimately proceed because it concerns A&C's right to payment under a Miller Act payment bond for work performed under both the MEP Agreement (85% of the total contract value) and the Fire Suppression Agreement (only 15% of the contract value). The ICC Arbitration concerns <u>the sole question</u> of whether Black Cat was entitled to terminate the smaller Fire Suppression Agreement for convenience without paying A&C's anticipated profits. Thus, there is no overlap between the parties and little overlap between the issues in the two proceedings.

Defendants contend that the ICC Arbitration "concerns Black Cat's alleged breach of the Subcontract" and make the wholly-unsupported claim that their liability in this case is "dependent on a ruling that Black Cat breached the Subcontract." (Motion at 7.) However, there is not one "Subcontract," but two - and the far more substantive subcontract is not even at issue

6

in the ICC Arbitration.[5]  Thus, even if it were true that A&C was required to prove that Black Cat breached the MEP Agreement before A&C could recover from Defendants for its work under that agreement, it is indisputable that the ICC Arbitration will shed no light on that issue and staying this action would do nothing to promote judicial economy with respect to the work performed under the MEP Agreement (constituting the bulk of the dispute in this case).

Defendants suggest that their liability to A&C under Fire Suppression Agreement depends upon whether the tribunal in the ICC Arbitration finds that Black Cat breached that agreement.  Even if that is the case, judicial economy is not served by staying these proceedings because the ICC Arbitration will be concluded before this Court will be asked to make any determination about Defendants' liability under the Fire Suppression Agreement.

Indeed, a stay would simply mean that discovery in this action would be further delayed until the ICC Arbitration regarding the Fire Suppression Agreement is completed, after which this action would be recommenced in its present posture and the parties would proceed to litigate all remaining issues.

2.      No risk of inconsistent results

There is no danger arising from potentially inconsistent results in this litigation and the ICC Arbitration absent a stay for three reasons.  First, the tribunal in the ICC Arbitration has already found that Black Cat was not entitled to terminate the Fire Suppression Agreement for convenience without paying A&C's expected profits, as a matter of law.  To the extent this finding is binding upon the parties here, it is already available for the Court's consideration.

---

[5] Counsel for Defendants represents Black Cat in the ICC Arbitration and is well aware of the limited scope of those proceedings.  Thus, it appears that Defendants' contention that there is one global "Subcontract" at issue in both proceedings is a deliberate effort to mislead the Court.

Second, the final chapter of the ICC Arbitration (determining A&C's damages under the Fire Suppression Agreement) will almost certainly be concluded before the end of this year, long before this Court might be called upon to make a substantive decision on any dispositive issue. Again, if the tribunal's final damages calculation in the ICC Arbitration is binding here, it will be available for the Court's consideration in due time and there is no risk of inconsistent results.

Third, Defendants fail entirely to describe what impact the tribunal's award in the ICC Arbitration may have upon this litigation or why "inconsistent results" of litigation and arbitration between different parties might be of concern here.  Instead, they merely argue that "[a] stay is appropriate, even if the outcome in A&C's ICC Arbitration will not have a preclusive effect here." (Motion at 8 (emphasis added).)  In other words, Defendants argue both (a) that the Court should wait for the results of the ICC Arbitration because the determination of whether Black Cat breached the Fire Suppression Agreement is a critical element of the small portion of A&C's claim related to work performed under the Fire Suppression Agreement; and (b) that the results of the ICC Arbitration will have no impact on this case.  Thus, Defendants have failed to explain how the possibility of inconsistent results weighs in favor of staying these proceedings.

3.  Granting a stay will prejudice A&C

Requiring A&C to stay this lawsuit in favor of arbitration with a non-party to this suit (who is not Defendants' principal) would prejudice A&C and subvert the rationale for the Miller Act.  The Miller Act was designed to provide protection to subcontractors such as A&C.  *F. D. Rich Co. v. U. S. for Use of Indus. Lumber Co.*, 417 U.S. 116, 122 (1974) (because suppliers on government projects are deprived of their usual security interest in the form of a lien, the Miller Act was intended to provide an alternate remedy to protect the rights of those suppliers).  This "congressionally mandated remedy should not lightly be interfered with or delayed."  *U.S. for*

*Use of Pensacola Const. Co. v. St. Paul Fire & Marine Ins. Co.,* 705 F. Supp. 306, 309 (W.D. La. 1988) (declining to stay Miller Act litigation in favor of pending arbitration).

Further, A&C has now incurred substantial costs in prosecuting its Miller Act claim, including the expense of collecting and producing thousands of pages of documents, and would be prejudiced by interrupting the discovery process. A&C has served AMEC with a subpoena, seeking documents which will likely demonstrate that AMEC supported and endorsed A&C's requests for additional payment due to delays and inefficiencies outside of A&C's control. A&C has fully briefed AMEC's motion to quash and has filed its own motion to compel AMEC to produce these documents, and is awaiting a ruling on these motions. Staying these proceedings would further delay the discovery of AMEC's documents, which relate primarily to the MEP Agreement, and the remainder of the discovery in this case. Further, A&C's representative deponent has submitted a request for a visa to travel from Lebanon to Chicago in order to testify, and if these proceedings are stayed he may be required to re-start the process at a later date.

Allowing this case to proceed through discovery would not prejudice Defendants in any way. Defendants do not articulate any decision that may be made by the tribunal in the ICC Arbitration that would have any impact upon how discovery might proceed in this case. Nor do Defendants identify any other prejudice they may incur if the ICC Arbitration is allowed to continue in parallel with the parties' discovery efforts here. In summary, there is little to be gained by staying these proceedings in favor of the ICC Arbitration.

**B.** **These proceedings should not be stayed pending completion of the Qatar Litigation**

Defendants have not moved for a stay of these proceedings pending the conclusion of the Qatar Litigation, but based upon statements by counsel for Defendants, A&C anticipates that Defendants will make this additional request in their Reply. However, the standard for staying

these proceedings based upon pending foreign litigation is an even higher burden for Defendants to meet than the standard for staying the proceedings based upon a pending arbitration.

Federal courts "have a 'virtually unflagging obligation' to exercise the jurisdiction conferred on them by Congress." *AAR Int'l, Inc. v. Nimelias Enterp. S.A.*, 250 F.3d 510 (7th Cir. 2001) (quoting *Colorado River Water Conserv. Dist. v. U.S.*, 424 U.S. 800, 817 (1976)). "Abstention from the exercise of federal jurisdiction is the exception, not the rule." *Colorado River*, 424 U.S. at 813. The doctrine of abstention "is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it" and abdication of this obligation can be justified "only in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest." *Id.* (quoting *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 188-89 (1959)).

The *Colorado River* doctrine of abstention and its progeny typically deal with the issue of state and federal court concurrent jurisdiction. The situation is different when a court must review concurrent federal and foreign jurisdiction and where "the alternate forum is not the tribunal of a state of the federal union to which, under [the] Constitution, [the courts] owe a special obligation of comity." *Ingersoll Milling Mach. Co v. Granger*, 833 F.2d 680, 685 (7th Cir. 1987). When considering concurrent federal and foreign jurisdictions, "parallel proceedings in the same *in personam* claim should ordinarily be allowed to proceed simultaneously, at least until a judgment is reached in one which can be pled as res judicata in the other." *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 926-27 (D.C. Cir. 1984); *see also Granger*, 833 F.2d at 684; *Ludgate Ins. Co. v. Becker*, 906 F. Supp. 1233, 1242 (N.D. Ill. 1995).

In determining whether a stay is appropriate, the Court must engage in a two-part inquiry. First, it must determine whether the cases are parallel. *Global Material Tech., Inc. v. Dazheng*

*Metal Fibre Co., Ltd.*, No. 12-cv-01851, 2013 WL 80369, at *6 (N.D. Ill. Jan. 7, 2017). Second, if the proceedings are parallel, then the court must ask whether "exceptional circumstances" are present that would warrant abstention. *AAR Int'l*, 250 F.3d at 518. The case at bar and the Qatar Litigation are not parallel proceedings and even if they were, the requisite "exceptional circumstances" do not exist to warrant abstention. Finally, there are no facts demonstrating that this Court could accept and enforce any judgment entered in the Qatar Litigation.

1.    <u>The proceedings are not parallel</u>

Whether proceedings are parallel is a "critical threshold question . . . that focuses on whether there is a substantial likelihood that the [concurrent foreign] litigation will dispose of *all claims* presented in the federal case." *Global Material Tech., Inc.*, 2013 WL 80369, at *6 (quotation omitted). Any doubts "regarding the parallel nature of the foreign suit should be resolved in favor of exercising jurisdiction." *AAR Int'l, Inc.*, 250 F.3d at 518 (quoting *Schneider Nat'l Carriers, Inc. v. Carr*, 903 F.2d 1154, 1156 (7th Cir. 1990)). Suits are parallel only if "substantially the same parties are litigating substantially the same issues in two fora." *Id.*

The ongoing Qatar Litigation is not parallel to the proceedings at bar. First, the parties to the two proceedings are not the same. *Mountain Funding, Inc. v. Frontier Ins. Co.*, No. 01 C 2785, 2003 WL 21518556, at *4 (N.D. Ill. July 1, 2003) (lawsuits were not parallel where parties were not the same in claim against surety of bond). Further, the Qatar Litigation is between two foreign entities, A&C and Black Cat, and the parties' rights and obligations will be controlled by the MEP Agreement and Qatar law. In contrast, the case at bar is brought against two domestic sureties (whose principal is a domestic construction company) pursuant to the Miller Act, and the parties' rights and obligations will be controlled by this federal statute. Defendants' liability to A&C under the Miller Act may be significantly broader than Black Cat's liability to A&C, or

11

even AMEC's contractual liability. *Walton Tech. v. Weststar Eng'g, Inc.*, 290 F.3d 1199, 1209 (9th Cir.2002) ("In the context of Miller Act cases, however, we must look beyond the principal's contractual liability, to the Miller Act itself, in defining the limits of coextensive liability between a surety and its principal.") For example, while a contractor may raise a "pay-when-paid" defense to defend against a subcontractor's claims, the contractor's surety may not raise such a defense in the subcontractor's Miller Act claim. *Id.*; *see also Mai Steel Serv., Inc. v. Blake Constr. Co.*, 981 F.2d 414 (9th Cir.1992) (subcontractors ability to recover depended entirely upon the Miller Act, not on terms of its underlying contract).

In addition, the claims in the Qatar Litigation relate exclusively to the MEP Agreement. Even if those claims were identical to the Miller Act claims relating to the MEP Agreement (they are not), this case could not be stayed because the Qatar Litigation would not dispose of the claims relating to the Fire Suppression Agreement in this action. *See Global Material Tech., Inc.*, 2013 WL 80369 at *5-6 (denying motion to stay in favor of pending proceedings in China where the foreign claims appeared similar to the claims asserted in federal court but were actually more limited in scope). The Seventh Circuit cautions that it is a "serious abuse of discretion" to abstain where there is "any substantial doubt that the parallel . . . litigation will be an adequate vehicle for the complete . . . resolution of issues between the parties." *AAR, Int'l, Inc.*, 250 F.3d at 520 (reversing abstention of federal court proceedings in favor of pending proceedings in Greece). These proceedings are not parallel, and the stay should be denied.

2.     The requisite "exceptional circumstances" for a stay do not exist here

Moreover, even if the proceedings were considered parallel, an analysis of the *Colorado River* factors require a denial of the motion to stay. Where proceedings are found to be parallel, courts must then "balance the considerations that weigh in favor of, and against, abstention,

bearing in mind the exceptional nature of the measure." *AAR Int'l, Inc.*, 250 F.3d at 522 (internal quotation marks omitted). Those considerations are:

> (1) whether the state has assumed jurisdiction over property; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which jurisdiction was obtained by the concurrent forums; (5) the source of governing law, state or federal; (6) the adequacy of state-court action to protect the federal plaintiff's rights; (7) the relative progress of state and federal proceedings; (8) the presence or absence of concurrent jurisdiction; (9) the availability of removal; and (10) the vexatious or contrived nature of the federal claim.

*Id.*; *Lumen Const., Inc. v. Brand Const. Co., Inc.*, 780 F.2d 691, 694 (7th Cir. 1985).

These factors overwhelmingly lend themselves to denying a stay in this action. First, A&C, as a subcontractor on a federal project, can exercise the unique rights guaranteed to it under the Miller Act only in the federal courts of the United States. *See* 40 U.S.C. § 3133 (civil actions under the Miller Act must be brought in a United States District Court). Thus, this Court is not only a convenient forum for the adjudication of A&C's Miller Act claim against the domestic Defendants, it is the exclusive forum (factor 2); there is no concurrent jurisdiction in Qatar for Miller Act claims (factor 8); and thus the Qatar courts cannot protect A&C's rights under the Miller Act (factor 6). Further, the source of the governing law here, the Miller Act, is federal and domestic (factor 5).

Factor seven, the relative progress of both proceedings, also weighs in favor of this Court's exercise of jurisdiction because these proceedings have progressed significantly further than the proceedings in the Qatar Litigation. While the Qatar Litigation was filed earlier in 2017 than the case at bar, the parties in the Qatar Litigation are still entangled in jurisdictional arguments in the Court of Appeals and have not proceeded to the fact-finding phase in the Court of First Instance. Further, the Qatar Litigation is effectively stayed until October while the courts are on their annual three-month recess, so no progress is anticipated on any issue until the next hearing on October 7, 2018 (when Black Cat is scheduled to respond to A&C's opening

appellate brief). Further, cases in Qatar's courts proceed quite slowly compared to domestic litigation. The Special Rapporteur of the United Nations has raised a "concern relating to due process guarantees" due to "delays in judicial proceedings often caused by the postponement of hearings without clear and fair justification." United Nations Human Rights, Office of the High Commissioner, *Report of the Special Rapporteur on the independence of judges and lawyers*, *Mission to Qatar*, at ¶ 62, Mar. 31, 2015. (A copy of the Report is attached as Exhibit 4.) The parties in this case are at issue on the pleadings and in the midst of discovery. Once the Court rules upon AMEC's motion to quash, assuming AMEC produces its responsive documents by the end of August, A&C expects that fact discovery will be concluded by November 30, 2018.

Finally, factor three, the desirability of avoiding piecemeal litigation, does not weigh in favor of granting a stay. "Piecemeal litigation occurs when different tribunals consider the same issue, thereby duplicating efforts and possibly reaching different results." *LaDuke v. Burlington N. R. Co.*, 879 F.2d 1556, 1560 (7th Cir.1989) (internal quotation marks omitted). As stated previously, the issues in this case are distinct from those in the Qatari Litigation in that different claims and defenses may be presented, given the different parties and different sources of controlling law. This Court and the Qatar court may reach different results (for example, the Qatar court may find that Black Cat has certain contractual defenses to payment that are not available to Defendants under the Miller Act), but that will be because the courts will be considering different issues. Allowing this case to proceed will not result in piecemeal litigation, and this factor does not present an "exceptional circumstance" that would support a stay.

3.    The fairness of the Qatari Litigation cannot be established with facts

Finally, the fairness of a foreign proceeding is a fundamental concern in determining whether to recognize a foreign judgment, and evidence establishing the unfairness of a foreign

proceeding can justify the non-recognition of a foreign judgment. *See Amica Life Ins. Co. v. Barbor*, 488 F. Supp. 2d 750, 757 (N.D. Ill. 2007) (judgment of a Syrian court did not have preclusive effect in part because it was "unclear whether . . . the Syrian proceedings were fundamentally fair"); *Bridgeway Corp. v. Citibank*, 201 F.3d 134 (2d Cir. 2000) (affirming refusal to recognize judgment entered in Libya).

Indeed, A&C has serious concerns about the fairness of the Qatar Litigation. For example, the report by the Special Rapporteur for the United Nations cited above raised concerns about bias and discrimination by judges in favor of Qatari nationals and against non-nationals. (Exhibit 4 at ¶ ¶ 43-44.) Black Cat is a subsidiary of Qatar Investment & Projects Development Holding Company ("QIPCO"), a prominent Qatari-owned company whose board of directors is made up entirely of members of Qatar's ruling Al Thani family.[6] In contrast, A&C, while registered and formed in Qatar, is controlled by Jean Louis Cardahi, a Lebanese politician and businessman.[7] In short, it would be inappropriate to stay this action pending the resolution of the Qatari proceedings when it is not at all clear that the Qatari proceedings will result in an enforceable judgment that resolves the issues at bar.

## IV. CONCLUSION

A&C is entitled to vindicate its rights under the Miller Act against AMEC's sureties in federal court, and neither the ICC Arbitration nor the Qatar Litigation provide any compelling reason to delay or diminish A&C's ability to recover under this federal statute. Therefore, Defendants' motion to stay these proceedings should be denied.

---

[6] *See* the websites of Black Cat, http://www.blackcat.qa/profile#horizontalTab4 (last visited July 31, 2018); QIPCO, a private investment company that is a part owner of Black Cat, https://qipco.com.qa/about-qipco/ (last visited July 31, 2018); *A guide to the most powerful families in Qatar*, Priya Dsouza Communications, Feb. 24, 2017, *available at* http://priyadsouza.com/powerful-families-qatar-al-thani/ (last visited July 31, 2018).

[7] *See* A&C's website, http://www.cardahi.com/company/ac/ (last visited July 31, 2018).

Dated: July 31, 2018

Respectfully submitted,

A&C CONSTRUCTION &
INSTALLATION CO. WLL


By: /s/ Abram I. Moore
Abram I. Moore (Ill. Bar No. 6278871)
Nicole C. Mueller (Ill. Bar No. 6309735)
K&L GATES LLP
70 West Madison, Suite 3100
Chicago, Illinois  60602
Phone: (312) 372-1121
abram.moore@klgates.com
nicole.mueller@klgates.com

*Attorneys for A&C Construction &
Installation Co. WLL*

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that on the 31st day of July, 2018, a true and correct

copy of the foregoing **Plaintiff's Response in Opposition to Defendants' Motion to Stay**

**Proceedings Pending Arbitration** was served by electronic transmission via the Electronic

Case Filing system of the Court upon the following counsel of record:

> Robert E. Tonn
> Colin P. Smith
> William Farley
> Holland & Knight LLP
> 131 South Dearborn Street
> 30th Floor
> Chicago, Illinois 60603
> Phone: (312) 263-3600
> robert.tonn@hklaw.com
> colin.smith@hklaw.com
> william.farley@hklaw.com
>
> *Attorneys for Zurich American Insurance*
> *Co. and The Insurance Company of the State*
> *of Pennsylvania*
>
>
> Daniel B. Pasternak
> Brent R. Owen
> Squire Patton Boggs (US) LLP
> 1801 California Street, Suite 4900
> Denver, Colorado 80202
> daniel.pasternak@squarepb.com
> brent.owen@squarepb.com
>
> *Attorneys for Zurich American Insurance*
> *Co. and The Insurance Company of the State*
> *of Pennsylvania*

/s/ Abram I. Moore

Abram I. Moore

17