# EXHIBIT 2

ICC Case No. 21945/ZF/AYZ

## IN THE MATTER OF AN ARBITRATION UNDER THE RULES OF THE INTERNATIONAL COURT OF ARBITRATION OF THE INTERNATIONAL CHAMBER OF COMMERCE

### A&C CONSTRUCTION & INSTALLATION CO. WLL
(Doha, State of Qatar)

Claimant

and

### BLACK CAT ENGINEERING & CONSTRUCTION WLL
(Doha, State of Qatar)

Respondent

---

## SECOND PARTIAL AWARD

---

The Tribunal:

Mr. Victor Leginsky (Sole Arbitrator)

**Place of Arbitration:** Doha, State of Qatar

## Contents

I.      THE PARTIES .......................................................................................4

II.     THE ARBITRAL TRIBUNAL ...................................................................6

III.    THE SECRETARIAT OF THE ICC INTERNATIONAL COURT OF
        ARBITRATION ....................................................................................6

IV.     THE ARBITRATION AGREEMENT .........................................................6

V.      PLACE OF ARBITRATION ....................................................................7

VI.     APPLICABLE LAWS ............................................................................7

VII.    PROCEDURAL RULES .........................................................................7

VIII.   LANGUAGE OF ARBITRATION .............................................................7

IX.     TERMS OF REFERENCE (ARBITRATION DEED).....................................7

X.      THE PARTIES' RELATIONSHIP AND DISPUTE .....................................8

XI.     THE PROCEDURAL BACKGROUND TO THE ARBITRATION .........9

XII.    SUMMARY OF THE PARTIES' POSITIONS ON THE SUBSTANTIVE
        DISPUTE AND RELIEF SOUGHT ON THE MERITS ...........................10

XIII.   THE FIRST PARTIAL AWARD .............................................................12

XIV.    THE PROCEDURAL BACKGROUND LEADING TO THIS SECOND
        PARTIAL AWARD ..............................................................................14

XV.     THE LEGAL ISSUE TO BE DETERMINED IN THIS SECOND
        PARTIAL AWARD ..............................................................................21

XVI.    RELEVANT DOCUMENTS FILED AND REVIEWED .........................21

XVII.   CLOSURE OF PROCEEDINGS.............................................................22

XVIII.  RELEVANT CONTRACTUAL AND STATUTORY PROVISIONS .....22

XIX.    THE PARTIES' CASES ON THE PRELIMINARY LEGAL ISSUE AND
        RELIEF SOUGHT ...............................................................................25

A.      CLAIMANT'S SUBMISSIONS ...............................................................25

B.      RESPONDENT'S SUBMISSIONS ...........................................................27



XX.  TRIBUNAL'S ANALYSIS OF THE ISSUES TO BE DETERMINED...33

XXI.  REASONS AND FINDINGS.......................................................................34
A.   IS DETERMINATION OF THE PRELIMINARY LEGAL ISSUE APPROPRIATE?.........34
B.   WAS THE RESPONDENT ENTITLED, AS A MATTER OF LAW, TO TERMINATE THE FIRE SUPPRESSION ALLIANCE AGREEMENT FOR CONVENIENCE WITHOUT COMPENSATING CLAIMANT FOR RESULTING LOST PROFITS?..........................37
C.   WHAT ARE THE COSTS IMPLICATIONS FLOWING FROM THIS SECOND PARTIAL AWARD.....................................................................................................45

XXII.  OPERATIVE PART.................................................................................48



- 3 -

## I.   THE PARTIES

1.   The Claimant:

1.1 The Claimant in this arbitration is **A&C Construction & Installation Co. WLL** (hereinafter referred to as "**A&C**" or "**Claimant**"), a company incorporated at the Ministry of Economy and Commerce with Commercial Registration No. 32477 in the State of Qatar, having its registered office at:

A&C Construction & Installation Co. WLL
P. O. Box 177
Doha, Qatar
T: +974 44329334 ; F: +974 44329395

1.2 The Claimant is represented in this arbitration by its duly authorized attorneys:

1.2.1   Mr. Abram Moore, Mr. Matthew Walker, Mr. Alexios Hallak of

K&L GATES LLP
31st Floor, Tornado Tower
Al Funduq Street, West Bay
P.O. Box 26100
Doha, State of Qatar
Tel: +974 4424 6107
Fax: +974 4424 6101

Email: abe.moore@klgates.com, matthew.walker@klgates.com, alexi.hallak@klgates.com

1.2.2   And by: Sultan Al-Abdulla & Partners
Level 20, Al Fardan Towers
Al Funduq Street, West Bay
P.O. Box 177
Doha, State of Qatar
Tel: +974 4442 0660
Fax: +974 4442 0663

Email: alabdulla@qatarlaw.com, wcattan@qatarlaw.com

2   The Respondent

2.1 The Respondent in this arbitration is **Black Cat Engineering & Construction WLL** (hereinafter referred to as "**Black Cat**" or "**Respondent**"), a company duly organized and existing under the laws of Qatar with Commercial Registration No. 10756 and located at

Black Cat Engineering & Construction WLL
PO Box 12714, Al Brooq Building, 3rd Floor
Bin Mahmoud Street Doha, State of Qatar
T: +974 4428 0333; F:   +974 4442 9899

- 4 -

2.2 The Respondent is represented in this arbitration by its duly authorized attorneys:

2.2.1    Until 9 November 2017, by:

2.2.1.1 Messrs. Jonathan Collier, Paul Fisher
            Pinsent Masons LLP
            PO Box 22758. Tornado Tower
            West Bay, Doha
            State of Qatar
            Email: jonathan.collier@pinsentmasons.com, paul.fisher@pinsentmasons.com
            Ph.  974 4426 9200

2.2.1.2 Ms Anita Hormis
            Pinsent Masons LLP
            PO Box 115580, The Offices 1
            One Central
            Dubai, United Arab Emirates
            Email: anita.hormis@pinsentmasons.com

2.2.1.3 Sharq Law Firm
            Level 17, Alfardan Office Tower
            West Bay
            P.O. Box 6997
            Doha, State of Qatar
            a.amin@sharqlawfirm.com

2.2.2    After 9 November 2017, by:

2.2.2.1 Mr Tarek Saad and Ms Anoud Abu Odeh
            Squire Patton Boggs (MEA) LLP
            The Commercial Bank Plaza (CBQ), 16th Floor
            Dafna Area, P.O.Box 22632 Doha, Qatar
            Email: tarek.saad@squirepb.com, anoud.abuodeh@squirepb.com
2.2.2.2 Mr Jose Feris
            Squire Patton Boggs
            7, rue du General Foy
            75008 Paris, France
            Email: jose.feris@squirepb.com

2.2.2.3 Sharq Law Firm
            Level 17, Alfardan Office Tower
            West Bay
            P.O. Box 6997
            Doha, State of Qatar
            a.amin@sharqlawfirm.com

2.3 Claimant and Respondent are collectively referred to as the **"Parties"**.

- 5 -

## II.    THE ARBITRAL TRIBUNAL

3    At its session of 24 November 2016, the ICC International Court of Arbitration (hereinafter referred to as the "**Court**"), pursuant to Article 13(3) of the 2012 Rules of Arbitration of the ICC and upon the Canadian National Committee's proposal, appointed as Sole Arbitrator ( also referred to as "Arbitral Tribunal"):

> Mr Victor P. Leginsky, Canadian citizen
> Villa A05, Arenco Villas, Al Sufouh 2
> P.O. Box 214990
> Dubai, United Arab Emirates
> T: +971 50 457 3770; F: +971 4 451 8346
> E: vleginsky@arbitralis.com

## III.    THE SECRETARIAT OF THE ICC INTERNATIONAL COURT OF ARBITRATION

4    As specified in Section IX below, this arbitration is conducted under the 2012 Rules of Arbitration of the ICC (hereinafter referred to as the "**ICC Rules**"). Counsel in charge of the file at the Secretariat of the ICC International Court of Arbitration (hereinafter referred to as the "**Secretariat**") is Ms. Asli Yilmaz (+33 1 49 53 28 32; fax: +33 1 49 5357 80; email: ica5@iccwbo.org), together with Deputy Counsel Ms. Amany Chamieh (+33 1 49 53 28 28), at 33-43, avenue du Président Wilson, 75116 Paris, France.

## IV.    THE ARBITRATION AGREEMENT

5    The arbitration clause is contained in the JVA, which was executed between the Parties by the Claimant's Managing Partner and the Respondent's General Manager, at sub-clause 7.1 "Disputes/Law", and reads as follows:

> "7.1 *Any dispute arising out of or in connection with this JVA, which cannot be settled amicably by the Senior Management for the Parties within twenty eight (28) days following the receipt by the Party at fault of a notice from the claiming Party, shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one or three arbitrators appointed in accordance with the said Rules. The venue of arbitration shall be Doha, State of Qatar. The arbitration proceedings shall be conducted in English. The arbitration award shall be final, binding on the Parties, and enforceable with any court of competent jurisdiction*" ("**Arbitration Agreement**"; this comprises a copy of the Arbitration Agreement for the purposes of Article 31(3) of the Qatar Arbitration Law[1] and this Arbitration Agreement is also attached hereto as **Attachment 'A'**).

6    The applicability of Clause 7 of the JVA as the applicable Arbitration Agreement was challenged by the Respondent in a jurisdictional plea, which was determined by the Partial Award in this matter dated 12 June 2017 ("**First Partial Award**"). Pursuant to that First Partial Award, Clause 7 of the JVA is the applicable Arbitration Agreement.

---

[1] Arbitration Law in Civil and Commercial Matters, Law 2 of 2017 of the State of Qatar



## V.   PLACE OF ARBITRATION

7   While the Arbitration Agreement stipulated that the "venue" of the arbitration is Doha, the Parties agreed in the Terms of Reference[2] at ¶54 that the Arbitration Agreement provided for Doha, State of Qatar, being the place of arbitration.

## VI.   APPLICABLE LAWS

8   According to Clause 7 of the JVA, sub-clause 7.2, *"[t]his JVA shall in all respects be governed, construed and interpreted in accordance with the laws of the State of Qatar"*.

9   Clause 7 of the JVA was determined to be applicable in respect of the Fire Suppression Alliance Agreement in the First Partial Award[3] and so clause 7.2 is applicable.

10   The applicable procedural law is the Qatar Arbitration Law.

## VII.   PROCEDURAL RULES

11   The present arbitration is conducted in accordance with the mandatory rules of the law of the State of Qatar, the ICC Arbitration Rules in force as from 1st January, 2012, and the Terms of Reference. Where these mandatory provisions are silent and failing a specific agreement between the Parties the proceedings shall be governed by the rules, which the Arbitral Tribunal deems appropriate.

12   The Parties have granted the Arbitral Tribunal the power to implement rules and issue procedural orders on specific procedural issues if and when needed[4].

## VIII.   LANGUAGE OF ARBITRATION

13   According to the Arbitration Agreement, the language of the proceedings is English.

## IX.   TERMS OF REFERENCE (ARBITRATION DEED)

14   The Sole Arbitrator circulated a draft Terms of Reference document on 26 November 2016, subsequent versions of which were discussed by the Parties and the Sole Arbitrator.

15   By email dated 29 November 2016, the Secretariat indicated that on 24 November 2016, the International Court of Arbitration of the International Chamber of Commerce extended the time limit for establishing the Terms of Reference until 28 February 2017 (Article 23(2) of the ICC Rules).

---

[2] Discussed more fully at Section IX hereof, and attached hereto as Attachment 'B'

[3] First Partial Award, ¶ 161

[4] Terms of Reference, Attachment 'B', ¶¶ 51, 52



16 By email dated 27 February 2017, the Secretariat indicated that on 23 February 2017, the International Court of Arbitration of the International Chamber of Commerce extended the time limit for establishing the Terms of Reference until 30 April 2017 (Article 23(2) of the ICC Rules).

17 The Parties continued to discuss the Terms of Reference, which were ultimately signed by both Parties and by the Arbitral Tribunal and dated for reference 21 March 2017. The Terms of Reference document is attached hereto as **Attachment 'B'**.

## X.    THE PARTIES' RELATIONSHIP AND DISPUTE

18 As was set out in the First Partial Award:

18.1    The Claimant and the Respondent entered into a Preliminary Joint Venture Agreement dated 16 October 2011 (the "JVA"[5]) to bid on works in relation to United States Army Corps of Engineers' ("USACE's") tender (through companies such as AMEC or ANHAM) for certain construction on the Blatchford-Preston Complex at the Al Udeid air base in Qatar (the "Project").

18.2    On 11 September 2012, the Respondent submitted to AMEC a "tender in a joint venture with [the Claimant]" for the construction of two billet buildings "including demolition, earthworks, paving and site utilities" on the Project. This bid was rejected and AMEC invited the Respondent to submit a tender in its own name.

18.3    On 1 October 2012, AMEC and the Respondent entered into a contract for the provision of all labour, materials, equipment and supervision in respect of the construction of 2 billet buildings (the "MEP Works"). The Claimant and the Respondent contracted via the Subcontract Alliance Agreement dated 31 January 2013 for the MEP Works (the "MEP Alliance Agreement"[6]).

18.4    On 24 January 2013, AMEC and the Respondent entered into a contract to provide the internal fire suppression construction for the 2 billet buildings ("Fire Suppression Work"). The Claimant and the Respondent contracted via the Subcontract Alliance Agreement dated 1 July 2013 for the Fire Suppression Work (the "Fire Suppression Alliance Agreement").

18.5    The Parties also make reference to the contracts between the Respondent and AMEC. In the MEP Works context, that contract is Subcontract Agreement Number F011900041 dated 1 October 2012, and in the Fire Suppression Works context, it is Subcontract Agreement Number F011900073 dated 24 January 2013. These contracts are referred to in more detail at paragraph 76 herein.

18.6    An alleged dispute arose between the Parties in connection with the Fire Suppression Work and/or the termination or alleged termination of the Fire Alliance Suppression Agreement, and/or the alleged breach of the JVA.

---

[5] The Sole Arbitrator notes he uses the short form "JVA" as that is the short form used by the Parties in that contract.

[6] The Sole Arbitrator notes that the Respondent prefers the use of the short form "MEP Subcontract". The Sole Arbitrator notes that his use of the short form "MEP Alliance Agreement" in this Second Partial Award is used because that that is the name given to those Agreements by the Parties on the face of those Agreements. This same note applies to the "Fire Suppression Alliance Agreement".



## XI. THE PROCEDURAL BACKGROUND TO THE ARBITRATION

19  The procedural steps taken in this proceeding prior to the making of the First Partial Award were set out in that award as follows:

19.1    On 12 May 2016, the Claimant filed with the Secretariat its Request for Arbitration (hereinafter referred to as the "Request"), together with four appendices. As the JVA's arbitration clause stipulated that disputes be heard "by one or three arbitrators appointed in accordance with the [ICC] Rules", Claimant suggested that the dispute be settled by one arbitrator as, *inter alia*, the "sums in issue in the arbitration are relatively modest"[7].

19.2    On 17 May 2016, the Secretariat acknowledged receipt of Claimant's Request and assigned the present case number.

19.3    On 17 June 2016, the Secretariat notified Claimant's Request to Respondent. It invited Respondent to provide its Answer to the Request ("Answer") and to comment on the number of arbitrators and, as the case may be, on Claimant's proposed qualifications for the sole arbitrator in its Answer or any request for an extension of time for submitting its Answer.

19.4    On 13 July 2016, the Respondent requested an extension of time for submitting its Answer to 6 September 2016, and, due to alleged complexity of this dispute, requested an Arbitral Tribunal comprising 3 arbitrators.

19.5    On 20 July 2016, the Secretariat noted Respondent's request and gave a preliminary extension of time until 22 August 2016 for its Answer (asking for the Claimant's position on a further extension), and requested payment of the provisional advance on costs.

19.6    On 23 July 2016 the Claimant sent a letter, dated 22 July 2016, to the Secretariat disagreeing with any further extension of time for the Answer, and restating its position that a sole arbitrator be appointed.

19.7    On 22 August 2016 the Respondent provided its Answer, setting out its jurisdictional plea and restating its position that 3 arbitrators be appointed.

19.8    On 22 August 2016, the Secretariat acknowledged Respondent's Answer and further noted that the provisional advance on costs had been paid. It requested the Respondent to provide comments on the qualifications of suggested nominee and chairperson. By letter dated 30 August 2016 the Respondent provided those requested comments.

19.9    On 1 September 2016, the Secretariat wrote to the Parties informing them that, on the same date, the Court had decided to submit the arbitration to one arbitrator (Article 12(2)) and fix the advance on costs at US $80,000, subject to later readjustments (Article 36(2)), and further invited the Parties to jointly nominate the sole arbitrator by 15 September 2016, failing which the Court would appoint the president.

19.10    On 22 September 2016, the Secretariat wrote to the Parties informing them that, as the parties did not jointly nominate the sole arbitrator, the Court had decided to take the necessary steps for the appointment of the sole arbitrator (Article 13(3)).

19.11    On 8 October 2016, the Secretariat wrote to the Parties informing them that, on 6 October 2016, the Court appointed Ms. Erin Miller Rankin as sole arbitrator upon the Canadian National Committee's proposal (Article 13(3)).

---

[7] Request for Arbitration, ¶ 17(e)

19.12    On 10 November 2016, the Secretariat wrote to the Parties informing them that, on the same date, the Court accepted Ms. Miller Rankin's resignation acting as sole arbitrator (Article 15(1)) and indicated to the Parties that it took the necessary steps for the appointment of the sole arbitrator (Article 13(3).

19.13    On 24 November 2016, the Secretariat wrote to the Parties informing them that, on the same date, the Court appointed Mr Victor P Leginsky as sole arbitrator upon the Canadian National Committee's proposal (Article 13(3)).

19.14    On 25 November 2016, Victor P Leginsky wrote to the Parties informing them of his appointment by the Court as the Sole Arbitrator. He invited the Parties to agree on the date and the formalities of a Case Management Conference.

19.15    On 26 November 2016, Victor P Leginsky wrote to the Parties attaching draft Terms of Reference and draft Specific Procedural Rules for use in the proceedings, requesting the Parties' comments, the Claimant's by 4 December 2016 and the Respondent's by 11 December 2016.

19.16    On 25 January 2017, the first Case Management Conference was held by telephone conference pursuant to Article 24(4) of the ICC Rules.

20    The procedural steps leading up to the making of the First Partial Award, as it was an award on jurisdiction, were set out in that First Partial Award at Section XIV and are hereby incorporated by reference into this Second Partial Award.

## XII.    SUMMARY OF THE PARTIES' POSITIONS ON THE SUBSTANTIVE DISPUTE AND RELIEF SOUGHT ON THE MERITS

21    The Parties have summarized their substantive dispute in the Terms of Reference[8], Attachment 'B' and the same is summarized herein, along with reference to the pleadings.

22    The Agreements in relation to the Project are set out at paragraph 18 of this Second Partial Award.

23    On 16 December 2015 the Respondent sent a "Notice of Termination for Convenience" to the Claimant in relation to the Fire Suppression Alliance Agreement vis à vis the Fire Suppression Works[9].

24    The Claimant claims that the Respondent did not have a right to so terminate the Fire Suppression Alliance Agreement and, even if it did, it could not do so without compensating the Claimant.

25    The Claimant claims:

25.1    That the Respondent has breached the JVA by (i) terminating the Fire Suppression Alliance Agreement while refusing to pay the Claimant its share of the profits under the JVA, and by (ii) taking over or assigning responsibility for the Fire Suppression Works contrary to the express terms of the JVA;

---

[8] Please see Section VII of the Terms of Reference, Attachment 'B'

[9] ¶ 41 Request for Arbitration and its Exhibit 'D'



- 10 -

25.2      That the Respondent's action in terminating the Fire Suppression Agreement without cause or justification, and without compensation, is a breach of its duty of good faith pursuant to Article 172 of the Qatari Civil Code[10] especially as it did so expecting that the Fire Suppression Works were to become more profitable, hoping to keep the profits for itself; and

25.3      That if a right to terminate the Fire Suppression Agreement existed, the exercise of such right without compensation was unlawful pursuant to Article 63 of the Qatari Civil Code as it was calculated to harm or, by its nature, cause excessive or unaccustomed damage to the Claimant, especially in the context of the Respondent not itself having been terminated by AMEC. The Respondent's actions were inappropriate and contrary to the industry norm for joint venture partners in the construction industry and the damage caused to Claimant was excessive and disproportionate.

26 The Claimant's request for relief in these substantive proceedings comprises[11]:

26.1 Respondent shall compensate Claimant for all costs it has incurred to date associated with the performance of the Fire Suppression Work (an amount currently estimated at US$472,000);

26.2 Claimant shall receive 50% of any and all profits that Respondent earns as a result of performing the Fire Suppression Work (an amount currently estimated at US$370,000);

26.3 Declaratory relief in that the Sole Arbitrator should declare that, for the MEP works, BCEC and A&C are to share any profits or losses equally under the JVA.

26.4 Moral damages for Respondent's conduct in violation of Articles 172 and 63 of the Qatari Civil Code in the sum of US$168,400 (being 20% of the sum in issue, an amount falling within the normal contemplation of moral damages), pursuant to Articles 202, 203 and 264 of the Qatari Civil Code;

26.4.1      Interest (including interest on the costs) at such rate and for such a period as the Arbitral Tribunal shall determine;

26.4.2      Claimant's costs of these proceedings, including legal and arbitral fees; and

26.4.3      Such further and other relief as the Arbitral Tribunal finds just and equitable.

27 In respect of the substantive matters, the Respondent states that all aspects of the Parties' relationship has been as contractor/subcontractor (not joint venturers pursuant to the JVA) as the Respondent (not any "joint venture") was awarded the MEP Works and the Fire Suppression Works, and it subcontracted those Works to the Claimant through the MEP Alliance Agreement and the Fire Suppression Alliance Agreement.

---

[10] Law No. 22 of 2004

[11] ¶ 74 Request for Arbitration

28  The Fire Suppression Agreement was terminated for convenience by the Respondent in accordance with clause 29 of the contract between it and AMEC dated 1 October 2012, which the Respondent states is incorporated by reference into the Fire Suppression Agreement and accordingly applies as between the Claimant and the Respondent.

29  The Respondent alleges serious failures by the Claimant in its performance of its duties the Fire Suppression Agreement.

30  The Respondent requested that the Claimant provide details of any legitimate costs incurred as at the date of breach but it states that the Claimant failed to provide any substantiating evidence for such costs.

31  The Respondent denies that the Claimant has any entitlement to the relief sought in the Request.

32  The Respondent, in the substantive proceedings, requests a declaration that the Claimant is not entitled to the relief sought.

## XIII.  THE FIRST PARTIAL AWARD

33  On 12 June 2017 the First Partial Award in this proceeding was rendered and notified to the parties on 15 June 2017 and received by Claimant and Respondent on 18 June 2017.  The Operative Section of the First Partial Award ordered that:

33.1        The jurisdictional objections to the Sole Arbitrator's jurisdiction to hear and decide ICC Case No. 21945/ZF raised by the Respondent Black Cat Engineering & Construction WLL in its Answer to the Request for Arbitration of 22 August 2016 and detailed in its "Respondent's Submissions on the Preliminary Issue of the Arbitrator's Jurisdiction" filed on 16 February 2017 before this Arbitral Tribunal are hereby dismissed.

33.2        The Sole Arbitrator retains jurisdiction to hear and decide the issues remaining in ICC Case No. 21945/ZF.

33.3        The Respondent Black Cat Engineering & Construction WLL shall pay United States Dollars Forty-one thousand one hundred ninety-two (USD 41,192.00) to the Claimant A&C Construction & Installation Co. WLL.[12]

34  As can be seen by the forgoing, the First Partial Award dealt with matters of jurisdiction. These were expressed generally in the First Partial Award as:

34.1        In its Answer, the Respondent stated that the Claimant brought this arbitration pursuant to the wrong contract. It states that the Claimant "mischaracterised the alleged breaches of contract as breaches of the JVA when in fact the dispute arises out of alleged breaches of the sub-sub-contract between A&C and BCEC dated 1 July 2013 for the Fire Suppression Works ("Fire Suppression Contract")"[13].

34.2        The effect of this alleged mischaracterization was that the correct contract did not have an arbitration clause for the resolution of disputes but had a clause remitting the ultimate resolution of disputes to a court[14].

[12] Partial Award in this proceeding dated 12 June 2017, ¶ 224

[13] First Partial Award, ¶ 53

[14] First Partial Award, ¶ 54

- 12 -

34.3      The Respondent explained that this court clause is applicable because the "dispute resolution clause in the Fire Suppression Contract is clause 31, of the contract dated 1 October 2012 between AMEC Environment & Infrastructure Inc. ("AMEC") and BCEC which is incorporated by reference and accordingly applies as between BCEC and A&C"[15].

34.4      The Respondent concluded that as the proper contract under which to resolve the alleged dispute is the Fire Suppression Alliance Agreement, and as that Agreement does not allow for the resolution of disputes by arbitration, the Tribunal is without jurisdiction and any dispute should be resolved by the Qatari courts[16].

35  The Respondent had set out five grounds for challenging the jurisdiction of the Sole Arbitrator in this arbitration and those formed the issues addressed in the First Partial Award. Those five were:

35.1      No dispute has crystallized in respect of the MEP Alliance Agreement. This alleges that a claim for declaratory relief based on the JVA provision that the Parties are to share any profits or losses equally is premature because of the Claimant's failure to notify the Respondent of this;

35.2      The Claimant has commenced this arbitration under the wrong contract (JVA instead of Fire Suppression Alliance Agreement), and that the appropriate contract does not contain an arbitration clause, so the correct forum to resolve the alleged dispute is the Qatari courts, and the Respondent has commenced a case in what it states is the proper forum, the Qatari courts, in relation to a money claim under the MEP Alliance Agreement between the Parties, and that the Claimant has indicated that it intends to commence a counterclaim in that proceeding;

35.3      The Respondent's signatory to the JVA, its General Manager Mr. Adnan Mubarak, did not have the requisite authority to bind the Respondent to the arbitration obligation in the JVA, referring to Article 721 of the Qatari Civil Code, and that the burden of any proof to the contrary lies with the Claimant;

35.4      The last two grounds deal with the termination of the JVA, that is the former that the JVA terminated for an extraneous cause beyond the Parties' control, being AMEC's unforeseen decision not to award the Tendered Works (defined at ¶ 79.1 of the First Partial Award) to a joint venture of the Parties, and the latter that the JVA automatically terminated on the execution of the MEP Alliance Agreement and/or upon the execution of the Fire Suppression Alliance Agreement.

36  As can be seen from the orders made in the First Partial Award, all of those grounds were dismissed, and this proceeding carried on subsequent to the First Partial Award.

37  The procedural background leading to the First Partial Award as set out in that Award is reproduced at Section XIV of that Award and is hereby incorporated by reference into this Second Partial Award. The further procedural background detailing the steps which took place subsequent to the First Partial Award leading to this Second Partial Award are set out in Section XIV below.

---

[15] First Partial Award, ¶ 55

[16] First Partial Award, ¶ 56



- 13 -

## XIV.  THE PROCEDURAL BACKGROUND LEADING TO THIS SECOND PARTIAL AWARD

38  By letter dated 15 June 2017, the Secretariat notified the Parties of the First Partial Award[17] to the Parties.

39  As the determinations of the First Partial Award meant that this proceeding would continue, the Sole Arbitrator asked the Parties to consider appropriate dates for the holding of a second CMC, as had been ordered by P.O. No. 3, paragraph 3[18].

40  On 22 June 2017 the Sole Arbitrator emailed a copy of the First Partial Award to the Office Manager of His Excellency the Minister of Justice of the State of Qatar ("MOJ") in fulfilment of Article 31(11) of the Qatar Arbitration Law[19].

41  On 28 June 2017 the Claimant replied with some convenient dates for the second CMC but on 29 June 2017 the Respondent communicated:

41.1        Requesting sight of the confirmation given to the Tribunal from the MOJ that the recipient of that email was indeed the designated individual at the administrative unit as per Article 31(11) of the Qatar Arbitration Law; and
41.2        Requesting that these arbitral proceedings be suspended as matters relating to the Arbitral Tribunal's jurisdiction had been placed before the Qatari courts and it would avoid potential waste to suspend pending the resolution of such matters in the Qatari courts.

42  By email dated 30 June 2017, the Claimant differed with the Respondent on the matters raised by it on 29 June 2017, indicating that the matter before the Qatari courts would deal only with whether disputes under the MEP Alliance Agreement would be dealt with by arbitration; it being uncontested in the Qatari courts that disputes under the Fire Suppression Alliance Agreement are arbitrable, the second CMC should be set as soon as possible.

43  By email dated 2 July 2017, the Arbitral Tribunal declined to suspend these proceedings, determining that there existed no basis upon which to suspend given that the Respondent itself had submitted[20] that the Qatari court proceedings focus on the MEP Alliance Agreement, allowing this proceeding, focused on the Fire Suppression Alliance Agreement, to continue.

44  In that email of 2 July, the Arbitral Tribunal also proposed a date for the second CMC and asked for the Claimant's position on the Arbitral Tribunal having to provide the confirmation of the MOJ that the recipient of electronic copy of the First Partial Award

---

[17] Letter Ms. Asli Yilmaz dated 15 June 2017

[18] Arbitral Tribunal email to the Parties dated 19 June 2017

[19] That Article states: "The Arbitration Tribunal sends to the administrative unit competent in the arbitration affairs in the ministry [of Justice] an electronic copy of the arbitral award or the resolution ending litigation, if appropriate, within two weeks of its issuance."

[20] Respondent's Submissions 16 February 2017, ¶ 24 in relation to the First Partial Award



was designated individual pursuant to Article 31(11) of the Qatar Arbitration Law. On the same day the Claimant said it was not relevant to ask for confirmation of the MOJ email address to which awards are to be sent, and agreed to the date proposed for the second CMC.

45  On 2 July 2017 the Arbitral Tribunal determined that, from a legal perspective, there is no basis for the request made by the Respondent to provide confirmation of the MOJ of the identity of the recipient of electronic copies of awards pursuant to Article 31(11) of the Qatar Arbitration Law as that law does not require an Arbitral Tribunal to request such confirmation from the MOJ, nor to evidence receipt of such confirmation[21, 22].

46  On 9 July 2017 the Arbitral Tribunal asked the Parties if a proposed second CMC would be held the following day. The Respondent indicated that the Parties were in discussions on "a very serious issue as regards the documentation which it has presented to you and the Respondent in these proceedings" and suggested that "no further steps are taken unless and until this matter is resolved[23]".

47  The Claimant, on the same day, indicated that the matter raised by the Respondent, concerning different versions of the JVA, was not a serious one, and did not merit slowing progress in this proceeding. Out of an abundance of caution, the Arbitral Tribunal postponed the second CMC and directed the Parties to agree on time on either the 18 or 19 July 2017 for it, failing which, the Arbitral Tribunal would order the second CMC[24].

48  On 12 July 2017 the Arbitral Tribunal issued Procedural Order No. 4 ordering the holding of the second CMC by telephone on 19 July 2017 at 4 PM Doha time.

49  On 13 July 2017 the Respondent made an application for the postponement of the second CMC supported by 9 appendices to the effect that the Claimant had proffered different versions of the JVA thereby misleading the Sole Arbitrator.

50  On the same date, the Claimant opposed the further delay of the second CMC, supplying the letter it had sent to the Respondent on 6 July 2017 denying any issue of misleading the Sole Arbitrator or the Respondent in its provision of the JVA in these proceedings.

51  The Arbitral Tribunal, after having reviewed all of the documents, told the Parties by email dated 15 July 2017 that it would proceed with the second CMC as order in P.O. No. 4. However, the Respondent, in an email dated 17 July 2017, indicated that it had filed *"an annulment application in the Qatari courts submitting that the Tribunal has been constituted and a Partial Award in these proceedings has been rendered on the basis of a fraud on the documents"* and that *"any future award [in this proceeding] would also be*

---

[21] Arbitral Tribunal email to the Parties dated 2 July 2017 at 6:21 P.M.

[22] On 11 July 2017 confirmation of the First Partial Award was received from the MOJ of the State of Qatar by means of an email signed, "The administrative unit competent in the Arbitration affairs in the Ministry of Justice", which email was copied to the Parties.

[23] Respondent email dated 9 July 2017 at 8:10 PM

[24] Arbitral Tribunal email to the Parties dated 9 July 2017 at 10:49 P.M.



*jeopardised if it has been obtained by fraud and/or forgery*" (the "**fraud on the documents**" issue). It also indicated that it would not discuss any future conduct of the proceedings in the second CMC.

52  As well, counsel for the Respondent was unavailable for the time set for the second CMC due to a hearing in London. Several email communications over the following 2 days succeeded in obtaining agreement to hold the second CMC on 26 July 2017, and P.O. No. 5 was issued on 19 July 2017 ordering that second CMC for that date.

53  The other aspect to be determined in the organizing of the second CMC was the role that the Respondent would play in that meeting. As it had indicated that it would discuss the "fraud on the documents" issue but not any future conduct of the proceedings[25], the Arbitral Tribunal queried if the Respondent would at least maintain a listening brief during the telephone CMC. After consultation with the Parties, it was determined that the Respondent would remain on the entirety of the telephone CMC, but simply not take part in the discussion of the next steps in the proceeding[26].

54  The second CMC took place by telephone as ordered on 26 July 2017. Discussed were the "fraud on the documents" matter as well as further steps to be taken in the proceeding.

55  As the Respondent had raised the "fraud of the documents" issue, a process for determining that issue was embarked upon. Ultimately, after that process, P.O. No. 6 was issued determining that issue. The steps taken in arriving at P.O. No. 6 are set out in the following chart, which was created by the Sole Arbitrator for another purpose[27]:

| Item # | Date (2017) | From/To[28] | Communication or Event |
|---|---|---|---|
| 1 | 9 July | T to Ps | Request to commit to dates for 2nd CMC |
| 2 | 9 July | R to T cc C | Request no further steps pending very serious issue re: documentation presented by C to T & R in these proceedings |
| 3 | 9 July | C to T cc R | Disagreed with stay of proceedings; set out C's view of the basics of R's contentions of the JVA as attached to the Alliance Agreements |
| 4 | 9 July | T to Ps | Parties to discuss the issue over the next couple of days; delay 2nd CMC by phone to either 18 July or 19 July; Ps to agree a time on either day by c.o.b. 11 July 2017. Failing agreement by that time, Procedural Order would issue for 2nd CMC by phone on either 18 July or 19 July at a particular time |

---

[25] Respondent email 20 July 2017 2:47 P.M.: "The reasons for postponing any further consideration of the procedural timetable in the light of the serious allegations raised above, were highlighted in the Respondent's letter to the Tribunal of 13 July 2017" and concerned the "fraud on the documents" issue.

[26] Respondent email 20 July 2017 5:53 PM

[27] As discussed below, on 9 October 2017 the Respondent filed a challenge to the Sole Arbitrator pursuant to Article 14 of the ICC Rules 2012. This chart was part of a letter dated 12 October 2017 sent by the Sole Arbitrator to the Secretariat.

[28] The abbreviations used in the chart are C= Claimant; R = Respondent; Ps= Parties; T= Arbitral Tribunal; CMC = Case Management Conference; cc= copied; PO = Procedural Order; c.o.b = close of business; App "" = Appendix to this Challenge with corresponding letter; item # = items from this list by corresponding number; arb = arbitration



| 5 | 12 July | T to Ps | PO No. 4 issued ordering 2nd CMC by phone on 19 July at 4 PM Doha time |
|---|---|---|---|
| 6 | 13 July | C to T & R | Dial-in numbers for the 2nd CMC |
| 7 | 13 July | R to T cc C | Letter (App "G") setting out R's position on the JVA's attachment to the Alliance Agreements, with 9 attachments: App "E", App "F", Fire Suppression subcontract JVA ICC version, MEP subcontract JVA ICC version, MEP subcontract JVA BCEC original version, Fire Suppression subcontract JVA BCEC original version, MEP subcontract JVA BCEC US court version, Fire Suppression subcontract JVA BCEC US Court version, C's email item #3; Remedy requested by Respondent was only that T *"postpone any CMC pending consideration of this, obviously serious, development"*. |
| 8 | 13 July | C to T cc R | Reject call to postpone 2nd CMC as no grounds demonstrated for so doing; attached its letter App "F" |
| 9 | 15 July | T to Ps | After review of documents at item #7 refused to postpone 2rd CMC, indicating that T and Ps would *"discuss the JVA issue as well as set the steps necessary to continue with this matter"* during the 2nd CMC |
| 10 | 17 July | R to T cc C | (1) Asked T if T comprehended the seriousness of this matter & T's duty to render an enforceable award; (2) disclosed an application to Qatari courts *"that the Tribunal has been constituted and a Partial Award in these proceedings has been rendered on the basis of a fraud on the documents"* (3) sought clarification of the purpose of 2nd CMC saying that R *"will not be prepared to discuss the future conduct of the proceedings as part of that telephone hearing"* (4) indicated that Counsel for the R was busy in ICC arb in London; requested 2nd CMC weekdays after 6pm (GMT) and on Sundays |
| 11 | 17 July | C to T cc R | Requested 2nd CMC proceed as ordered; indicated that a CMC can proceed in a party's absence so long as minutes are taken and the absent party can comment on those minutes |
| 12 | 18 July | T to Ps | In clarification of content of 2nd CMC, *"Naturally I would be pleased to hear from both Parties to gain a better understanding of the JVA issue as well as to indicate my understanding of it so far for the Parties comment. However, we also do need to discuss the future conduct of these proceedings as part of that CMC as this arbitral proceeding is proceeding"*; asked if R would stay on the call while future conduct of proceedings were discussed |
| 13 | 18 July | R to T cc C | Would take instructions on remaining on 2nd CMC call while future conduct of proceedings were discussed; requested postponement until Sunday 23 July due to matter raised at item # 10 ¶ (4) |
| 14 | 18 July | C to T cc R | Unavailable on Sunday 23 July, but available after 4pm Doha time on the 25th, 26th or 27th July |
| 15 | 18 July | T to Ps | Asked if Ps available 26 July for 2nd CMC |
| 16 | 18 July | R to T cc C | Asked if 6pm UK / 8pm Doha time on Wednesday 26 July would be a suitable time for all parties for 2nd CMC |
| 17 | 19 July | C to T cc R | C agreed to time & date at item # 16 |
| 18 | 19 July | T to Ps | PO No. 5 issued ordering 2nd CMC by phone on 26 July at 8 PM Doha time |
| 19 | 20 July | T to Ps | Asked for clarification as to participation in 2nd CMC so that proper minutes could be taken if a P was to be absent |
| 20 | 20 July | R to T cc C | R would be on 2nd CMC *"for the purpose of dealing with the allegation raised in its letter to the Claimant of 6 July 2017* [App "F"] *and to the Tribunal of 13 July 2017 (namely the allegation that these proceedings have been constituted - and a Partial Award rendered - on the basis of a misrepresentation and/or a fraud on the* |



| | | | |
|---|---|---|---|
| | | | *documents)*" but would "*not be participating any further for the purpose of timetabling the future conduct of these proceedings. However, as part of the discussion referred to above we will make submissions as regards the options available to you. The reasons for postponing any further consideration of the procedural timetable in the light of the serious allegations raised above, were highlighted in the Respondent's letter to the Tribunal of 13 July 2017 [App "G"]*" |
| 21 | 20 July | T to Ps | Asked if R would remain represented on the call on the call while future conduct of proceedings were discussed, to ascertain if transcribers were to be retained to make proper minutes on that portion of the call if R was to be absent |
| 22 | 20 July | R to T cc C | Confirmed it would remain on the entirety of the call to avoid transcribers but would not participate in the future conduct of proceedings portion |
| 23 | 26 July | T, C & R | 2rd CMC took place by telephone |
| 24 | 27 July | R to T cc C | R expressed willingness to put its submissions (both in terms of the facts, substantive law and procedural rules upon which it relies) in written form; requested a time frame for this |
| 25 | 28 July | C to T cc R | On the issue of the fraud on the documents, proposed T enter a second Partial Final Award dealing with the matter |
| 26 | 29 July | R to T cc C | R intends to provide submissions in response on the issue of the fraud on the documents no later than Tuesday 1 August 2017 |
| 27 | 29 July | T to Ps | Confirmed intention of R to provide its submission on the issue of the fraud on the documents no later than Tuesday 1 August 2017; asked it to also provide its position on other matters unrelated to that issue but related to further steps in the proceeding |
| 28 | 2 August | R to T cc C | Due to unforeseen circumstances submissions would be served later |
| 29 | 2 August | T to Ps | Acknowledged the information in item # 28; indicated that T looked forward to R's responsive submission |
| 30 | 2 August | R to T cc C | Email read: "*As promised (and with apologies for the slight delay compared with the anticipated date of service), please find attached : (i) the Respondent's responsive submissions on procedure; and (ii) exhibits*" sent by a large file delivery service, Mimecast |
| 31 | 27 August | T to R cc C | Request for re-initiation of the Mimecast delivery of R's responsive submission as, due primarily to vacation abroad, T had been unable to extract the files |
| 32 | 28 August | R to T cc C | Email read: "*Dear Sir, Please find attached the requested documents. Kind regards*". Remedy requested by Respondent was as follows: "7. CONCLUSION<br>*The Respondent is not requesting that the Arbitrator make a finding of fraud. That requires proper process and is a matter that can only be determined by the Qatari Courts. Instead, the Respondent requests that the Tribunal resign as they can no longer fulfil their duties under the Rules to ensure that:*<br>*7.1.1 The Award is enforceable (Article 41 of the Rules);*<br>*7.1.2 The Tribunal acts 'with a lack of impartiality or independence' given that the alternative is to proceed with the arbitration in full knowledge that the Claimant has misled the Tribunal (see grounds for removing arbitrator at Article 14(1) of the Rules).*<br>*7.2 At the very least, the Respondent requests that the Tribunal suspend these proceedings pending determination of the question of fraud on the documents by the domestic Qatari courts during the course of the existing annulment proceedings filed on 16 July 2017.*<br>*7.3 It is also open to the Tribunal to issue a Final Award dismissing the claims, should the Tribunal conclude that, in light of the*" |



| | | | *Claimant's conduct, it is not possible to continue to conduct a fair arbitration.*<br>*7.4 In any event, the Respondent invites the Tribunal to dismiss the Claimant's application for a second 'Final Partial Award', which would require the Tribunal to determine a matter that is currently before the Qatari courts.*<br>*7.5 The Respondent makes no comment on the Claimant's application for the determination of a preliminary issue, namely whether the Respondent had a lawful right to terminate the Fire Suppression Alliance Agreement for convenience. As confirmed during the call on 26 July 2017, the Respondent has no instructions to continue with these arbitral proceedings. No admission is thereby made in respect of the Claimant's allegation that the termination of the Fire Suppression Alliance Agreement was unlawful".* |
|---|---|---|---|
| 33 | 30 August | C to T cc R | Email read: *"As a courtesy, we attach hereto our internal rough translation of the challenge to your jurisdictional award that was filed in the Qatar court by BCEC. We would be happy to respond to the materials re-submitted by BCEC, should the Tribunal find it helpful. Claimant's position remains that the Tribunal should simply issue an additional partial award to put an end to BCEC's continued efforts to frustrate these proceedings".* |
| 34 | 30 August | T to Ps | Email read: *"I am in receipt of the email below, and its attachment. I would appreciate the response offered by the Claimant, and to aid that I attach a reply sheet. On that sheet I have reproduced the Respondent's submissions with a few notes and a few questions that I would like the Claimant to address. Certainly the Claimant is not restricted to answering those questions; it can submit as it sees the necessity to so do. I would appreciate a response by 6 September 2017. Thank you all for your kind attention to this matter".* |
| 35 | 6 September | C to T cc R | Email read: *"Per your request, attached please find Claimant's responses to Respondent's arguments and the Tribunal's questions regarding Respondent's attempt to re-argue the issue of whether the Tribunal has jurisdiction in this matter. Claimant's new additions are in red red and in italics".* |
| 36 | 6 September | T to Ps | Email read: *"I am in receipt of the Claimant's Responses of today 6 September 2017 to the Respondent's 'Response To Claimant's Submissions Regarding Next Procedural Steps', dealing with the alleged fraud matter, dated 2 August 2017. I do not require any further submissions on this matter, and will determine this issue shortly. Thank you all for your kind attention to this matter".* |
| 37 | 10 September | T to Ps | Delivery of PO No. 6 |

56 On 12 September 2017, the Arbitral Tribunal asked the Parties to address the next steps in the proceeding by 17 September 2017. The Claimant had earlier proposed that a preliminary legal issue be briefed and decided[29], given that certain matters are before the Qatari courts bearing on this proceeding[30], progress could be made while the courts

---

[29] Claimant's submission regarding proposed next steps, 28 July 2017

[30] At the time the Claimant made this proposal, only the proceeding considering if disputes under the MEP Alliance Agreement were arbitrable; since that time the Respondent indicated that it had filed "an annulment



decide these matters. Claimant stated the issue as: "whether, as a matter of law, Respondent was entitled to terminate the Fire Suppression Alliance Agreement for convenience without compensating Claimant for its resulting lost profits" (the "**Preliminary Legal Issue**"). The Arbitral Tribunal asked the Parties to agree with this approach, or come up mutually with another approach to progress this matter.

57  On 17 September 2017 the Claimant wrote that the Respondent had been unresponsive to its letters in regard to next steps, and asked the Arbitral Tribunal to order next steps.

58  On 18 September 2017 the Arbitral Tribunal wrote once again to the Parties indicating that the determination of the preliminary legal issue seems an efficient approach but, before ordering that step, that the Respondent provide its views by 20 September 2017. On 20 September 2017 the Respondent replied: "Dear Sir, the Respondent will not be taking any further active part in these proceedings".

59  On 24 September 2017, the Arbitral Tribunal directed the Parties to submit briefs on the Preliminary Legal Issue, with the Claimant submitting on 5 October 2017, the Respondent on 2 November 2017 and the Claimant on 16 November 2017.

60  The Claimant asked for an extension of time for its first submission, ultimately granted to 12 October 2017, with the remaining submissions extended accordingly.

61  As alluded to above, on 9 October 2017, the Respondent filed a challenge to the Sole Arbitrator pursuant to Article 14 of the ICC Rules 2012. The Parties and the Sole Arbitrator filed comments on that challenge pursuant to Article 14(3) of the ICC Rules 2012, and, on 26 October 2017, the ICC Court decided that the challenge against the Sole Arbitrator was admissible but was rejected on the merits pursuant to Article 14(3) of the ICC Rules 2012.

62  The Claimant filed its first submission on the Preliminary Legal Issue on 13 October 2017. As it was filed slightly after the deadline, the Arbitral Tribunal allowed the Respondent until 12 November 2017 to file its submission.

63  On 9 November 2017, the Respondent indicated that it had changed its counsel from Pinsent Masons LLP to Squire Patton Boggs (MEA) LLP. Due to such change it requested an extension of time to file its submission on the Preliminary Legal Issue. The Claimant agreed to an extension to 23 November 2017, and the Arbitral Tribunal amended its direction in that regard on 10 November 2017 by email.

64  In an email dated 12 September 2017 the Claimant had proposed having an opportunity to provide a reply submission. On 2 December 2017 the Sole Arbitrator canvassed the Parties as to any agreement on this and on 3 December 2017 new counsel for the Respondent indicated that it had no objection to Claimant's reply submission being due two weeks after Respondent's submission. The Claimant's Reply Submission was received on 14 December 2017.

---

application in the Qatari courts submitting that the Tribunal has been constituted and a Partial Award in these proceedings has been rendered on the basis of a fraud on the documents": Respondent email 17 July 2017



65  No further requests to make submissions in respect of the Preliminary Legal Issue were received from either Party.

66  On 30 January 2018 the Sole Arbitrator, by email, noted for the Parties Article 31(4) of the Qatar Arbitration Law requiring that "awards" (without distinguishing amongst interim, partial or final awards) have an order as to costs unless the parties otherwise agree. In that email the Sole Arbitrator asked if there was Party agreement for a deferral of costs of this Second Partial Award to the Final Award.

67  By emails dated 30 January 2018 and 1 February 2018 respectively, the Claimant and Respondent gave differing views on the question of deferring costs. Therefore, by email dated 1 February 2018 the Sole Arbitrator directed each Party to provide its costs submissions pertaining to the Preliminary Legal Issue, together with evidence of those costs being paid, by 7 February 2018.

68  Both Parties made costs submission on 7 February 2018, with the Claimant making a supplementary costs submission on 8 February 2018.

69  On 22 March 2018, the ICC Court extended the time limit for rendering the final award until 30 April 2018 pursuant to ICC Rules Article 30(2).

## XV.  THE LEGAL ISSUE TO BE DETERMINED IN THIS SECOND PARTIAL AWARD

70  As set out above the legal issue to be determined in this Second Partial Award is the Preliminary Legal Issue: whether, as a matter of law, Respondent was entitled to terminate the Fire Suppression Alliance Agreement for convenience without compensating Claimant for its resulting lost profits.

71  The Sole Arbitrator clarifies that, if the Claimant is successful in being awarded the declaration that it seeks, the Claimant will still have to prove that it suffered lost profits. For this reason, the Sole Arbitrator recasts the legal issue slightly as, "whether, as a matter of law, Respondent was entitled to terminate the Fire Suppression Alliance Agreement for convenience without compensating Claimant for any resulting lost profits which may be proven to have been suffered".

72  A further analysis of the issues to be determined in this Second Partial Award is set out at Section XX below.

## XVI.  RELEVANT DOCUMENTS FILED AND REVIEWED

73  The following submissions and documents have been filed in these proceedings in respect of the Preliminary Legal Issue:

| No. | Document | Date |
|-----|----------|------|
| i. | Claimant's Submission Regarding Preliminary Legal Issue and Exhibits | 12 October 2017 |
| | Claimant's Exhibit A - JVA | |

|      | Claimant's Exhibit B – Fire Suppression Alliance Agreement |                  |
| ---- | ------------------------------------------------------------ | ---------------- |
|      | Claimant's Exhibit C – Termination Notice |                  |
|      | Claimant's Exhibit D – Paul Fisher Article |                  |
|      | Claimant's Exhibit E – Pinsent Masons Article |                  |
| ii.  | Respondent's Submission Opposing Claimant's Proposed Preliminary Legal Issue and Exhibits | 23 November 2017 |
|      | Respondent's Exhibit 1 - Claimant's 7 June 2017 Complaint filed in the United States District Court for the Northern District of Illinois |                  |
|      | Respondent's Exhibit 2 - Claimant's 16 July 2017 Amended Complaint filed in the United States District Court for the Northern District of Illinois |                  |
|      | Respondent's Exhibit 3 - 5 June 2013 email |                  |
|      | Respondent's Exhibit 4 - Overview of Alliance Commercial Summary, 3 pages, each with a diagram |                  |
|      | Respondent's Exhibit 5 - email exchange 20-23 November 2013 |                  |
|      | Respondent's Exhibit 6 - 19 February 2014 email |                  |
|      | Respondent's Exhibit 7 - 22 April 2014 Claimant email |                  |
|      | Respondent's Exhibit 8 - 23 April 2014 Claimant's principal's email |                  |
|      | Respondent's Exhibit 9 - 13 February 2016 Claimant email |                  |
| iii. | Claimant's Reply | 14 December 2017 |
| iv.  | Claimant's Costs Submissions with Appendices 'A' and 'B' | 7 February 2018  |
| v.   | Respondent's Costs Submissions with Exhibit 'A' | 7 February 2018  |
| vi.  | Claimant's Supplementary Costs Submissions with ICC Letter dated 17 May 2017 and Wire Confirmation | 8 February 2018  |

74  All of the above submissions and documents have been fully reviewed by the Sole Arbitrator.

## XVII. CLOSURE OF PROCEEDINGS

75  The Tribunal declared the proceedings closed on 19 March 2018 pursuant to Article 27 of the ICC Rules in relation to Preliminary Legal Issue: whether, as a matter of law, Respondent was entitled to terminate the Fire Suppression Alliance Agreement for convenience without compensating Claimant for any resulting lost profits which may be proven to have been suffered.

## XVIII. RELEVANT CONTRACTUAL AND STATUTORY PROVISIONS

76  The contractual documents referred to by the Parties in this case include the following provisions:

76.1       The JVA, provisions of which include (apart from the Arbitration Agreement, reproduced above):

"*3: Execution of the Project*

*3.1 The Parties agree that the Project Works and the Project shall be carried out as follows:*



...

*3.3 Although the intention is to identify the responsibilities of each party the JV will be fully integrated and BCEC and A&C shall share any resultant profits/ losses equally.*

*3.4 Neither Party shall be entitled to assign any of the rights or obligations under this JVA without the prior written consent of the other Party.*

...

*6. JVA Term and Termination*

*6.1 This JVA shall commence the Effective Date and shall continue in full force and effect until its expiry or termination in accordance with Clause 6.2.*

*6.2 This JVA shall automatically terminate on any of the following events:*

*i. The decision by the Parties not to submit a Proposal to the Client;*
*ii. The Contract is awarded by the Client to a third party;*
*iii. The Parties enter into the JV Agreement."*

76.2     Fire Suppression Alliance Agreement[31] which is headed, "THIS ALLIANCE AGREEMENT BY DEED is made the 1st day of July, 2013", at its Clause 2 – Documents forming part of the Agreement[32]:

*"1. Overview of Alliance Commercial Summary in 3 No. Pages.*
*2. AMEC Subcontract Agreement Number FGI1900073 (rev.01 November 2011 in 18 No. Pages.*
*3. Exhibit 1 Statement of Work for Fire Protection in 14 No. Pages.*
*4. Exhibit 2 Prime Contract Flow Down Provisions under W912ER-11-D-002 in 43 No. Pages.*
*5. Exhibit 3-BCEC & A&C Tender Programme in 6 No. Pages dated 19th December 2012.*
*6. Exhibit 4 – Price Schedule as Main Contract between BCEC and AMEC.*
*7. Exhibit 5 - Documentation Acknowledgment.*
*8. Exhibit 6 Representations and Certifications document in 10 No. Pages.*
*9. AMEC Subcontractor Health, Safety and. Environmental (HSE) Loss Prevention Policy, December 2011 in 9 No. Pages.*
*10. Exhibit 8 Synchronized Pre-deployment & Operational Tracker (SPOT) Reporting Requirements in 3 No. Pages.*
*11. BCEC letter referenced 355120006·CH·3998 & 3999/AMEC/F/6 dated 17th December, 2012 in 2 No. Pages*
*12. A&C Construction & Installation Co. WLL quotation letter ref AC/12-0244/MSC/O dated 17th December 2012*
*13. Preliminary Joint Venture Agreement dated 16th October, 2011 in 3 No. Pages."*

76.3     BCEC/AMEC Contract:

76.3.1  Clause 29 of the BCEC/AMEC contract:

*"TERMINATION FOR CONVENIENCE*

---

[31] Attachment 'C' to the Request for Arbitration

[32] This list is set out at pages 2 and 3 of the Agreement



- 23 -

*AMEC may, at its sole discretion, terminate the Services for its own convenience at any time. Where Subcontractor is not in default hereunder, AMEC agrees to pay Subcontractor for all work done in conformity with the requirements of this Agreement up to the date when the Agreement is terminated. In such event, Subcontractor shall only be entitled to compensation for Services satisfactorily performed, and shall not be entitled to anticipated profit on Services not performed."*

### 76.3.2 Clause 31 of the BCEC/AMEC contract:

*"Any dispute arising hereunder shall first be resolved by taking the following steps where a successive step is taken if the issue is not resolved at the preceding step: 1) by the technical and contractual personnel for each party performing this Agreement, 2) by executive management of each party, 3) by mediation, or 4) through a court system of competent jurisdiction."*

### 76.3.3 Clause 42 of the BCEC/AMEC contract:

*"This Agreement is to be governed by and construed in accordance with the laws of the state of AMEC's office entering into this Agreement as designated in the introductory paragraph of this Agreement and any action instituted for the enforcement of this Agreement shall be resolved only in the federal or state courts of that state. In the event that any of the provisions, portions, or applications of this Agreement is held to be unenforceable or invalid by a court of competent jurisdiction, the parties shall negotiate an equitable adjustment in the provisions of this Agreement with a view toward effecting the purpose of this Agreement. The validity and enforceability of the remaining provisions, portions, or applications shall not be affected."*

76.4    Subcontract Minutes of Meeting:

*"4.11 Settlement of Disputes*
*4.11.1 As per the provision in accordance the Main Contract between BCEC and AMEC Infrastructure & Environment Inc."*

77 The statutory provisions from the Qatar Civil Code referred to by the Parties are:

77.1    Article 707: *"The employer may withdraw from the contract and stop the work at any time prior to its completion, provided that the contractor shall be indemnified for all expenses incurred, all works completed, and any profit he could have made had the work been completed"*;

77.2    Article 263: *"1. The court shall calculate the indemnity unless such calculation is provided in the contract or by the law. 2. Indemnity shall cover damages incurred by the obligee, including loss of profit, provided that such damages or loss of profit are a natural consequence of the obligor's failure or delay to perform the obligation. Damages shall be deemed consequential if they were reasonably foreseeable or within the contemplation of the parties at the time of the conclusion of the contract."*

77.3    Article 169: *"Where the wording of the contract is clear, it shall not be capable of deviating from or construing the intent of the contracting parties. Where a contract must be construed, the common intention of the parties shall be sought without restriction to the literal meaning of the words, taking into account the nature of the transaction as well as the honesty and confidence that should prevail between the parties in accordance with commercial custom."*



- 24 -

77.4     Article 170: "1. *Any doubt in the wording of the contract shall be interpreted in favour of the obligor. 2. However, where the contract contains a clause discharging a party from liability, such provision shall be construed narrowly*";

77.5     Articles 183 and 184: "1. *In contracts binding on both parties and imposing reciprocal obligations (synallagmatic contracts), where one of the parties fails to perform his obligation, the other party may, upon formal notice to the former, demand performance of the contract or its rescission, and may claim any damages caused by such failure to perform. 2. The judge may, mutatis mutandis, determine a period of grace within which the obligor shall perform his obligation. The judge may also reject the application for rescission if the obligation not performed is insignificant compared with the obligations considered in their entirety.*" …(184) "1. *The parties may agree that, in the case of a failure to perform the obligations arising from the contract, such contract shall be deemed to have been rescinded ipso facto without a court order. 2. Such an agreement may not limit the authority of the judge to terminate the contract, unless the wording of the contract expressly indicates that this is the parties' mutual intention. 3. Other than in commercial transactions, an agreement to deem a contract rescinded ipso facto shall not release the parties from the obligation of serving a formal notice. Any agreement between the parties to the contrary shall be void.*"

## XIX. THE PARTIES' CASES ON THE PRELIMINARY LEGAL ISSUE AND RELIEF SOUGHT

### A. CLAIMANT'S SUBMISSIONS

78 As set out above, each Party made a submission on the Preliminary Legal Issue. The Claimant's position can be summarized as set out below.

79 The claim was brought because the Respondent, in the words of the Claimant, "…*attempted to terminate [the Claimant] from certain Fire Suppression works in connection with the construction of certain billets [in respect of the Project] and has refused to pay [the Claimant] its anticipated profits for those works*…[33]".

80 The claim was brought under the JVA[34] and the Fire Suppression Alliance Agreement[35], as the allegation flowed from the purported termination for convenience of the Claimant from the Fire Suppression works.

81 The letter of termination for convenience or "Termination Notice"[36] used the "Termination for Convenience" clause[37] in the contract between the Respondent and

---

[33] Request for Arbitration ¶ 1

[34] Submission 12 October 2017, ¶¶ 3-6

[35] Submission 12 October 2017, ¶¶ 8-10

[36] First two paragraphs of Respondent's letter dated 16/12/2015, attached as Exhibit 'C' to the 12 October 2017 Submission

[37] Clause 29 of AMEC Subcontract Agreement No. F011900073: "AMEC may, at its sole discretion, terminate the Services for its own convenience at any time. Where Subcontractor is not in default hereunder, AMEC agrees to pay Subcontractor for all work done in conformity with the requirements of this Agreement up to the date when the Agreement is terminated. In such event, Subcontractor shall only be entitled to compensation for Services satisfactorily performed, and shall not be entitled to anticipated profit on Services not performed.



AMEC, the main contractor, to terminate the Claimant under the Fire Suppression Subcontract Alliance Agreement:

> *"We refer to Clause 29 of the 24th January 2013 Subcontract Agreement between AMEC ('AMEC Environment & Infrastructure Inc') and Black Cat ('Black Cat Engineering & Construction WLL') (Number F011900073), which is incorporated into the 1ˢᵗ July 2013 Subcontract Alliance Agreement for the Fire Suppression Works.*
>
> *This letter constitutes formal notification that Black Cat hereby invokes Clause 29 of the Subcontract. Effective immediately, the Fire Suppression Subcontract Alliance Agreement (dated 1ˢᵗ July 2013) is terminated."*

82  The Claimant argues that the Respondent was not legally entitled to use the "Termination for Convenience" clause because:

82.1      The clause refers on its face to "AMEC" and "Subcontractor" defined[38] in that agreement as "Blackcat Engineering & Construction W.L.L.", not to the Claimant[39];

82.2      There is no language in the Fire Suppression Alliance Agreement allowing the Respondent such a right vis à vis the Claimant[40];

82.3      While AMEC Subcontract Agreement No. F011900073 is incorporated into the Fire Suppression Alliance Agreement, all of its terms are not stated to be applicable on a "back-to-back" basis to apply *mutatis mutandis* to the Claimant and Respondent:

> *"Moreover, there is no term in the Fire Suppression Alliance [Agreement] which states that BCEC (as opposed to AMEC) has the right to terminate A&C (as opposed to BCEC) for convenience without entitlement to anticipated profits. Indeed, there is no term in the Fire Suppression Alliance which purports to give BCEC the rights vis a vis A&C that AMEC has vis a vis BCEC under the AMEC-BCEC Subcontract. There is not even a provision in the Fire Suppression Alliance stating that the AMEC-BCEC Subcontract is incorporated on a "back to back" basis (which itself would likely be insufficient). Thus, Article 29 of the AMEC-BCEC Subcontract, which expressly sets forth only AMEC's right to terminate BCEC for convenience, does not vest any rights in BCEC to terminate A&C for convenience without entitlement to anticipated profits"[41];*

82.4      To the contrary, argues the Claimant, the Parties are bound by the JVA, and the Parties contracted to share all profits equally under the JVA[42];

---

Where Subcontractor's services have been so terminated by AMEC, said termination shall not affect any rights of AMEC against Subcontractor then existing or which may thereafter accrue. Any retention or ·payment of moneys due Subcontractor by AMEC will not release Subcontractor from liability".

[38] First paragraph of AMEC Subcontract Agreement No. F011900073

[39] Submission 12 October 2017, ¶¶ 24-25

[40] Submission 12 October 2017, ¶ 26

[41] Submission 12 October 2017, ¶ 28

[42] Submission 12 October 2017, ¶¶ 17 -21

- 26 -



82.5    The JVA does not have a "termination for convenience" clause allowing a party to terminate the JVA without paying expected profits[43].

83  There were only three circumstances under which the JVA was terminable not including for convenience[44]:

> "*To the contrary, the JVA is fully incorporated in the Fire Suppression Alliance and, as set forth above, under that agreement A&C and BCEC expressly agreed that A&C would be responsible for all Project works and that A&C's right to perform the works on the Project could not be assigned to another party without A&C's written consent. Further, under the JVA, A&C and BCEC agreed to the limited circumstances under which the Parties' Alliance could be terminated, and they did not agree that it could be terminated for convenience without entitlement to anticipated profits*"[45].

84  The Claimant goes on to argue that as the contractual matrix of the Fire Suppression Works did not include a "termination for convenience" clause, Qatari law[46] prevails over the termination. If it is seen as an employer withdrawing from the contract prior to completion, then Article 707 applies, binding the employer to pay "*…any profit [the contractor] could have made had the work been completed*". If it seen as a breach of contract, then Article 263 again binds the breaching party to pay the lost profit.

85  Further, in respect of Qatari law, the Claimant states that there is no ambiguity in the contractual matrix- it is clear that the Respondent has no right to terminate the Fire Suppression Alliance Agreement for convenience and not pay the Claimant's lost profits[47]. However, if there is some ambiguity, the Arbitral Tribunal would interpret the contractual matrix in line with the mutual intention of the Parties[48].

86  As well, the Claimant argues that pursuant to Qatari Civil Code Article 170(2), an Arbitral Tribunal must construe narrowly any provision purporting to discharge a party from liability under a contract.

87  The Claimant concludes that, "*Respondent is obligated to pay Claimant's lost profits in the event of a termination for convenience*" and "*… requests that the Tribunal make a finding in Claimant's favor on this preliminary legal issue*"[49].

### B.    RESPONDENT'S SUBMISSIONS

88  The Respondent filed its written Submission on the Preliminary Legal Issue dated 23 November 2017 ("**Respondent's Submission**"). For ease of analysis, the Claimant's

---

[43] Submission 12 October 2017, ¶ 20

[44] Submission 12 October 2017, ¶¶ 19-20

[45] Submission 12 October 2017, ¶ 27

[46] References to the Qatari Civil Code

[47] Qatari Civil Code Article 169(1)

[48] Qatari Civil Code Article 169(2)

[49] Submission 12 October 2017, ¶ 34



Reply Submission of 14 December 2017 ("**Claimant's Reply**") is dealt with in this section as well.

89  The Sole Arbitrator notes that the Respondent's Submission was made "*Under Protest*" "*...and without waiver of its position that jurisdiction in this matter is wrongly held*"[50]. However, no applications are before the Sole Arbitrator in relation to this reservation.

90  As its initial position, the Respondent argues that the Preliminary Legal Issue cannot be resolved by a preliminary legal determination[51], to a large extent, because, in the Respondent's submission, the contractual provisions necessary to construe are too complex and too interrelated to lend themselves to the determination of a discrete legal question.

91  The Respondent argues that the Subcontract Minutes of Meeting were actually included in the contractual matrix of the agreement for the Fire Suppression Works. It argues that "*[i]n identifying what comprised the Fire Suppression Alliance Agreement, the Tribunal specified, "As set out at the top of page 2 of that agreement, 'This Alliance Agreement is made 31st day of January, 2013 between [the Parties].'"However, contrary to the Tribunal's finding of exclusion, the list associated with the Alliance Agreement by Deed made 31st day of January, 2013 expressly includes the Subcontract Minutes of Meeting" that the contractual matrix of the includes the Subcontract Minutes of Meeting*[52]".

92  The Claimant describes the arguments underlying the Respondent's submission generally as an attempt to re-litigate matters, which have been determined in the First Partial Award[53]. It characterizes the quote in italics in paragraph 91 above as disclosing a "scrivener's error[54]" in which the Sole Arbitrator, in describing the heading of the Fire Suppression Alliance Agreement wrote "1st day of January, 2013" [the heading for the MEP Alliance Agreement] instead of the correct heading "1st day of July, 2013.

93  The Respondent goes on to argue that the Claimant has been inconsistent in its various submissions as to what documents comprised the contractual matrix of the Fire Suppression Alliance Agreement. In its Request for Arbitration in this proceeding, it comprised 113 pages; in its 7 June 2017 Complaint filed in the United States District Court for the Northern District of Illinois it comprised 106 pages; then on 16 July 2017 it amended that United States District Court for the Northern District of Illinois filing so that the Fire Suppression Alliance Agreement comprised 112 pages[55].

---

[50] Respondent's Submission 23 November 2017 page 1

[51] Respondent's Submission 23 November 2017 Section III, pp. 2-8

[52] Respondent's Submission 23 November 2017, ¶ 7

[53] Claimant's Reply ¶¶ 1 - 4

[54] Claimant's Reply ¶ 2

[55] Respondent's Submission 23 November 2017, ¶¶ 8-11



94  The Respondent states that, in its view, the 112-page version most recently submitted by the Claimant is the "official version" and includes the words in "3 No. pages" to describe the JVA excluding the termination and arbitration clauses of the JVA[56].

95  The Respondent points out that "*it has never been disputed that the pages containing the Termination for Convenience clause 29, dispute resolution clause 31 (court of competent jurisdiction), and governing law and venue clause 42 (Pennsylvania, U.S.A)...*" parts of AMEC/BCEC Agreement were incorporated by reference into the matrix of the Fire Suppression Alliance Agreement, "*...which the Tribunal has held governs Claimant's claims*"[57]. As this is clear there is no need to construe Parties' intent under Qatar Civil Code Article 169(2)[58].

96  Therefore, the Respondent states, the Arbitral Tribunal will need to consider carefully the complex factual record including that the "*termination clause advanced by Claimant is located on a page not existing in the original agreement, and that the different termination clause advanced by Respondent is located on a page always existing in the original agreement*" which will inform the Arbitral Tribunal as to the Parties' intent[59].

97  The Claimant describes the substance of these arguments as "*re-litigating the copying error in the JVA copied to the Alliance Agreements*" and characterizes the arguments as "*attacking the Tribunal's* [First] *Partial Award or Procedural Order No. 6, both of which are final as to the law of this case moving forward*"[60].

98  The Respondent argues that the Arbitral Tribunal needs to consider which applicable law is necessary to construe the contractual matrix and the Parties' intent – whether Qatari law pursuant to the JVA or Pennsylvania law pursuant to AMEC/BCEC Agreement[61].

99  The Respondent then argues that the Arbitral Tribunal needs to consider a substantive issue as to whether the Respondent is legally allowed to use clause 29 of AMEC/BCEC Agreement "*on a flow down, back-to-back basis to terminate Claimant with compensation for work satisfactorily performed, but without compensation for anticipated profits on services not performed or not performed satisfactorily*" due to evidence that, first, the Claimant considered that the AMEC/BCEC Agreement was back-to-back with the Fire Suppression Alliance Agreement and, second, that the Parties "*interpreted and performed under the contract as if the pages of the* [Subcontract] *Minutes of Meeting were "inadvertently omitted""* comparing the "*copying error*" allowing the inclusion of the termination and arbitration clauses of the JVA with the "*inadvertent omission*" of the Subcontract Minutes of Meeting from the documents comprising the Fire Suppression Alliance Agreement[62].

---

[56] Respondent's Submission 23 November 2017, ¶¶ 12-13

[57] Respondent's Submission 23 November 2017, ¶ 14

[58] Respondent's Submission 23 November 2017, ¶ 15 and re-iterated at ¶¶ 16-18

[59] Respondent's Submission 23 November 2017, ¶ 20

[60] Claimant's Reply ¶ 3

[61] Respondent's Submission 23 November 2017, ¶ 21

[62] Respondent's Submission 23 November 2017, ¶ 22



100 The Claimant, however, differs with the Respondent as to any agreement of the Parties that the AMEC/BCEC agreement was back-to-back with the Fire Suppression Alliance Agreement and included the Subcontract Minutes of Meeting. It states, "[u]*nlike the Subcontract Minutes of Meeting, the JVA actually is expressly incorporated in the Fire Suppression Alliance and under that agreement the Parties expressly agreed to the limited circumstances under which the Parties' Alliance could be terminated, and they did not agree that it could be terminated for convenience without entitlement to anticipated profits*[63]".

101 The evidence referred to by the Respondent in its submission falls into two main categories:

101.1 Eight excerpts from emails between the Parties that the Respondent argues proves that the Claimant considered the Subcontract Minutes of Meeting "...*including its Section 4.2.2 expressly incorporating the AMEC contract provisions as flow down, back-to-back..*" to be part of the Fire Suppression Alliance Agreement[64]; and

101.2 An analysis of a diagram showing the priorities and connections of the Fire Suppression Alliance Agreement documents which, the Respondent argues, evidences the Parties' intent that the "*AMEC contract provisions would operate on a flow down basis*"[65].

102 The Respondent concludes this section of its submission by reiterating that "*it is reasonable to conclude from just this sample evidence that the pages of the [Subcontract] Minutes of Meeting were similarly "inadvertently omitted" from the Fire Suppression Alliance Agreement, and should be considered added to the Fire Suppression Alliance Agreement*"[66].

103 However, the Claimant denies the probative value of this evidence, stating, "[d]*espite the Tribunal's clear and final decision on this matter, Respondent appears to request that the Tribunal reconsider its decision based upon a handful of emails and correspondence between the parties. ... However, none of the correspondence cited by Respondent has anything to do with the Subcontract Minutes of Meeting. Moreover, the cited correspondence fails to meet the lowest threshold of the necessary probative value to demonstrate evidence of any agreement by the parties to amend the express terms of the Fire Suppression Alliance Agreement, as previously interpreted by the Tribunal, in such a way so as to support Respondent's argument*"[67].

104 The last argument of the Respondent's position that the Preliminary Legal Issue cannot be resolved by a preliminary legal determination is that a preliminary legal determination is "*inappropriate in these circumstances*"[68].

105 The circumstances the Respondent refers to comprises:

---

[63] Claimant's Reply ¶ 8

[64] Respondent's Submission 23 November 2017, ¶ 23 and ¶¶ 25-28

[65] Respondent's Submission 23 November 2017, ¶ 24

[66] Respondent's Submission 23 November 2017, ¶ 29

[67] Claimant's Reply ¶ 7

[68] Respondent's Submission 23 November 2017, section III(G)



105.1       This preliminary determination amounts to an improper bifurcation because *"evidence relating to different issues is so inextricably linked that separate phases would result in needless repetition"* and *"the proposed preliminary legal issue raises many factual and legal issues that will define the parties' relationship for purposes of making determinations on the entire merits of Claimant's claims"* rendering this determination inappropriate[69];

105.2       The determination in Partial Award No. 1 that the JVA comprised 5 pages (including the termination and arbitration clauses) has increased the interpretative complexity of *"the relevant termination provisions and the governing law, venue and dispute resolution provisions in the Fire Suppression Alliance Agreement governing the claims in this matter"*[70]; and

105.3       The evidentiary record as to the intention of the Parties is continuing to develop in relation to the issues of *"the interpretation of the termination provisions, including most importantly the seminal issue of what provisions existed and/or were relied upon and used in performing the Fire Suppression Alliance Agreement"*, a state of affairs *"further impacted by the necessity to interpret clause 31 and 42 provisions regarding dispute resolution, governing law and venue"* – *"[n]ot only will there be a lack of efficiency in handling this issue in the proposed preliminary fashion, such a process would be fundamentally unfair given the factual record that has developed and is continuing to develop"*[71].

106 The Claimant responds:

106.1       That it is a proper severance of an issue for decision, not an improper bifurcation, also arguing that the Respondent's reference to the Secretariat's Guide is misplaced: *"…Respondent cites "¶ 263" of the Secretarias Guide, but appears to actually rely upon ¶ 3-923, which states, in part, that "[s]plitting the proceedings may be useful where there are dispositive preliminary issues (e.g. limitation periods) or major issues of jurisdiction to determine." Indeed the Secretariat advises that "[w]here such issues may truly be dispositive of part of the dispute or the entire dispute, bifurcation can ultimately save time and cost." This is precisely such a case"*[72]; and

106.2       There is not the "interpretative complexity" alleged by the Respondent, and alleges that the Respondent is attempting to *"…forcibly introduce ambiguity into the Fire Suppression Alliance Agreement where there is none"*. It rejects *"…Respondent's argument is that there are some vaguely-defined complex factual and legal issues relating to "the intention of the parties as to the interpretation of the termination provisions, including most importantly the seminal issue of what provisions existed and/or were relied upon and used in performing the Fire Suppression Alliance Agreement"'* and states *"Respondent has failed to identify a single ambiguous term therein that would require an investigation of the parties intended interpretation"*[73].

107 Lastly, the Respondent argues, in relation to the Preliminary Legal Issue, that it was legally entitled to terminate the Fire Suppression Alliance Agreement for convenience,

---

[69] Respondent's Submission 23 November 2017, ¶ 30

[70] Respondent's Submission 23 November 2017, ¶ 31

[71] Respondent's Submission 23 November 2017, ¶ 32

[72] Claimant's Reply ¶ 11

[73] Claimant's Reply ¶ 12

without paying the Claimant's lost profits[74] as the Parties interpreted AMEC/BCEC Agreement as being on a flow-down, back-to-back basis with the Fire Suppression Alliance Agreement, allowing for the applicability of the AMEC Subcontract clause 29[75].

108 Assuming clause 29 of the AMEC Subcontract is legally available to the Respondent, its actions thereunder were compliant with that Article and with Article 707 of the Qatar Civil Code, as it offered to pay the Claimant for work done to the date of the termination and that is all that is required under clause 29. Even on a narrow construction under Qatar Civil Code Article 170, clause 29 limits recovery for lost profits, a speculative category of damages[76].

109 The Claimant argues that the Respondent's position on clause 29 of the AMEC/BCEC Agreement is without merit. It states, *"The key question here is whether Clause 29 of the contract between AMEC and Respondent should be applied mutatis mutandis as between Respondent and Plaintiff. If the parties had expressly agreed to such an understanding in the Fire Suppression Alliance Agreement, then Respondent most certainly would have directed the Tribunal's attention to that agreement. Of course, the Parties did not come to any such agreement, which is dispositive of the entire preliminary legal issue at hand. ... Nevertheless, Respondent argues that Clause 29, expressly written as applying only between AMEC and Respondent, should be applied as between Respondent and Plaintiff, because the Subcontract Minutes of Meeting from the MEP Subcontract Alliance should be also considered a part of the Fire Suppression Alliance Agreement ... But the Subcontract Minutes of Meeting are not part of the Fire Suppression Alliance Agreement. Indeed, this Tribunal has already rejected Respondent's very argument in its Partial Award... "[77]*

110 The Respondent reserves its rights to argue, at a later date, that it had a right to terminate the Fire Suppression Alliance Agreement due to Claimant default, referencing Qatar Civil Code Articles 183 and 184[78].

111 The Respondent makes two points in relation to the Claimant's position that none of the three events have occurred to terminate the JVA. First, the First Partial Award's finding that none of the three events had occurred does not amount to a substantive determination on this point[79] and, second, those three events of termination are not exclusive as to termination – the Fire Suppression Alliance Agreement can terminate in other ways[80].

112 The Claimant disagrees with the effect of determinations made in the First Partial Award, arguing throughout its Reply that the findings and holdings made in the First Partial

---

[74] Respondent's Submission 23 November 2017 Section IV

[75] Respondent's Submission 23 November 2017, ¶ 33

[76] Respondent's Submission 23 November 2017, ¶ 34

[77] Claimant's Reply ¶¶ 5 & 6

[78] Respondent's Submission 23 November 2017, ¶ 35

[79] Respondent's Submission 23 November 2017, ¶ 36

[80] Respondent's Submission 23 November 2017, ¶ 37



Award are applicable to and binding upon the Parties in the determination of this Preliminary Legal Issue[81].

113 In conclusion, the Respondent requests[82]:

113.1    That the Arbitral Tribunal decline to decide the Preliminary Legal Issue at all, or, in any event, not without holding a full and fair hearing with witness statements and cross-examination thereof;

113.2    If it decides the Preliminary Legal Issue, to determine that the Respondent was entitled to terminate the Fire Suppression Alliance Agreement for convenience without compensating Claimant for lost profits; and

113.3    In any event, that the Arbitral Tribunal decline to find that the Respondent was obligated to compensate the Claimant for lost profits in connection with the Respondent terminating the Fire Suppression Alliance Agreement.

## XX.    TRIBUNAL'S ANALYSIS OF THE ISSUES TO BE DETERMINED

114 The Sole Arbitrator has reviewed the submissions of both Parties in order to establish the issues to be determined in this Second Partial Award.

115 As set out above, the Claimant sets out a relatively simple proposition: that the Respondent does not have the right to utilize clause 29 of AMEC/BCEC Agreement[83] to terminate for convenience the Claimant's employment under the Fire Suppression Alliance Agreement. Although acknowledging that the AMEC/BCEC Agreement is one of the documents "forming part of" the Fire Suppression Alliance Agreement[84] the Claimant says that on its face, only AMEC has the right to terminate its relationship with the Respondent for convenience under this provision.

116 The Respondent, although it submits arguments gauged to rebut this proposition, first takes the position that this determination of a Preliminary Legal Issue is inappropriate and should be dismissed without determination for various reasons.

117 After a review of the submissions of the Parties, the Sole Arbitrator establishes the issues addressed in this Second Partial Award as follows:

117.1    Is it appropriate for the Sole Arbitrator to determine this Preliminary Legal Issue or should the Sole Arbitrator dismiss it without determination?

117.2    If it is found appropriate for the Sole Arbitrator to determine this Preliminary Legal Issue, was the Respondent entitled, as a matter of law, to terminate the Fire Suppression Alliance Agreement for convenience without compensating Claimant for

---

[81] For example, Claimant's Reply ¶ 6

[82] Respondent's Submission 23 November 2017, ¶¶ 38-40

[83] AMEC/BCEC Subcontract Agreement No. F011900073

[84] See above, ¶ 76.2

any resulting lost profits which may be proven to have been suffered?

117.3     What are the costs implications flowing from this Second Partial Award?

## XXI.  REASONS AND FINDINGS

## NOW HEREBY THE SOLE ARBITRATOR HAVING HEARD AND CONSIDERED ALL THE EVIDENCE ADDUCED BY THE PARTIES DOES HEREBY MAKE THIS SECOND PARTIAL AWARD

118 The Sole Arbitrator has considered all the pleadings, submissions, evidence and arguments advanced by the Parties in making its determination for this Second Partial Award. Where relevant, it has identified specific parts of the evidence it has relied upon in reaching its decision. All objections made by the Parties to any parts of the evidence have been taken into account in weighing that evidence. While the Arbitral Tribunal refers to certain submissions, evidence and arguments presented by each Party below, this Second Partial Award is not intended to be a complete or exhaustive exposition of the matters taken into account in reaching its decision. Those matters not expressly mentioned in this Second Partial Award have been duly taken into account also.

### A.     IS DETERMINATION OF THE PRELIMINARY LEGAL ISSUE APPROPRIATE?

119 The Respondent argues that the Preliminary Legal Issue is not one appropriate for determination, for various reasons.

120 Prior to examining the Respondent's arguments in detail, it is useful to look at the steps taken to arrive at this Second Partial Award.

121 As set out above, the Claimant had initially proposed the Preliminary Legal Issue on 28 July 2017 just after the second CMC, which took place by telephone on 26 July 2017. However, other matters as set out above delayed the next steps in this proceeding.

122 Given that certain matters bearing on this proceeding were, and still are, before the Qatari courts, the Sole Arbitrator wished to employ a step in the proceeding to progress matters the courts decide those related matters. On 12 September 2017, the Arbitral Tribunal asked the Parties to address the next steps in the proceeding by 17 September 2017. The Arbitral Tribunal asked the Parties to either agree with the Claimant's proposal of the Preliminary Legal Issue, or else to come up with another mutually agreed approach to progress this matter.

123 An extension of time was granted to 20 September 2017, on which date the Respondent replied: "*Dear Sir, the Respondent will not be taking any further active part in these proceedings*". Given that the determination of this discrete issue seemed to be a useful and efficient way to progress this matter in the face of ongoing court proceedings, the Sole Arbitrator proceeded with the Preliminary Legal Issue.

124 By email of 5 October 2017, the Claimant agreed to provide its submission of the Preliminary Legal Issue on 12 October 2017. On 10 October 2017, the Sole Arbitrator informed the Parties that, as the Claimant would be delivering its submission on the



- 34 -

preliminary legal issue by 12 October 2017, the date for the Respondent to provide its Reply was 9 November 2017.

125  On 9 November 2017, the Respondent instructed new counsel, though whom the Respondent indicated that it would be taking part in these proceedings. On 10 November 2017, following consultation with the Parties, the Respondent was directed to provide its Reply in respect of the Preliminary Legal Issue by 23 November 2017, which date was complied with. The Claimant provided its Reply on 14 December 2017.

126  The Respondent now argues, as set out above, that the determination of the Preliminary Legal Issue is inappropriate because it is an improper bifurcation and because the issues raised are either too complex or too interrelated with other issues so as to be determined short of a final award determining all issues.

127  The Claimant argues, citing the Secretariat's Guide[85], that this is a case where *"such issues may truly be dispositive of part of the dispute or the entire dispute"* making the determination of an issue efficient.

128  The claim in this case was made as the direct result of a termination letter issued by the Respondent to the Claimant wherein the Respondent based its purported termination of the employment of the Claimant under the Fire Suppression Alliance Agreement on clause 29 of the AMEC/BCEC agreement. This Preliminary Legal Issue determination queries if the Respondent had the legal right to do that.

129  After a review of all of the evidence and submissions, the Sole Arbitrator finds that the Preliminary Legal Issue poses a discrete legal question which can be answered apart from other determinations which have yet to be made in this proceeding. If the Respondent had the legal right to utilize clause 29 of the AMEC/BCEC Agreement in the way that it did, certain results flow, and vice versa.

130  In any event, the Sole Arbitrator finds that, in the context of ongoing court proceedings, the determination of the Preliminary Legal Issue will offer efficiencies and a way of progressing matters while awaiting the outcome of the court proceedings.

131  The Sole Arbitrator also rejects the Respondent's argument that a full and fair hearing with witness statements and cross-examination should be held on the Preliminary Legal Issue. As is evident in the below analysis, the determination of the Preliminary Legal Issue is a simple legal one. The Respondent has not presented us with a clear explanation of what witnesses could add to that determination, except for what it called an initial sampling of relevant evidence.

132  The sample of relevant evidence provided by the Respondent comprised some email exchanges between the Parties. The first was pre-contractual, and the rest were discussions between the Parties during the course of the contract.

---

[85] Claimant's Reply ¶ 11

- 35 -

133  It has to be noted again that the Parties have set out those documents that comprise the Fire Suppression Alliance Agreement[86], which are listed at paragraph 76.2 above. Those are the documents that must be examined to gain the contractual intention of the Parties, not random discussions that the Parties may have had.

134  The Respondent has also argued that the process of determining the Preliminary Legal Issue *"would be fundamentally unfair given the factual record that has developed and is continuing to develop"*[87]. It states that the factual record is continuing to develop in two areas: (1) the intention of the Parties as to the interpretation of the Fire Suppression Alliance Agreement termination provisions, the most important element of which is "what provisions existed and/or were relied upon and used in performing" that Agreement; and (2) a need to further interpret clauses 31 and 42 of the AMEC/BCEC Agreement regarding dispute resolution, governing law and venue. The developing factual record in these areas, the Respondent states, leads to certain evidence being "inextricably linked" to other evidence on different issues so that bifurcating the proceeding into separate phases would result in needless repetition.

135  In analyzing the intention of the Parties as to the interpretation of the Fire Suppression Alliance Agreement termination provisions, the Sole Arbitrator notes again that the composition of that Alliance Agreement is set, with the JVA being the document instrumental in controlling the Parties relationship *inter se*[88]. Therefore, termination of the relationship between the Parties would be governed by those documents, under the laws of the State of Qatar.

136  Regarding the further claimed need to further interpret clauses 31 and 42 of the AMEC/BCEC Agreement, the Respondent claims that that process is made more complex by the confirmation in P.O. No. 6 that there are five pages to the JVA. It must be noted again that the Respondent itself confirmed to the Arbitral Tribunal that there are five pages to the JVA in its 16 March 2017 submission[89]. And, if the Respondent is arguing once again that the Subcontract Minutes of Meeting should be considered as part of the Fire Suppression Alliance Agreement, given the holding at paragraph 158 of the First Partial Award, such an argument could not be acceded to.

137  Based on the foregoing analysis, the Sole Arbitrator rejects the claim that there is "evidence relating to different issues is so inextricably linked that separate phases would result in needless repetition" because the issues raised by the Respondent are ones that were dealt with in the First Partial Award and in P.O. No. 6.

---

[86] Please see ¶ 158 of the First Partial Award as to the Arbitration Tribunal's holding as to the composition of the Fire Suppression Alliance Agreement

[87] Respondent's Submission 23 November 2017, ¶ 32

[88] Please see ¶¶ 174 to 179 below

[89] At ¶ 28 of P.O. No. 6, the Arbitral Tribunal held: *"As set out above, in its submission dated 16 March 2017, well before proceedings were closed for the Partial Award and well before the Partial Award was made, the Respondent placed before the Arbitral Tribunal the full text of the JVA, and this is the document (complete with arbitration clause) that the Arbitral Tribunal considered in making its Partial Award, with the approbation of the Parties".*



138 The Sole Arbitrator finds that the determination of the Preliminary Legal Issue is appropriate.

> B. **WAS THE RESPONDENT ENTITLED, AS A MATTER OF LAW, TO TERMINATE THE FIRE SUPPRESSION ALLIANCE AGREEMENT FOR CONVENIENCE WITHOUT COMPENSATING CLAIMANT FOR RESULTING LOST PROFITS?**

139 Having found that the determination of the Preliminary Legal Issue is appropriate, the Sole Arbitrator goes on to determine if the Respondent was entitled, as a matter of law, to terminate the Fire Suppression Alliance Agreement for convenience without compensating Claimant for any resulting lost profits which may be proven to have been suffered.

140 The basic fact underpinning the determination of the Preliminary Legal Issue is that the Respondent based its purported termination of the Fire Suppression Alliance Agreement, *vis à vis* the Claimant, on clause 29 of the AMEC/BCEC Agreement.

141 As set out at paragraph 81 above, the Respondent's termination letter stated, in summary: *"We refer to Clause 29 of* [the AMEC/BCEC Agreement], *which is incorporated into the 1st July 2013* [Fire Suppression Alliance Agreement] ... *This letter constitutes formal notification that Black Cat hereby invokes Clause 29 of* [the AMEC/BCEC Agreement]. *Effective immediately, the Fire Suppression Subcontract Alliance Agreement (dated 1st July 2013) is terminated".*

142 The documents comprising the Fire Suppression Alliance Agreement are listed at paragraph 76.2 above. No cogent evidence has been led that the Parties agreed to documents other than those on that list to comprise the Alliance Agreement, nor is there contemporaneous evidence that either Party discussed with the other the inclusion of other documents on that list, or that documents had been excluded therefrom. Further, as discussed in paragraphs 131 to 137 of this Second Partial Award, the Respondent's argument that the *"evidentiary record as to the intention of the Parties is continuing to develop"* in relation to certain issues of the interpretation of that Alliance Agreement were dealt with in the First Partial Award and in P.O. No. 6.

143 Therefore, the Sole Arbitrator finds that that list of documents comprising the Fire Suppression Alliance Agreement at paragraph 76.2 above is complete.

144 It is clearly seen that the AMEC/BCEC Agreement is part of the documents comprising the Fire Suppression Alliance Agreement[90]. The question then becomes, for what purpose or purposes did the Parties agree to its inclusion?

145 The Fire Suppression Alliance Agreement itself is only 4 pages long with only 2 paragraphs so it does depend for much of its substance on the appended documents which were incorporated by reference at its paragraph 2. Its paragraph 1 simply states:

---

[90] Above, ¶ 76.2 item 2 in the list

"*In consideration of the Contractor agreeing to pay the Subcontractor the amount due in accordance with the terms of this Agreement, the Subcontractor will provide the Services in accordance with this Agreement*".

146 The Respondent submits[91] that the first item on the list of documents appended to the Fire Suppression Alliance Agreement, "Overview of Alliance Commercial Summary in 3 No. Pages", are diagrams which are illustrative of the intent of the Parties:

"*The first two diagrams illustrate that the "Main Subcontract" is the AMEC to BCEC contract, and that the "Flowdown Subcontract" is the BCEC to A&C contract. The third diagram is titled "Contractual Relationships" and shows AMEC at the top, with an arrow pointing down to Black Cat, and with an arrow pointing from Black Cat down to A&C.*"

147 An analysis of these three pages reveals that only the first page is illustrative of Fire Suppression, as the heading of that page states that it is illustrative of "Agreement No: F1011900073", which is the AMEC/BCEC agreement for Fire Suppression Works. The second overview page refers to both AMEC/BCEC agreements, MEP and Fire Suppression, and third ("Contractual Relationships") relates only the AMEC/BCEC agreement No: F1011900041, AMEC/BCEC MEP agreement, and not to Fire Suppression.

148 Examining the first of those three pages (which are attached as **Attachment D**) it can be seen that the contract to the Claimant is a "flowdown" subcontract from the Respondent's agreement with AMEC in terms of "Nett cost" and "50% profit". There is a dashed flowdown line for the "Agreed amount of cost for BCEC to support the project" to be charged to the Claimant, but with an asterisk indicating that this charge was "To be formalized and agreed by both parties (assumption)".

149 However, it is worth noting that only costs are covered in this diagram illustrating the flowdown effect of the contractual relationship; nowhere in this diagram or the Fire Suppression Alliance Agreement is there mention of a "Back-to-back" arrangement or of the terms of the AMEC/BCEC Agreement binding the Claimant in its agreement with the Respondent.

150 In the bottom half of the first page of Attachment D is a two column figure, "Scenario 1 – Cost saving to overall Project". In the left-hand column is set out a "50% equal share to BCEC and A&C". In the right-hand column a line "Add A&C share of profit (50%)". At the bottom of the page is written:

"*Projected Cash Flow ... Direct flow of receivables from AMEC [based on monthly re-measurement of work completed] to BCEC will be transferred to A&C [subject to deduction of all approved costs incurred by BCEC which are direct costs to the JV]*".

151 As has been noted, the JVA between the Parties is also incorporated by reference into the Fire Suppression Alliance Agreement.

---

[91] Submission 12 October 2017, ¶ 24

152  Therefore, a clear reading of the first page of Attachment D shows that it is supportive of the JVA being instrumental in governing the relationship between the Parties given its references to 50% equal sharing and 50% profits (the proportions set out in the JVA), as well as its direct reference to the "JV".

153  Such a reading of this interpretative document supports the Claimant's position[92] that the JVA determines the basic relationship between the Parties.

154  In respect of the JVA, the Respondent argues that the composition of the JVA is still open to question implying that one cannot safely rely on the application of all 5 of its pages to the relationship. Its allegations and the Arbitral Tribunal's analysis are:

154.1  The Respondent states that it is "undisputed" that the description of the JVA in the list of documents appended to the Fire Suppression Alliance Agreement includes the words "in 3 No. Pages"[93]; while that description reads as the Respondent states, the Arbitral Tribunal has found, based largely on the actions of the Respondent itself in bringing the full JVA to the Sole Arbitrator's attention[94], that that description does not describe the actual document to which the Parties refer – this is made clear at paragraphs 29 to 31 of P.O. No. 6, Attachment C;

154.2  It states that pages of the JVA have been considered to be added to the Fire Suppression Alliance Agreement "based on an alleged and unproven "copying error""[95]; contrary to the Respondent's submission, this is the subject of a clear finding of the Arbitral Tribunal at paragraphs 27 to 29 of P.O. No. 6, Attachment C;

154.3  It describes one of the 5 agreed pages of the JVA as "language of clause 6.2 on the disputed page of the Preliminary JVA[96]" – The Arbitral Tribunal notes that that page of the JVA is not "disputed" as the Respondent itself presented the correct version of the JVA as comprising all of those 5 pages, including the one bearing clause 6.2.

155  To summarize, the Respondent's argument that the composition of the JVA is still open to question cannot succeeded given the determinations and orders set out in Procedural Order No. 6.

156  Further, the Respondent attempts to argue for reliance upon the Subcontract Minutes of Meeting in the context of the Fire Suppression Alliance Agreement[97]. However, these arguments were put to rest by the findings and holdings of the First Partial Award[98].

---

[92] Submission 12 October 2017, ¶¶ 3, 4, 6 & 12

[93] Respondent's Submission 23 November 2017, ¶ 13

[94] Please see footnote 89 above.

[95] Respondent's Submission 23 November 2017, ¶ 29

[96] Respondent's Submission 23 November 2017, ¶ 37

[97] Respondent's Submission 23 November 2017, ¶¶ 6, 7, 22 & 29

[98] First Partial Award ¶ 72.2 – the Subcontract Minutes of Meeting are part of the MEP Alliance Agreement; First Partial Award ¶ 72.3 - the Subcontract Minutes of Meeting are not part of the Fire Suppression Alliance Agreement; First Partial Award ¶¶ 88- 96 – the Parties' respective arguments for and against the Subcontract



157  Further, the Respondent argues that there is a lack of clarity to the factual record which, to summarize, will require either the Arbitral Tribunal's application of Article 169 of the Qatar Civil Code or an equivalent provision of Pennsylvania law applicable to the interpretation of termination clauses[99].

158  In making that argument, the Respondent fails to acknowledge the record of this arbitral proceeding in terms of the award and the orders that have been made, based in no small measure on the actions of the Respondent itself. Underpinning this argument is the proposition that:

> "The undisputed record shows that the termination clause advanced by Claimant is located on a page not existing in the original agreement, and that the different termination clause advanced by Respondent is located on a page always existing in the original agreement. Respondent understands that the termination clause advanced by Claimant is now procedurally considered to be part of the Fire Suppression Alliance Agreement, and Respondent believes its interpretation prevails on the substantive issue of termination even if that page is included. Nevertheless, at a minimum the Tribunal will need to consider carefully the parties' intent in light of what has become a complex factual record that continues to evolve, including Claimant's already inconsistent filings in the U.S. lawsuit it recently initiated".

159  It is clear that what the Respondent calls the "original agreement" is the partially copied version of the JVA that the Claimant mistakenly attached to the pleadings of this arbitral proceeding. The most important omission to the Respondent's proposition is that it was the Respondent itself that brought to the attention of the Arbitral Tribunal the fact that the Parties had agreed a 5-page JVA and that that is the version upon which to rely.

160  Although it is the Respondent itself that set the record straight on the JVA by including the entire 5-page JVA in its 16 March 2017 submission[100], it again makes the argument that there was an "original agreement" of something less than 5 pages, and that the factual record is, in some way, confused or unclear.

161  Given that the Respondent acted well before proceedings had closed on the First Partial Award to set the record straight on the JVA, there is no doubt, given the findings and

---

Minutes of Meeting deemed to be part of the Fire Suppression Alliance Agreement; First Partial Award ¶¶ 154-158 – the Arbitral Tribunal's holding that *"the contractual arrangement between the Parties concerning the Fire Suppression Works are those comprising the Fire Suppression Alliance Agreement, which are the Alliance Agreement itself and those documents as are listed in that Agreement at its paragraph 2, page 2 (see ¶ 72.3 [First Partial Award]), which list excludes the Subcontract Minutes of Meeting and includes the JVA. The Subcontract Minutes of Meeting are not part of the Fire Suppression Alliance Agreement"*; First Partial Award ¶ 159 – the evidence upon which the holding was based.

[99] Respondent's Submission 23 November 2017, ¶¶ 20 to 22

[100] At ¶ 28 of P.O. No. 6, the Arbitral Tribunal held: *"As set out above, in its submission dated 16 March 2017, well before proceedings were closed for the Partial Award and well before the Partial Award was made, the Respondent placed before the Arbitral Tribunal the full text of the JVA, and this is the document (complete with arbitration clause) that the Arbitral Tribunal considered in making its Partial Award, with the approbation of the Parties"*.

holdings in the First Partial Award and P.O. No. 6[101], that the Arbitral Proceeding is based on the foundation that there was a 5-page JVA agreed by the Parties, and that there are no other versions of the JVA with any independent relevance or status *qua* fewer pages.

162  In terms of the Respondent's allegation of a lack of clarity in the factual record leading to a potential need to seek the common intention of the parties pursuant to Article 169 of the Qatar Civil Code the Arbitral Tribunal notes its holding in the First Partial Award:

> "*The Qatari Civil Code provides, at its Article 169, that where the words of a contract are clear, one should not deviate from the words nor interpret the Parties' intent. The contractual regime put into place by the Parties to govern the Fire Suppression Work is clear.*"[102]

163  Further on the allegation of of a lack of clarity, the Arbitral Tribunal notes its holding in P.O. No. 6 in respect of the JVA:

> "*This Arbitral Tribunal finds that the intention of the Parties when they made the Alliance Agreements was to incorporate all 5 pages of the JVA, which they incorporated by reference into the Alliance Agreements, as it is agreed by both Parties that these 5 pages comprise the full JVA*".

164  Given those findings and holdings, and given the Respondent's arguments relate to the composition of the JVA[103] and an implied applicability of the Subcontract Minutes of Meeting[104]there is no lack of clarity in the factual record of this Arbitration Proceeding in relation to the limited issues addressed in the Parties' submissions and before the Sole arbitrator in this Second Partial Award.

165  Dealing with the main issue before the Arbitral Tribunal for decision in this Second Partial Award, "whether, as a matter of law, Respondent was entitled to terminate the Fire Suppression Alliance Agreement for convenience without compensating Claimant for its resulting lost profits", the Respondent argues:

> "*...there is a significant sample of evidence showing Claimant considered the [AMEC/BCEC] contract to be applied in a flow down, back-to-back basis from Respondent to Claimant even without the pages of the Minutes of Meeting being physically included in the original Fire Suppression Alliance Agreement, i.e., the parties interpreted and performed under the contract as if the pages of the Minutes of Meeting were "inadvertently omitted""*[105]

166  The premises of this argument are two-fold:

---

[101] P.O. No. 6 is attached as Attachment 'C'

[102] At ¶ 160 of the First Partial Award

[103] Referenced in Respondent's Submission 23 November 2017, ¶¶ 20 & 21

[104] Referenced in Respondent's Submission 23 November 2017, ¶ 22

[105] Respondent's Submission 23 November 2017, ¶ 22

166.1    The Fire Suppression Alliance Agreement is a "flow-down" subcontract and that automatically means that it is the same as a "back-to-back" arrangement in which all terms of the AMEC/BCEC Agreement apply *mutatis mutandis* to the parties to the Fire Suppression Alliance Agreement including the Termination for Convenience clause 29; and

166.2    The Claimant impliedly agrees with this proposition.

167  The Claimant replies that the "significant sample of evidence" cited by the Respondent *"fails to meet the lowest threshold of the necessary probative value to demonstrate evidence of any agreement by the parties to amend the express terms of the Fire Suppression Alliance Agreement, as previously interpreted by the Tribunal, in such a way so as to support Respondent's argument"*[106].

168  It is the Arbitral Tribunal's view that the Respondent misapprehends the task before it in this determination of the Preliminary Legal Issue in presenting this "significant sample of evidence". It is agreed that the thirteen documents listed at paragraph 2 of the Fire Suppression Alliance Agreement form part of that Agreement, but nothing in that regime clearly indicates that the Parties signed on to a "back-to-back" arrangement in which all terms of the AMEC/BCEC Agreement apply *mutatis mutandis* to them. It has also been held that there is no lack of clarity in this contractual regime. As a result, it is not now open for the Respondent to go behind this contractual regime to try to give it an interpretation which the suite of documents comprising this contractual regime will not bear.

169  The Qatari Civil Code provides, at its Article 169, that where the words of a contract are clear, one should not deviate from the words nor interpret the Parties' intent[107]. The contractual regime put into place by the Parties to govern the Fire Suppression Work is clear, as has been set out above in the discussions surrounding the First Partial Award and P.O. No. 6.

170  The Respondent next argues that the determination of the Preliminary Legal Issue would amount to an improper bifurcation of the points of dispute in this arbitration where *"evidence relating to different issues is so inextricably linked that separate phases would result in needless repetition"*[108].

171.  In demonstrating how this is so, it returns, *inter alia*, to question the composition of the JVA, a matter that was settled in P.O. No. 6[109].

---

[106] Claimant's Reply ¶ 7

[107] Article 169: *"Where the wording of the contract is clear, it shall not be capable of deviating from or construing the intent of the contracting parties. Where a contract must be construed, the common intention of the parties shall be sought without restriction to the literal meaning of the words, taking into account the nature of the transaction as well as the honesty and confidence that should prevail between the parties in accordance with commercial custom."*

[108] Respondent's Submission 23 November 2017, ¶ 30

[109] Respondent's Submission 23 November 2017, ¶ 31, saying *"Indeed, adding those Preliminary JVA pages into the mix only increases the complexity of interpreting the relevant termination provisions and the governing law, venue and dispute resolution provisions in the Fire Suppression Alliance Agreement governing the claims in this matter"*.

172  The Respondent argues that "[t]*he issue of the intention of the parties as to the interpretation of the termination provisions, including most importantly the seminal issue of what provisions existed and/or were relied upon and used in performing the Fire Suppression Alliance Agreement, cannot be handled through the bifurcated fashion proposed and initially viewed as an efficient use of time*"[110]. However, as has been stated above, there is no such "seminal issue" as described by the Respondent.

173  The provisions of the Fire Suppression Alliance Agreement are clear and, as set out above, no interpretation of them is possible: "where the words of a contract are clear, one should not deviate from the words nor interpret the Parties' intent".

174  Therefore, to answer the question posed in paragraph 144 above it is the view of the Arbitral Tribunal that the AMEC/BCEC Agreement was incorporated by reference into the Fire Suppression Alliance Agreement to inform the Parties of the scope of work and other specifications of the Fire Suppression Works, but that issues concerning the Parties' relationship were governed by the JVA, also incorporated by reference into the Fire Suppression Alliance Agreement.

175  As was found in the First Partial Award[111], the JVA continues to govern the Parties' relationship within the Fire Suppression Alliance Agreement[112].

176  The First Partial Award held that the dispute resolution provisions of the JVA governed the Parties' relationship. So too the other provisions of the JVA continue to govern the Parties' relationship within the Fire Suppression Alliance Agreement. This is shown by a reading of the Fire Suppression Alliance Agreement as a whole, and is exemplified by the analysis of Attachment D at paragraphs 145 to 152 herein.

177  Clause 8.4 of the JVA[113] makes it clear that it governs the Parties' relationship, in this case, within the Fire Suppression Alliance Agreement, vis à vis those matters contained in it, and this includes, *inter alia*, the percentage profit share and the termination of the Parties' relationship.

178  Clause 7.2 of the JVA makes it clear that the JVA is "*governed, construed and interpreted in accordance with the laws of the State of Qatar*". As a contract the JVA is governed by, *inter alia*, Qatari contract law. Therefore, the Respondent is correct when it says that the termination provisions of the JVA "[do] *not speak to other bases for termination that might exist if Qatar law is applied*"[114]. However, this is beyond the scope of this Second Partial Award.

---

[110] Respondent's Submission 23 November 2017, ¶ 32

[111] First Partial Award, ¶¶ 141 to 163

[112] See in particular First Partial Award, ¶ 163.3 "…the JVA is a viable and vital part of the Fire Suppression Alliance Agreement".

[113] "*This JVA embodies the entire agreement between the Parties in respect of the subject matter hereof and supersedes all prior representations, expressions of intent, correspondences, understandings, undertakings, representations, warranties, arrangements or agreements of any nature whatsoever, whether verbal or written with respect to the subject matter hereof*".

[114] Respondent's Submission 23 November 2017, ¶ 37



179 For the sake of completeness, then, the Sole Arbitration finds, in answer to the question posed by the Respondent at paragraph 96 hereof, that applicable law under which to construe the contractual matrix and the Parties' intent is that of the State of Qatar.

180 These findings and holdings then lead to the second part of the Preliminary Legal Issue – is there, at law, a limitation on compensation to the Claimant for any lost profits which may have resulted from the Respondent's termination of the Fire Suppression Alliance Agreement?

181 The Respondent argues that, as clause 29 of the AMEC/BCEC Agreement was properly used to terminate the Fire Suppression Alliance Agreement, as that contract applies to the Parties as well as to the parties to it, the Claimant is thus restricted from receiving its anticipated profits by the clear wording of that clause.

182 The Claimant argues, firstly, that the AMEC/BCEC Agreement does not apply *mutatis mutandis* to the Parties, so clause 29 thereof was not available to the Respondent to use to terminate the Fire Suppression Alliance Agreement, and, as such the damages limitation on receiving anticipated profits is inapplicable.

183 Secondly, the Claimant argues that Article 707(1) of the Qatar Civil Code[115] would override a provision such as clause 29 of the AMEC/BCEC Agreement, as it states that a subcontractor terminated for convenience shall be entitled to "any profit he could have made had the work been completed".

184 For the reasons set out herein, the Sole Arbitrator holds that the AMEC/BCEC Agreement does not apply to the Parties in respect of the termination of the Parties' relationship under the Fire Suppression Alliance Agreement, as that aspect of their contractual relation is governed by the JVA.

185 As a result of this holding, clause 29 of the AMEC/BCEC Agreement does not apply to the Parties' relationship under the Fire Suppression Alliance Agreement and, therefore, the limitation of potential damages set out in clause 29[116] of that Agreement likewise does not apply.

186 However, this holding should not be interpreted any further than this, and all claims to damages by the Claimant remain to be proven, whether under contract or under the laws of the State of Qatar.

---

[115] As set out at ¶ 13 of the Claimant's Submission 12 October 2017: "The employer may withdraw from the contract and stop the work at any time prior to its completion, provided that the contractor shall be indemnified for all expenses incurred, all works completed, and any profit he could have made had the work been completed".

[116] "…In such event, Subcontractor shall only be entitled to compensation for Services satisfactorily performed, and shall not be entitled to anticipated profit on Services not performed…."



C. WHAT ARE THE COSTS IMPLICATIONS FLOWING FROM THIS SECOND PARTIAL AWARD

187. What costs implications should flow from this Second Partial Award?

188 The Rules state, at Article 37(3): "*At any time during the arbitral proceedings, the arbitral tribunal may make decisions on costs, other than those to be fixed by the Court, and order payment*" and, at Article 37(4): "*The final award shall fix the costs of the arbitration and decide which of the parties shall bear them or in what proportion they shall be borne by the parties*".

189 Therefore, the Arbitral Tribunal has a discretion in respect of its decision on costs prior to the Final Award.

190 Qatar Arbitration Law Article 31(4) states: "*The award shall include the amount of the arbitration costs of fees and expenditures, the obligated party of its payment and payment procedures*" and does not distinguish among types of awards. Therefore, the Sole Arbitrator has a duty to exercise discretion to apportion costs of this Second Partial Award.

191 The Claimant, in its Costs Submission of 7 February 2018, argues that the Sole Arbitrator should consider the conduct of the Parties in exercising discretion on costs. Its first argument on conduct is alleged dilatory tactic including the Respondent's "repeated and unmeritorious" challenges to the tribunal's jurisdiction, allegations of fraud on the documents and its application challenging the tribunal[117].

192 The Claimant argues that Respondent's change of counsel should not excuse the "deliberate and unreasonable prolonging of these proceedings and the inflation of the legal costs of both parties" for which it was responsible, and that the Respondent should be held accountable for this in costs[118].

193 Second, the Claimant argues that the Respondent's arguments made in respect of this Preliminary Legal Issue were not efficient as the Respondent's primary aim was to argue that the determination of this Issue was inappropriate[119].

194 Further, the Claimant argues that when the Respondent did argue the merits of the determination of the Preliminary Legal Issue its arguments were mostly "*recycled arguments, blatantly attempting to re-adjudicate matters that the tribunal has already decided*"[120]

195 Lastly, on conduct matters, the Claimant states that the Respondent is employing a strategy of engaging in delaying tactics so as to put financial pressure on the Claimant in

---

[117] Claimant's Costs Submission 7 February 2018 ¶ 4

[118] Claimant's Costs Submission 7 February 2018 ¶ 5

[119] Claimant's Costs Submission 7 February 2018 ¶ 7

[120] Claimant's Costs Submission 7 February 2018 ¶ 7



- 45 -

having to afford to prosecute this arbitration case, and this strategy should be answerable in costs[121].

196 The Claimant states that its costs are reasonable and provides evidence to support its cost claim of sum requested US$ 90,880.60. It asks the Sole Arbitrator to take upon judicial notice or experience the reasonableness of the Claimant's legal bills and sates that it has been efficient in its presentation of the case on the Preliminary Legal Issue.

197 The Claimant submitted its Supplementary Costs Submission of 8 February 2018 because it states it had inadvertently omitted a significant cost that it has incurred in this matter: the payment of Respondent's share of the advance on costs in this matter of US$40,000. It provided proof of payment of the Respondent's share of the advance on costs.

198 Therefore, the Claimant's request[122] is that:

(a) Respondent pays all of Claimant's legal costs and expenses that have been incurred in connection with these proceedings
Less
the amount of Claimant's legal costs and expenses that the Tribunal has already awarded in favor of Claimant in its partial award dated 12 June 2017; plus

(b) US$ 40,000 for the Respondent's advance on costs; and

(c) That Respondent should be fully responsible for its own costs in respect of the same.

199 The Respondent argues that it should be awarded its costs, and explains the reasonableness of its positions taken and arguments made.

200 The Respondent also anticipated the conduct arguments that were, indeed, made by the Claimant. It defends against those by saying that it *"recited the relevant history, acknowledged the prior rulings, and simply pointed out that those prior rulings, which Claimant vigorously argued for, must be taken into account when evaluating Claimant's request. Respondent merely used the existence of those rulings to illustrate why the Tribunal should deny Claimant's invitation to decide an important substantive issue on briefing alone"[123].*

201 It also defends against what the Claimant called a blatant attempt at re-adjudication[124] of matters which were the subject of previous decisions by saying that such decisions were made *"in a procedural order described as making a "procedural or discretionary decision" and "not finally determining a substantive claim." The Tribunal did not evaluate the intention of the parties on the substantive issue of how they interpreted*

---

[121] Claimant's Costs Submission 7 February 2018 ¶ 8

[122] A combination of the Claimant's Cost Submission of 7 February 2018 and its Supplementary Costs Submission of 8 February 2018

[123] Respondent's Costs Submission 7 February 2018 ¶ 3.2

[124] Claimant's Costs Submission 7 February 2018 ¶ 7

*competing termination clauses*"[125] and were therefore open to further discussion in the context of the Preliminary Legal Issue.

202  The Respondent's request is that the Tribunal award Respondent its total costs of US$ 55,615.37, and deny any requested award of costs to Claimant. The Respondent submitted evidence supporting the sum claimed.

203  The Sole Arbitrator is of the view that it is most appropriate, in the context of a Partial Award dealing strictly with a narrow legal question, that the discretion to apportion costs of this Second Partial Award be limited to the costs expended in the determination of that legal issue. Therefore, the advance on costs amount paid by the Claimant on behalf of the Respondent is not considered in this award, but can be dealt with either by a separate application or in the Final (or other) Award.

204  Likewise, for the same reason, the Sole Arbitrator does not consider matters of conduct of the Parties unrelated to this Preliminary Legal Issue, including the allegation of a strategy on the part of the Respondent of engaging in delaying tactics so as to put financial pressure on the Claimant.

205  The Sole Arbitrator is also of the view that, in exercising discretion as to costs in respect of the Preliminary Legal Issue application, it is appropriate to consider the relative efficiency and helpfulness of the Parties. The Claimant suggested the Preliminary Legal Issue as a means of progressing the case while the Qatari courts are considering a matter related to this case. This is helpful to the arbitral process and leads to efficiencies in the conduct of the arbitration.

206  The Respondent opposed the Preliminary Legal Issue application, which is a neutral factor in the apportionment of costs. Obviously, the Tribunal and the arbitral process benefit from vigorous adversarial argument on the issues of the arbitration. However, as argued by the Claimant, much of the Respondent's argument re-litigated issues that had been determined in the First Partial Award and in Procedural Order No. 6. To the extent that this occurred[126], it is a negative factor due to inefficiency dealing with matters argued by the Respondent which had already been determined.

207  When examining the costs claimed by the Parties as relate to the Preliminary Legal Issue, one can also see the balance of efficiencies on the Claimant's side. The Claimant claimed US$ 21,511.40[127] for this application, whereas the Respondent claimed costs of US$ 55,615.37[128].

---

[125] Respondent's Costs Submission 7 February 2018 ¶ 3.3

[126] Please see ¶¶ 156, 162, 175 and 176 where determinations made by the First partial Award were pointed out, and ¶¶ 154, 155, 161, 163 and 171 where determinations made by in P.O. No. 6 were used, and ¶ 160, Respondent argued the "original" JVA contrary to its 16 March 2017 submission.

[127] Claimant's Costs Submission 7 February 2018 Appendix 'A', Legal Cost Report

[128] Respondent's Costs Submission 7 February 2018 ¶ 4.1 and Exhibit 'A'



208 Given the efficient and effective way in which the Claimant addressed the Preliminary Legal Issue, the Sole Arbitrator grants it the costs of this application.

209 The Sole Arbitrator finds that the costs charged by the Claimant for this application (US$ 21,511.40) are reasonable. The factors taken into account in making this finding are:

209.1     The costs were proportionate, particularly when compared to those of the Respondent's; and

209.2     The rates charged are within the market rate, as argued by the Claimant.

210 The Sole Arbitrator is satisfied, by an examination of Appendices 'A' and 'B' provided by the Claimant, that the items of costs set out therein were actually incurred.

211 Therefore, the Sole Arbitrator grants the Claimant its costs in this Second Partial Award in the amount of US$ 21,511.40.

## XXII. OPERATIVE PART

212 For the reasons set out earlier in this Second Partial Award, the Sole Arbitrator decides and Awards as follows:

(1) It is declared that Black Cat Engineering & Construction WLL was not entitled to terminate the Fire Suppression Alliance Agreement dated 1 July 2013 for convenience without consequently compensating A&C Construction & Installation Co. WLL for any resulting lost profits if proven.

(2) The Respondent Black Cat Engineering & Construction WLL shall pay United States Dollars Twenty-one thousand five hundred eleven and forty cents (US$ 21,511.40) to the Claimant A&C Construction & Installation Co. WLL as costs relating to this Second Partial Award.

(3) All other requests and claims of A&C Construction & Installation Co. WLL and Black Cat Engineering & Construction WLL are reserved for future award(s).

**MADE AND RENDERED** by the Arbitral Tribunal, in Doha, State of Qatar, which is the seat of the Arbitration, on this 18th day of April 2018.

**The Tribunal:**

**Mr. Victor Leginsky** (Sole Arbitrator):

(Signature)     ...........................................

ATTACHMENT 'A'



 

such activities. The Steering Committee shall carefully monitor the project schedule and the progress of the Project. The Steering Committee shall consist of four (4) individuals, two (2) individuals to be nominated by BCEC and two (2) to be nominated by A&C. Each nominating Party shall have the right to remove and replace its appointed members on the Steering Committee at any time upon notice to the other Parties. The Steering Committee shall meet as often as is necessary or appropriate to carry out the activities contemplated by this Agreement, which meetings may be held by telephone. Each Party shall be entitled to convene a meeting of the Steering Committee upon seven (7) days' prior written notice to the other Parties (or less if all Parties agree). The quorum of the Steering Committee shall be one (1) representative of each Party present in person or by proxy. All decisions of the Steering Committee shall require the approval of all members of the Steering Committee present at such meeting in person or by proxy. In the event that a unanimous decision has not been taken within seven (7) days from the date on which any matter is raised at a Steering Committee meeting, then such matter shall be referred to the chief executive officers of BCEC and A&C for amicable resolution. The Chairman of the Steering Committee shall be appointed by BCEC as the indicated leader of the JV.

5.  RESPONSIBILITIES WITHIN THE JOINT VENTURE

In the event that the Project is awarded to the JV and the Contract is executed with the Client and the JV, the Parties shall assume under the Contract joint and several liability towards the Client for the proper fulfillment of the Contract.

6.  JVA TERM AND TERMINATION

6.1  This JVA shall commence the Effective Date and shall continue in full force and effect until its expiry or termination in accordance with Clause 6.2.

6.2  This JVA shall automatically terminate on any of the following events:

i.  The decision by the Parties not to submit a Proposal to the Client;
ii.  The Contract is awarded by the Client to a third party;
iii.  The Parties enter into the JV Agreement.

7.  DISPUTES / LAW

7.1  Any dispute arising out of or in connection with this JVA, which cannot be settled amicably by the Senior Management of the Parties within twenty eight (28) days following the receipt by the Party at fault of a notice from the claiming Party, shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one or three arbitrators appointed in accordance with the said Rules. The venue of Arbitration shall be Doha, State of Qatar. The arbitration proceedings shall be conducted in English. The arbitration award shall be final, binding on the Parties, and enforceable with any court of competent jurisdiction.

7.2  This JVA shall in all respects be governed, construed and interpreted in accordance with the laws of the State of Qatar.

**ATTACHMENT 'B'**



INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

Case No. 21945/ZF

Between

## A&C CONSTRUCTION & INSTALLATION CO. WLL

(Doha, Qatar)

Claimant

and

## BLACK CAT ENGINEERING & CONSTRUCTION WLL

(Doha, Qatar)

Respondent

---

## TERMS OF REFERENCE
In accordance with Article 23 of the ICC Arbitration Rules

---

21 March 2017

Place of Arbitration:
Doha, State of Qatar

## TABLE OF CONTENTS

I.THE PARTIES AND THEIR REPRESENTATIVES     3

A.Claimant     3
B.Respondent     3

II.THE ARBITRAL TRIBUNAL     4

III.SECRETARIAT COUNSEL OF THE ICC INTERNATIONAL COURT OF ARBITRATION 4

IV.NOTIFICATIONS AND COMMUNICATIONS     4

V.BACKGROUND OF THE DISPUTE     5

VI.PROCEDURAL HISTORY     6

VII.SUMMARY OF THE PARTIES' POSITION AND RELIEF SOUGHT     7

A.Claimants' Request for Arbitration     7
B.Relief Sought by Claimant     8
C.Respondent's Answer to the Request 9
D.Relief Sought by Respondent 9

VIII.ISSUES TO BE DECIDED     9

IX.THE ARBITRATION CLAUSE     10

X.THE APPLICABLE SUBSTANTIVE LAW     10

XI.PROCEDURAL RULES     10

A.Applicable rules     10
B.Place of arbitration     11
C.Language of the proceedings 11
D.Amount in dispute     11
E.Provisional timetable of the proceedings     11

XII.VAT     11

XIII.DATE AND SIGNATURE     11

## I.   THE PARTIES AND THEIR REPRESENTATIVES

### A.   Claimant

1. Claimant in this arbitration is A&C Construction & Installation Co. WLL (hereinafter referred to as "A&C" or "Claimant"), a company incorporated at the Ministry of Economy and Commerce with Commercial Registration No. 32477 in the State of Qatar, having its registered office at:

> A&C Construction & Installation Co. WLL
> P. O. Box 177
> Doha, Qatar
> T: +974 44329334
> F: +974 44329395

2. Claimant is represented by:

> Mr Abram Moore, Mr. Matthew Walker, Mr Alexios Hallak
> K&L GATES LLP
> 31st Floor, Tornado Tower
> Al Funduq Street, West Bay
> P.O. Box 26100
> Doha, State of Qatar
> Tel: +974 4424 6107
> Fax: +974 4424 6101
> Email: abe.moore@klgates.com, matthew.walker@klgates.com,
> alexi.hallak@klgates.com

> Sultan Al-Abdulla & Partners
> Level 20, Al Fardan Towers
> Al Funduq Street, West Bay
> P.O. Box 177
> Doha, State of Qatar
> Tel: +974 4442 0660
> Fax: +974 4442 0663
> Email: alabdulla@qatarlaw.com, wcattan@qatarlaw.com

### B.   Respondent

> Respondent in this arbitration is Black Cat Engineering & Construction WLL (hereinafter referred to as "Black Cat" or "Respondent"), a company duly organized and existing under the laws of Qatar with Commercial Registration No. 10756 and located at:

> Black Cat Engineering & Construction WLL
> PO Box 12714
> Al Brooq Building, 3rd Floor
> Bin Mahmoud Street
> Doha, State of Qatar

T: +974 4428 0333
F: +974 4442 9899

3. Respondent is represented by:

Mr Jonathan Collier, Paul Fisher
PINSENT MASONS LLP
PO Box 22758. Tornado Tower
West Bay, Doha
State of Qatar
Email: jonathan.collier@pinsentmasons.com,paul.fisher@pinsentmasons.com

Ms Anita Hormis
PINSENT MASONS LLP
PO Box 115580
The Offices 1
One Central
Dubai, United Arab Emirates
Email: anita.hormis@pinsentmasons.com

Sharq Law Firm
Level 17, Alfardan Office Tower
West Bay
P.O. Box 6997
Doha, State of Qatar
a.amin@sharqlawfirm.com

4. Claimant and Respondent are collectively referred to as the "Parties".

II. THE ARBITRAL TRIBUNAL

5. At its session of 24 November 2016, the ICC International Court of Arbitration
(hereinafter referred to as the "Court"), pursuant to Article 13(3) of the 2012 Rules of
Arbitration of the ICC and upon the Canadian National Committee's proposal,
appointed as Sole Arbitrator ( also referred to as "Arbitral Tribunal"):

Mr Victor Leginsky
Villa A05
Arenco Villas
Al Sufouh 2
P.O. Box 214990
Dubai, United Arab Emirates
T:    +971 50 457 3770
F:    +971 4 451 8346
E:    vleginsky@arbitralis.com

### III. SECRETARIAT OF THE ICC INTERNATIONAL COURT OF ARBITRATION

6. As specified in Section XI-A below, this arbitration is conducted under the 2012 Rules of Arbitration of the ICC (hereinafter referred to as the "ICC Rules"). Counsel in charge of the file at the Secretariat of the ICC International Court of Arbitration (hereinafter referred to as the "Secretariat") is Ms Živa Filipič (+33 1 49 53 28 32; fax: +33 1 49 53 57 80; email: ica5@iccwbo.org), together with Deputy Counsel Mr Pedro Arcoverde (+33 1 49 53 28 16), at 33-43, avenue du Président Wilson, 75116 Paris, France.

### IV. NOTIFICATIONS AND COMMUNICATIONS

7. Each Party shall submit simultaneously to the Sole Arbitrator and to the other Party's Counsel a copy of each communication, brief or document to be submitted to the Arbitral Tribunal, with a copy to the Secretariat in electronic format only.

8. Any and all communications in this arbitration shall be valid if made to the above-mentioned addresses.

9. A copy of the Arbitral Tribunal's decisions/orders signed by the Arbitral Tribunal shall be communicated by courier. Its other communications may be made by email.

10. The Parties, their Counsel as well as the Arbitral Tribunal are to notify immediately all Parties to and signatories of the present Terms of Reference and the Secretariat of any change of name, description, address, telephone, fax, email address, etc. Failing such notification, communications sent in accordance with the present provisions shall be valid.

### V. BACKGROUND OF THE DISPUTE

11. The following facts are provided as background information only and are not intended to pre-judge any issue that may arise in this arbitration in relation to any such facts.

12. On 16 October 2011, Claimant entered into a Preliminary Joint Venture Agreement with Respondent (the "JVA") to bid on works in relation to United States Army Corps of Engineers' ("USACE's") tender (through companies such as AMEC or ANHAM) for certain construction on the Blatchford-Preston Complex at the Al Udeid air base in Qatar (the "Project").

13. On 11 September 2012, the Respondent submitted to AMEC a "tender in a joint venture with [the Claimant]" for the construction of two biller buildings "including demolition,



earthworks, paving and site utilities" on the Project. This bid was rejected and AMEC invited Black Cat to submit a tender in its own name.

14. On 1 October 2012, AMEC and the Respondent entered into a contract for the provision of all labour, materials, equipment and supervision in respect of the construction of 2 billet buildings (the "MEP Works"). The Claimant and the Respondent contracted via the Subcontract Alliance Agreement dated 31 January 2013 for the MEP Works (the "MEP Agreement").

15. On 24 January 2013, AMEC and the Respondent entered into a contract to provide the internal fire suppression construction for the 2 billet buildings ("Fire Suppression Work"). The Claimant and the Respondent contracted via the Subcontract Alliance Agreement dated 1 July 2013for the Fire Suppression Work (the "Fire Suppression Agreement").

16. A dispute arose between the Parties in connection with the Fire Suppression Work and/or the termination or alleged termination of the Fire Suppression Agreement, and/or the alleged breach of the JVA.

VI. PROCEDURAL HISTORY

17. On 12 May 2016, Claimant filed with the Secretariat its Request for Arbitration (hereinafter referred to as the "Request"), together with 4 appendices. As the JVA's arbitration clause stipulated that disputes be heard "by one or three arbitrators appointed in accordance with the [ICC] Rules", Claimant suggested that the dispute be settled by one arbitrator as, *inter alia*, the "sums in issue in the arbitration are relatively modest".

18. On 17 May 2016, the Secretariat acknowledged receipt of Claimant's Request and assigned the present case number.

19. On 17 June 2016, the Secretariat notified Claimant's Request to Respondent. It invited Respondent to provide its Answer to the Request ("Answer") and to comment on the number of arbitrators and, as the case may be, on Claimant's proposed qualifications for the sole arbitrator in its Answer or any request for an extension of time for submitting its Answer.

20. On 13 July 2016, the Respondent requested an extension of time for submitting its Answer to 6 September 2016, and, due to alleged complexity of this dispute, requested an Arbitral Tribunal comprising 3 arbitrators.

21. On 20 July 2016, the Secretariat noted Respondent's request and gave a preliminary extension of time until 22 August 2016 for its Answer (asking for the Claimant's position on a further extension), and requested payment of the provisional advance on costs.

22. On 23 July 2016 the Claimant sent a letter, dated 22 July 2016, to the Secretariat disagreeing with any further extension of time for the Answer, and restating its position that a sole arbitrator be appointed.

23. On 22 August 2016 the Respondent provided its Answer, setting out its jurisdictional plea and restating its position that 3 arbitrators be appointed.

24. On 22 August 2016, the Secretariat acknowledged Respondent's Answer and further noted that the provisional advance on costs had been paid. It requested the Respondent to provide comments on the qualifications of suggested nominee and chairperson. By letter dated 30 August 2016 the Respondent provided those requested comments.

25. On 1 September 2016, the Secretariat wrote to the Parties informing them that, on the same date, the Court had decided to submit the arbitration to one arbitrator (Article 12(2)) and fix the advance on costs at US$80,000, subject to later readjustments (Article 36(2)), and further invited the Parties to jointly nominate the sole arbitrator by 15 September 2016.

26. On 22 September 2016, the Secretariat wrote to the Parties informing them that, on the same date, the Court had decided to take the necessary steps for the appointment of the sole arbitrator (Article 13(3)).

27. On 8 October 2016, the Secretariat wrote to the Parties informing them that, on 6 October 2016, the Court appointed Ms. Erin Miller Rankin as sole arbitrator upon the Canadian National Committee's proposal (Article 13(3)).

28. On 10 November 2016, the Secretariat wrote to the Parties informing them that, on the same date, the Court accepted Ms. Miller Rankin's resignation acting as sole arbitrator (Article 15(1)) and indicated to the Parties that it took the necessary steps for the appointment of the sole arbitrator (Article 13(3).

29. On 24 November 2016, the Secretariat wrote to the Parties informing them that, on the same date, the Court appointed Mr Victor P Leginsky as sole arbitrator upon the Canadian National Committee's proposal (Article 13(3)).

30. On 25 November 2016, Victor P Leginsky wrote to the Parties informing them of his appointment by the Court as the Sole Arbitrator. He invited the Parties to agree on the

date and the formalities of a Case Management Conference.

31. On 26 November 2016, Victor P Leginsky wrote to the Parties attaching draft Terms of Reference and draft Specific Procedural Rules for use in the proceedings, requesting the Claimant to provide its comments by 4 December 2016 and the Respondent to provide its, on the Claimant's, by 11 December 2016.

32. On 25 January 2017, the first Case Management Conference was held by telephone conference pursuant to Article 24(4) of the ICC Rules.

## VII. SUMMARY OF THE PARTIES' POSITION AND RELIEF SOUGHT

33. The purpose of the following summaries, provided by the Parties at the Arbitral Tribunal's request, is to satisfy the requirements of Article 23(1)(c) of the ICC Rules, without prejudice to any other or further allegations, arguments or contentions contained in the pleadings or submissions already filed and in such submissions as will be made in the course of this arbitration. No statement or omission in the summary of either Party is to be interpreted as a waiver of any issue of fact or law. By signing these Terms of Reference, neither Party subscribes to or acquiesces in the summary of the other Party. By accepting such summaries, the Arbitral Tribunal expresses no views whatsoever as to the relevance of the facts set out, the relevance or validity of any agreements mentioned or any rights, defences or objections asserted, made or raised by either Party.

### A. Claimant's Request for Arbitration

34. This action arises because Respondent has purported to terminate the Fire Suppression Agreement "for convenience" and without paying Claimant the profits to which it is entitled pursuant to the JVA. Respondent has no contractual right to terminate for convenience. Even if Respondent did have such a right, it would not be entitled to terminate the Fire Suppression Agreement and refuse to compensate Claimant in bad faith and unlawfully as it has here.

35. Claimant brings the following claims against Respondent:

    a. *Breach of the JVA by Respondent* - The JVA is a valid and binding contract between Claimant and Respondent. The JVA is a foundational agreement, the terms of which have also been incorporated into the Fire Suppression Agreement. Respondent has breached the JVA by, among other things: (i) terminating the Fire Suppression Agreement while refusing to pay Claimant its share of the profits under the JVA; and (ii) taking over and/or assigning

responsibility for the Fire Suppression Works in violation of the express terms of the JVA.

b. *Breach of Respondent's obligation of good faith* - Respondent's termination of the Fire Suppression Agreement without cause or compensation constitutes bad faith conduct in violation of Article 172 of the Qatari Civil Code. As further detailed in the Request for Arbitration, Respondent terminated the Fire Suppression Agreement only after it became clear that this contract was about to become significantly more profitable. Respondent, hoping to keep all of the profits for itself, simply terminated Claimant and refused to provide any justification whatsoever for its bad faith conduct.

c. *Respondent's Unlawful exercise of a right* - Even if Respondent had a right to terminate Claimant under the Fire Suppression Agreement without compensation, the exercise of such right would be unlawful pursuant to Article 63 of the Qatari Civil Code. Article 63 states that the exercise of a right is unlawful if its only intention is to harm another or if by its nature it causes excessive or unaccustomed damage to the other. Respondent's termination of the Fire Suppression Agreement, without Respondent having been terminated by AMEC, is totally inappropriate and contrary to the industry norm for joint venture partners in the construction industry and the damage caused to Claimant as a result of such termination would be totally excessive and disproportionate.

B.  **Relief Sought by Claimant**

36.  Without prejudice to Claimant's right to supplement the same during the course of the Arbitration, Claimant seeks the following:

a. Respondent shall compensate Claimant for all costs it has incurred to date associated with the performance of the Fire Suppression Work (an amount currently estimated at US$472,000);

b. Claimant shall receive 50% of any and all profits that Respondent earns as a result of performing the Fire Suppression Work (an amount currently estimated at US$370,000);

c. Moral damages for Respondent's conduct in violation of Articles 172 and 63 of the Qatari Civil Code in the sum of US$168,400 (being 20% of the sum in issue, an amount falling within the normal contemplation of moral damages), pursuant to Articles 202, 203 and 264 of the Qatari Civil Code;



      d. Interest (including interest on the costs) at such rate and for such a period as the Arbitral Tribunal shall determine;

      e. Claimant's costs of these proceedings, including legal and arbitral fees; and

      f. Such further and other relief as the Arbitral Tribunal finds just and equitable.

## C.  Respondent's Answer to the Request

37. The arbitral tribunal has no jurisdiction in relation to the purported claims as set out in the Request. This includes, but is not limited to, the following:
        a. A&C has mischaracterised the alleged breaches of contract as breaches of the JVA. The dispute arises out of alleged breaches of the Fire Suppression Agreement between A&C and BCEC. The Fire Suppression Agreement contains no agreement to refer a dispute to arbitration; and
        b. Even if the breaches arise out of the JVA, which is denied, the JVA does not contain a valid arbitration agreement.

38. Accordingly, BCEC respectfully submits that an arbitral tribunal has no jurisdiction in this matter. Instead the proper forum is the Qatari courts.

39. BCEC's participation in the Answer is without prejudice to its position that the arbitral tribunal has no jurisdiction.

40. It is wrong to say that the "joint venture....was awarded the MEP works and the Fire Suppression works". It was BCEC that was awarded these works, not any "joint venture". BCEC subcontracted these works to A&C and throughout the project, all aspects of the parties' relationship has been as contractor/subcontractor.

41. On 16 December 2015 the Fire Suppression Agreement was terminated for convenience by BCEC in accordance with clause 29 (dated 1 October 2012 between AMEC and BCEC, which is incorporated by reference into the Fire Suppression Agreement and accordingly applies as between BCEC and A&C). There were serious failures by A&C in its performance of the Fire Suppression Agreement. BCEC requested that A&C provide details of any legitimate costs incurred as at the date of breach. A&C have as yet failed to provide any substantiating evidence for such costs.

42. The Respondent denies that the Claimant has any entitlement to the relief sought in the Request.

## D.  Relief Sought by Respondent

43. BCEC respectfully requests the tribunal appointed in this matter to declare that:



a. It does not have jurisdiction in this matter; and

b. in the alternative, A&C has no entitlement to the relief sought in the Request.

## VIII. ISSUES TO BE DECIDED

44. Subject to Article 23(4) of the ICC Rules, the issues to be determined by the Arbitral Tribunal shall be those resulting from the Parties' submissions, statements and pleadings including forthcoming submissions, statements and pleadings and which are relevant to the adjudication of the Parties' respective claims and defences.

45. This does not limit the rights of the Parties to introduce new allegations of facts or new legal arguments and to raise further relevant issues. New claims will be dealt with in accordance with Article 23(4) of the ICC Rules.

## IX. THE ARBITRATION CLAUSE

46. The arbitration clause is contained in Clause 7 of the JVA, "Disputes/Law", at sub-clause 7.1, and reads as follows:

> *"7.1 Any dispute arising out of or in connection with this JVA, which cannot be settled amicably by the Senior Management for the Parties within twenty eight (28) days following the receipt by the Party at fault of a notice from the claiming Party, shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one or three arbitrators appointed in accordance with the said Rules. The venue of arbitration shall be Doha, State of Qatar. The arbitration proceedings shall be conducted in English. The arbitration award shall be final, binding on the Parties, and enforceable with any court of competent jurisdiction."*

47. The applicability of this clause is challenged by the Respondent in its jurisdictional plea.

48. For the avoidance of doubt, upon signing these Terms of Reference, the parties confirm that no provision within them constitutes an arbitration agreement between the parties.

## X. THE APPLICABLE SUBSTANTIVE LAW

49. According to Clause 7 of the JVA, sub-clause 7.2, *"[t]his JVA shall in all respects be governed, construed and interpreted in accordance with the laws of the State of Qatar"*..

50. The applicability of this clause is challenged by the Respondent as part of its jurisdictional plea.

## XI. PROCEDURAL RULES

### A. Applicable rules

51. The present arbitration shall be conducted in accordance with the mandatory rules of the law of the State of Qatar, the ICC Arbitration Rules in force as from 1st January, 2012, the present Terms of Reference and "Specific Procedural Rules" to be issued by the Arbitral Tribunal after consultation with the Parties. Where these mandatory provisions or the Specific Procedural Rules are silent and failing a specific agreement between the Parties the proceedings shall be governed by the rules which the Arbitral Tribunal deems appropriate.

52. The Parties grant the Arbitral Tribunal the power to issue procedural orders on specific procedural issues if and when needed.

53. The Arbitral Tribunal shall not assume the powers of an amiable compositeur or decide ex aequo et bono.

### B. Place of arbitration

54. The Parties agree that the arbitration clause provides for Doha, State of Qatar as the place of arbitration.

55. In accordance with Article 18(2) of the ICC Rules, the Arbitral Tribunal may after consultation with the Parties, conduct hearings and meetings at any location it considers appropriate, unless otherwise agreed by the Parties.

### C. Language of the proceedings

56. According to the arbitration clause, the language of the proceedings is English.

### D. Amount in dispute

57. The amount in dispute is currently quantified at US$1,010,400.00 plus interest and all of the Claimant's costs of these proceedings (including legal and arbitral fees).

### E. Provisional timetable of the proceedings

58. To be issued, after consultation with the Parties, at the date of signing hereof, or as soon as possible thereafter.

## XII. VAT

59. It is understood by the Parties and the sole arbitrator that Appendix III, Article 2, paragraph 13 of the ICC Rules is applicable. This paragraph provides: "*Amounts paid to the arbitrator do not include any possible value added tax (VAT) or other taxes or charges and imposts applicable to the arbitrator's fees. Parties have a duty to pay any such taxes or charges; however, the recovery of any such charges or taxes is a matter solely between the arbitrator and the parties*".

60. As between them and the arbitrators, the Parties take note that the Sole Arbitrator may have to pay value added tax on his fees and expenses. To the extent that this is the case, the sole arbitrator subject to VAT is entitled to claim, directly from the Parties, in addition to any entitlements received from the ICC, any value-added taxes to be paid by him. The Parties will jointly and severally be obliged to pay such taxes on demand. The arbitrator, if subject to VAT, may request the Parties to pay under the same conditions a retainer on VAT..

## XIII. DATE AND SIGNATURE

61. These Terms of Reference are signed in four originals by the persons mentioned hereafter and may be executed by counsel of the Parties, who hereby represent that they have the authority to execute this document on behalf of their respective clients as evidenced by the submitted Powers of Attorney.

Place of Arbitration: Doha, Qatar.

Date: 21 March 2016

(Doha, Qatar)

(Doha, Qatar)

Mr Victor P Leginsky, Sole Arbitrator



## ATTACHMENT 'C'

CASE NO 21945/ZF/AYZ

IN THE MATTER OF AN ARBITRATION UNDER THE

RULES OF THE INTERNATIONAL CHAMBER OF COMMERCE

BETWEEN

A&C CONSTRUCTION & INSTALLATION CO. WLL (Doha, Qatar)

Claimant

-and-

BLACK CAT ENGINEERING & CONSTRUCTION WLL (Doha, Qatar)

Respondent

---

PROCEDURAL ORDER NO. 6

10 SEPTEMBER 2017

---





ICC Case No. 21945/ZF/AYZ P.O. No. 6

BACKGROUND

1. On 13 July 2017 the Arbitral Tribunal (Sole Arbitrator) in ICC Case No. 21945/ZF/AYZ received a letter from the Respondent alleging that the Claimant had misled the Arbitral Tribunal "...(*whether deliberately or by accident*)..." as to the composition of a key document in these proceedings, the Preliminary Joint Venture Agreement between the Parties dated 16 October 2011 (the "JVA").

2. The Respondent brought to the Arbitral Tribunal's attention that the JVA as attached to two other key documents in this proceeding, the MEP Alliance Agreement and the Fire Suppression Alliance Agreement (together, the "Alliance Agreements"), were described in the Alliance Agreements as being "...in 3 No. pages..." whereas the JVA produced by the Claimant in the Request for Arbitration of these proceedings had an additional page inserted containing the subject arbitration agreement (clause 7) (the "Inserted Page") which (although the pages are not numbered) could be described as the 4th page of the 5-page JVA.

3. The Respondent also noted that the Inserted Page bore different makings, that is, the company stamps which appear on the 3 pages of the JVA as attached to Alliance Agreements are missing from the Inserted Page.

4. The Respondent indicates that it was alerted to this discrepancy by documents in a filing made by the Claimant in a US court proceeding wherein the Alliance Agreements containing only the 3 pages of the JVA without the Inserted Page had been filed.

5. The Respondent noted that the Claimant "...*selectively chose* [the Inserted Page] *and not all the supposed "missing" pages including the page containing Clause 1 ("Definitions")*".

6. The Respondent categorized the JVA with the Inserted Page as an "*incorrect and misleading version*" and stated that the Arbitral Tribunal had inadvertently relied on this incorrect and misleading version on 5 occasions in the Partial Award on jurisdiction, dated 12 June 2017 ("Partial Award"), in these proceedings.

7. The Respondent had brought these discrepancies to the attention of the Claimant by letter dated 6 July 2017 and the Claimant had replied by letter dated 12 July 2017 to the effect that two separate copying errors had been made; first, when the Alliance Agreements were assembled, the first, third and fifth pages of the JVA were utilised but the second and fourth were not; second, when submissions were made in this proceeding, the error was only partially corrected by use of the Inserted Page, which is the fourth page.

8. The Claimant in its letter of 12 July noted that the Respondent had fully corrected the situation in this proceeding by placing before the Arbitral Tribunal the fully corrected JVA comprising all 5 pages in a submission dated 16 March 2017.

9. The Claimant had also noted that it would correct the filing it made in the US court proceeding by submitting the same 5-page complete JVA attachment to the Alliance Agreements that the Respondent placed before the Arbitral Tribunal in these proceedings.

10. However, the Claimant's responses in its letter of 12 July had not answered the concerns of the Respondent, as the Respondent took the view that the JVA as attached to the Alliance Agreements comprised 3 pages without the Inserted Page and without the second and fourth

2

pages, and that the Claimant had misled the Arbitral Tribunal by adding the Inserted Page. The Respondent takes this position because it has in its possession the version of the JVA in 3 pages without the Inserted Page and without the second and fourth pages.

11. A second Case Management Conference ("CMC") was held in this proceeding on 26 July 2017. The issue of the JVA's composition and submission in this proceeding was discussed. Following that CMC, the Respondent confirmed by email that it would be willing to put its submissions (both in terms of the facts, substantive law and procedural rules upon which it relies) in written form, and did so by means of a complete submission date 2 August 2017.

12. In its 2 August 2017 submission, the Respondent stated (in summary):

    a. The original JVA dated 16 October 2011 contained 5 signed pages;

    b. The Alliance Agreements had appended to them copies of what was described as *'Preliminary Joint Venture Agreement dated 16th October, 2011 in 3 No. Pages.'* (emphasis added);

    c. The version of the JVA in the Fire Suppression Alliance Agreement produced by the Claimant in these proceedings included the Inserted Page;

    d. The version of the JVA in the MEP Alliance Agreement produced by the Claimant in these proceedings included the Inserted Page (save in respect of some different manuscript markings at clause 6.2);

    e. The Inserted Page does not bear the same corporate stamps as the JVA pages that were appended to the Alliance Agreements and so could not have been original appendices to the Alliance Agreements;

    f. The Claimant's court filing in the US shows the same 3-page JVA appendices not containing the Inserted Page;

    g. It was entirely misleading for the Claimant to have confirmed to the Arbitral Tribunal and the Respondent that the Alliance Agreements served in these proceedings were 'true and correct' copies of the originals when they had, without flagging the insertion, added the Inserted Page to the JVA appendices to the Alliance Agreements; and

    h. The Alliance Agreements themselves claim to exhibit JVA attachments with 3 No. pages (see 12(a) above).

13. The Respondent argues in its 2 August 2017 submission that the Claimant's actions of adding the Inserted Page to the JVA appendices to the Alliance Agreements without telling the Arbitral Tribunal or Respondent is tantamount to fraud.

14. The Respondent concludes from its 2 August 2017 submission that:

    a. The Arbitral Tribunal does not have the jurisdiction to make a finding of fraud but that annulment proceedings relating to this arbitration, filed on 16 July 2017, are pending before the domestic Qatari courts which proceedings include a plea of fraud on the documents, and the Respondent asks that the Arbitral Tribunal suspend this arbitration pending the outcome of those domestic Qatari court proceedings;

    b. Alternatively, the Respondent requests that the Arbitral Tribunal resign as it can no longer fulfil the duties under the ICC Arbitration Rules to ensure that:

        i. Any Final Award rendered is enforceable given (Article 41 of the Rules); or



3

    ii. That the Arbitral Tribunal can continue to act impartially and independently in full knowledge that the Claimant has misled the Arbitral Tribunal (see grounds for removing arbitrator at Article 14(1) of the Rules);

  c. The Respondent, in the further alternative, posits that it is open to the Arbitral Tribunal to issue a Final Award dismissing the Claimant's claims if the Arbitral Tribunal concludes that, in light of the Claimant's conduct, it is not possible to continue to conduct a fair arbitration; and

  d. The Respondent requests that the Arbitral Tribunal dismiss the Claimant's application for a second 'Final Partial Award' dismissing this application (made by the Claimant during the second CMC) which would require the Arbitral Tribunal to determine a matter that is currently before the Qatari courts.

15. The Respondent cited Qatar Law 13 of 1990 Civil and Commercial Procedural Law (Lexis Nexis), Articles 165, 178 and 185 to the effect that an arbitral award can be set aside on grounds including fraud, and also cited *Celtic Bioenergy Limited v Knowles Limited* [2017] EWHC 472 (TCC), and English High Court judgement on setting aside for serious irregularity where the award was obtained by fraud or in a manner contrary to public policy.

16. The Respondent further cited Qatar Law 11 of 2004, Penal Code (Lexis Nexis), Article 204 in regard to criminal fraud.

17. The Arbitral Tribunal directed the Claimant to reply to the 2 August 2017 submission and it did so by means of one dated 6 September 2017.

18. The Claimant had stated, in its 12 July letter, at ¶2, "*We confirm that there was an apparent copying error made in appending the Preliminary Joint Venture Agreement dated 16 October 2011 (the "JVA") to the two Subcontract Alliance Agreements between the parties. While pages 1, 3 and 5 of the JVA were copied, it appears that pages 2 and 4 inadvertently were not. We can only surmise that the copy of the JVA in BCEC's files was printed on double-sided paper, and that the back sides of the pages were not copied in the version of the JVA that was appended to the Alliance Agreements. In any event, both of the Alliance Agreements expressly refer to and incorporate the "Preliminary Joint Venture Agreement Dated 16th October, 2011" - a binding agreement with which both parties were familiar.*"

19. In its 6 September submission, it amplified it position by arguing that it did not matter what was actually appended to the Alliance Agreements because the JVA (agreed by both Parties to comprise a JVA dated 16 October 2011 containing 5 signed pages) was incorporated by reference, not by attachment, into the Alliance Agreements in any event.

20. The Claimant had stated, in its 12 July letter, at ¶3:

"*In the version of the JVA that A&C submitted to the Tribunal, it partially corrected BCEC's copying error by including the missing page 4 [the inserted Page]. BCEC then fully corrected its error by helpfully submitting the full JVA to the Tribunal, including both of the missing pages, and explaining as follows:*

*The Preliminary JVA previously exhibited to the Respondent's submissions was the version appended to the Claimant's Request for Arbitration. It is noted that this omits the*

4

*crucial 'definitions' page within the Preliminary JVA. The full Preliminary JVA is exhibited to these submissions.* (Respondent's Reply to Claimant's Submissions on the Preliminary Issue of the Arbitrator's Jurisdiction, ¶3.4, 16 March 2017)

*The copy BCEC appended included all five pages of the JVA, including page 2, which BCEC characterized as a "crucial" missing page. A&C obviously did not contest this and promptly accepted BCEC's position that the five-page version of the JVA is in fact the full version that the parties have agreed to*.

21. In its 6 September submission, it added:

"*Claimant does not dispute that it attempted to remedy BCEC's copying error with respect to the version of the JVA attached to both Alliance Agreements* [by means of the Inserted Page].

*Further, because Respondent relied upon the five-page version of the JVA in its argument opposing the Tribunal's jurisdiction, it should be estopped from changing its position in an effort to re-argue the matter.*"

22. The Claimant argues that the Respondent never contended that the Parties did not agree to the arbitration clause, and further argues that it does not contend that the Parties intended to delete the arbitration clause, or any other provisions, from the JVA when incorporating it into the Alliance Agreements.

23. The Claimant says that there is no dispute about the following facts:

    a. In its Request for Arbitration, Claimant included a missing page from the version of the JVA attached to the Alliance Agreements in an effort to remedy an apparent copying error made by the Respondent, such remedying being in accordance with Qatar law, pursuant to which "*[a] calculation or copying mistake shall not affect the validity of a contract and such mistake shall be corrected.*" (Article 133 of Law no (22) of 2004, Qatar Civil Code);

    b. From the inception of these proceedings, Respondent had in its possession its own copies of the Alliance Agreements, which included the same copying error that Claimant attempted to remedy;

    c. Prior to the issuance of the Partial Award (which was made 12 June 2017), Respondent never argued that there was anything improper about Claimant's attempt to remedy the copying error, despite having all the same facts then that it has now;

    d. Prior to the issuance of the Partial Award, Respondent never argued JVA incorporated into the Alliance Agreements did not include an arbitration provision, despite having all of the same facts then that it has now; and

    e. To the contrary, prior to the issuance of the Partial Award, Respondent actually took the position that the controlling JVA did include an arbitration provision - and even submitted own copy of the JVA which included the provision.

24. The Claimant states that there is no evidence whatsoever that Claimant's conduct was "dishonest, reprehensible or unconscionable," or evidence that it acted fraudulently.



5



25. The Claimant also commented on *Celtic Bioenergy Limited v Knowles Limited* as requested by the Arbitral Tribunal.

ANALYSIS

26. The Arbitral Tribunal has reviewed and considered all of the Parties factual and legal submissions, as well as the oral submissions on these matters made during the second CMC.

27. The Arbitral Tribunal finds that this is a case of a series of copying mistakes having been made with regard to the pages comprising the JVA and, as cited by the Claimant "... *copying mistake[s] shall not affect the validity of a contract and such mistake shall be corrected.*" (Article 133 of Law no (22) of 2004, Qatar Civil Code).

28. However, correction has already been previously made in this case, by the Respondent. As set out above, in its submission dated 16 March 2017, well before proceedings were closed for the Partial Award and well before the Partial Award was made, the Respondent placed before the Arbitral Tribunal the full text of the JVA, and this is the document (complete with arbitration clause) that the Arbitral Tribunal considered in making its Partial Award, with the approbation of the Parties.

29. Having considered all of the evidence, the Arbitral Tribunal considers it most likely that 2 JVA pages were omitted in error when being attached to the Alliance Agreements and the person assembling the attachments erroneously listed "3 No. pages" as comprising their JVA component. There is no evidence that the Parties put their minds to amending the JVA by omitting the second and fourth pages from what both Parties agree is a 5-page document.

30. This Arbitral Tribunal finds that the intention of the Parties when they made the Alliance Agreements was to incorporate all 5 pages of the JVA, which they incorporated by reference into the Alliance Agreements, as it is agreed by both Parties that these 5 pages comprise the full JVA.

31. Unfortunately, the error in only having physically attached 3 of the 5 JVA pages to the Alliance Agreements was only partially corrected when the Claimant submitted its Request for Arbitration by the addition of the Inserted Page. The error was not fully corrected until the Respondent helpfully did so in its submission of 16 March 2017, as set out above.

32. It has been noted that the Inserted Page bears different stamps than the other pages of the JVA. However, I find that this discrepancy is of no effect, as no Party objects to any of the substantive content of the Inserted Page.

33. As to any fraud claim, as the Respondent properly submits it is not in this Arbitral Tribunal's remit to make a finding of fraud and it does not entertain that line of argument or embark on that line of inquiry.

34. As to the Respondent's plea for suspension of these proceedings, there is no proven factual matrix upon which to base a decision to suspend this arbitration pending the outcome of domestic Qatari court proceedings. As what both Parties recognize as the full JVA was before this Arbitral Tribunal at the time of the making of the Partial Award, with no objection from either Party, and as this Arbitral Tribunal has found that the intention of the Parties was to incorporate the full 5-page JVA into the Alliance Agreements, the Arbitral Tribunal has no basis for concern that it operated

 

6



under deception or misapprehension due to a Party having misled it, so as to justify suspending this proceeding pending the decision of the court on the documents that were before this Arbitral Tribunal.

35. Given the findings of the Arbitral Tribunal above, there is no basis upon which the Arbitral Tribunal should base a decision to resign as there is no reason to believe that a Final Award would be unenforceable. Likewise, given the findings of the Arbitral Tribunal above, there is no suspicion on the part of the Arbitral Tribunal that it has been misled by either of the Parties so as to impede it continuing to act impartially and independently.

36. Further, given the findings of the Arbitral Tribunal above, there is no basis upon which it should now render an award dismissing the Claimant's claims, as there is no basis to find that a Party's conduct makes it impossible for the Arbitral Tribunal to continue to conduct a fair arbitration.

37. Lastly, it is the view of the Arbitral Tribunal that the proper means of disposing of this application is by Procedural Order and not by partial award, as the Arbitral Tribunal is not finally determining a substantive claim in determining this application, or a threshold jurisdictional issue as in the Partial Award, but rather is making a procedural or discretionary decision within its remit to so do.

ORDERS MADE

The Arbitral Tribunal hereby Orders that:

38. The application made by the Respondent Black Cat Engineering & Construction WLL for:

   a. The suspension of ICC Case No. 21945/ZF/AYZ pending the outcome of a domestic Qatari court proceeding;

   b. The resignation of the Arbitral Tribunal in ICC Case No. 21945/ZF/AYZ;

   c. The immediate making of an award dismissing the claims of the Claimant A&C Construction & Installation Co. WLL in ICC Case No. 21945/ZF/AYZ, or

   d. Any other remedy related to the Respondent's allegation that the Claimant in ICC Case No. 21945/ZF/AYZ has, to the date of this Procedural Order, intentionally misled this Arbitral Tribunal by presenting false or misleading documents relating to the JVA

is hereby dismissed.

39. The application of the Claimant A&C Construction & Installation Co. WLL for the immediate making of a partial award dismissing this application in ICC Case No. 21945/ZF/AYZ is hereby dismissed.

40. The Parties are requested to co-operate in good faith at all times in relation to the conduct of this Arbitration. The Arbitral Tribunal shall take into consideration the Parties' conduct when deciding on the allocation of costs.

41. The Parties are at liberty to apply in respect of the above or any other matter.

 7



ICC Case No. 21945/ZF/AYZ P.O. No. 6

42. This Procedural Order No. 6 may be followed by further orders in the course of this Arbitration.

43. The costs of this Order shall be costs in the reference.

Issued on 10 September 2017

Victor P. Leginsky, Sole Arbitrator
(The Arbitral Tribunal)

8

# ATTACHMENT 'D'

Agreement No: P1011080073
BCEC Subcontract Agreement with AMEC for Al Udeid MEP Works

## BLACK CAT A&C

| Main Subcontract | | AMEC to BCEC | Flowdown Subcontract | | BCEC to A&C |
|---|---|---|---|---|---|
| Contract Value | | 1,534,000 | Net Cost | | 1,394,545 |
| Nett cost (assume 10% profit) | | 1,394,545 | Add A&C share of profit (50%) | | 69,727 |
| Nett profit margin | | 139,455 | Value of Subcontract to A&C | | 1,464,273 |
| 50% equal share to BCEC and A&C | | 69,727 | | | |

Agreed amount of cost for BCEC to support the project (charged direct to A&C as an actual cost) — **58,000**

To be itemized and agreed by both parties beforehand

| Scenario 1 – Cost Saving to Overall Project | | | Flowdown Subcontract | | BCEC to A&C |
|---|---|---|---|---|---|
| Tender Nett Cost | | 1,394,545 | Nett Cost | | 1,394,545 |
| Assumed "Final Actual Cost" | | 1,305,000 | Add A&C share of profit (50%) | | 69,727 |
| Overall Saving | | 89,545 | Value of Subcontract to A&C | | 1,464,273 |
| 50% equal share to BCEC and A&C | | 44,773 | Adjustment of Saving (50% share) | | (44,773) |
| | | | Revised Subcontract Value to A&C | | 1,419,500 |



**Project Cash Flow**
Direct flow of recievables from AMEC (based on monthly re-measurement of work completed) to BCEC will be transferred to A&C (subject to deduction of all approved costs incurred by BCEC which are direct costs to the JV).



# BLACK CAT A&C

Agreement No's: F311900041 & F101900073
BCEC Subcontract Agreement with AMEC for All 1detd MEP Works

## Main Subcontract

| | AMEC to BCEC | | Flowdown Subcontract | | BCEC to A&C |
|---|---|---|---|---|---|
| Contract Value | 5,948,234 | Nett Cost | | | 9,043,376 |
| Nett cost (assume 10% profit) | 9,043,376 | Add A&C share of profit (50%) | | | 452,194 |
| Nett profit margin | 904,388 | Value of Subcontract to A&C | | | 9,498,070 |
| 50% equal share in BCEC and A&C | 452,194 | | | | |

Agreed amount of cost for BCEC to
support the project
(charged direct to A&C as an actual cost) | 250,000 |

* To be transalised and agreed by both parties (assumption)

| | | | Flowdown Subcontract | | BCEC to A&C |
|---|---|---|---|---|---|
| Scenario 1 - Cost Saving to Overall Project | | | Nett Cost | | 9,043,876 |
| Tender Nett Cost | 9,043,876 | | Add A&C share of profit (50%) | | 452,194 |
| Assumed "Final Actual Cost" | 8,454,274 | | Value of Subcontract to A&C | | 9,496,070 |
| Overall Saving | 589,602 | | Adjustment of Saving (50% share) | | (294,801) |
| 50% equal share to BCEC and A&C | 294,801 | | Revised Subcontract Value to A&C | | 9,201,269 |

**Project Cash Flow**
Direct flow of recievables from AMEC (based on monthly re-measurement of work completed) to BCEC will be transferred to A&C (subject
to deduction of all approved costs incurred by BCEC which are direct costs to the JV.



