# EXHIBIT 4

United Nations



# General Assembly

A/HRC/29/26/Add.1

Distr.: General
31 March 2015

Original: English

**Human Rights Council**
**Twenty-ninth session**
Agenda item 3
**Promotion and protection of all human rights, civil,**
**political, economic, social and cultural rights,**
**including the right to development**

## Report of the Special Rapporteur on the independence of judges and lawyers, Gabriela Knaul

**Addendum**

**Mission to Qatar**[*]

*Summary*

    The Special Rapporteur on the independence of judges and lawyers conducted an official visit to Qatar from 19 to 26 January 2014 with the purpose to examine both the achievements and challenges of Qatar in ensuring the independence of the judiciary and the free exercise of the legal profession.

    The Special Rapporteur met with a number of senior government officials at the Ministries of Foreign Affairs, Justice, Interior and Labour, as well as the Chief Justice of the Court of Cassation and other members of the judiciary, the Attorney-General, the speaker of the Advisory Council, representatives of the Qatar Financial Centre Authority and the Qatar International Court and Dispute Resolution Centre, the National Human Rights Committee, lawyers, members of the diplomatic community and other stakeholders.

---

[*]   The summary of the present report is circulated in all official languages. The report itself, contained in the annex to the summary, is circulated in the language of submission and in Arabic only.

GE.15-06846  (E)

\*1506846\*



 Please recycle



The Special Rapporteur presents her findings and concerns regarding (a) the independence and impartiality of the judiciary, including respect for the principle of separation of powers, the selection and appointment of judges and the impartiality of the judiciary; (b) non-Qatari judges; (c) accountability and disciplinary measures for judges; (d) fair trial, due process guarantees and the administration of justice; (e) access to justice and the situation of migrant workers; (f) women in the justice system; (g) prosecution services; (h) lawyers; and (i) education and training.

The Special Rapporteur recognizes that Qatar has come a long way in a short time with respect to developing its justice system. Yet, in spite of Qatar's progress and achievements, the Special Rapporteur is concerned that the challenges and shortcomings she identified are serious and negatively affect the independence and impartiality of the justice system, as well as the realization of people's human rights. If left unaddressed, those challenges and shortcomings will also undermine positive reform efforts.

# Annex

*[Arabic and English only]*

## Report of the Special Rapporteur on the independence of judges and lawyers on her mission to Qatar

## Contents

|  |  |  | *Paragraphs* | *Page* |
|---|---|---|---|---|
| I. | Introduction | | 1–4 | 4 |
| II. | Justice system | | 5–33 | 4 |
|  | A. | Constitutional provisions | 6–8 | 4 |
|  | B. | Legal framework | 9–15 | 5 |
|  | C. | Court structure | 16–28 | 6 |
|  | D. | Qatar Financial Centre | 29–33 | 8 |
| III. | Challenges to the independence and impartiality of the judiciary and the proper administration of justice | | 34–86 | 8 |
|  | A. | Independence and impartiality of the judiciary | 35–45 | 9 |
|  | B. | Judges who are non-nationals of Qatar | 46–51 | 11 |
|  | C. | Accountability and disciplinary measures | 52 | 11 |
|  | D. | Fair trial, due process guarantees and administration of justice | 53–63 | 12 |
|  | E. | Access to justice and the situation of migrant workers | 64–70 | 14 |
|  | F. | Women in the justice system | 71–74 | 15 |
|  | G. | Prosecution services | 75–77 | 16 |
|  | H. | Lawyers | 78–82 | 16 |
|  | I. | Education, training and capacity-building | 83–86 | 18 |
| IV. | Conclusions | | 87–90 | 18 |
| V. | Recommendations | | 91–128 | 19 |

# I. Introduction

1.     The Special Rapporteur on the independence of judges and lawyers, Gabriela Knaul, visited Qatar from 19 to 26 January 2014 at the invitation of the Government. She wishes to commend the Government's recent engagement with human rights mechanisms and hopes that this engagement will continue and be strengthened.

2.     The purpose of the visit was to examine, in the spirit of cooperation and dialogue, both the achievements and shortcomings of Qatar in ensuring the independence of the judiciary and the free exercise of the legal profession. The Special Rapporteur also concentrated on key issues regarding the administration of justice, such as due process and fair trial guarantees, access to justice and legal aid, the position of women in the justice system, accountability of judges and challenges related to the independence of non-Qatari judges.

3.     The Special Rapporteur visited Doha, where she met with a number of senior government officials at the Ministries of Foreign Affairs, Justice, Interior and Labour, as well as the Chief Justice of the Court of Cassation and other members of the judiciary, the Attorney-General, the speaker of the Advisory Council and lawyers. She also met with representatives of the Qatar Financial Centre Authority and the Qatar International Court and Dispute Resolution Centre, the National Human Rights Committee and the diplomatic community, as well as other stakeholders.

4.     The Special Rapporteur wishes to warmly thank the Government of Qatar for its invitation and engagement with her mandate, while fully respecting her independence. She notes with appreciation that, in the region, Qatar was the first State to issue a standing invitation to the special procedures of the Human Rights Council, on 1 June 2010, and the first to create a National Human Rights Institution in accordance with the principles relating to the status of national institutions (Paris Principles). She also thanks the United Nations Human Rights Training and Documentation Centre for South-West Asia and the Arab Region for its dedicated support in organizing the visit, and all those who dedicated their time to share their expertise and opinions with her.

# II. Justice system

5.     A dual judicial system, composed of sharia and adlia courts, prevailed in Qatar from its independence in 1971 until the enactment of Law No. 10 of 2003, which set up a unified court system.

## A. Constitutional provisions

6.     The Permanent Constitution of Qatar was ratified by public referendum on 29 April 2003, promulgated by the Emir on 8 June 2004 and entered into force on 9 June 2005. It recognizes the principle of separation of powers in its article 60.

7.     The judicial authority is regulated by chapter five of part IV of the Constitution, which includes provisions establishing the supremacy of the law (article 129) and recognizing the independence of the judiciary (articles 130 and 131), that judges shall not be removed from office arbitrarily (article 134), that court sessions shall be public (article 133) and that everyone shall have access to the courts (article 135). Chapter five also enshrines the existence of the Supreme Council of the Judiciary, the body in charge of the administration of the courts (article 137). The Constitution further defines the general role of the Attorney-General as that of conducting public prosecution in the name of the

people, supervising law enforcement and ensuring the application of criminal laws (article 136).

8.      In addition, the Constitution guarantees in its part III a selected list of fundamental rights and freedoms. Of interest to the Special Rapporteur's mandate, guarantees relating to equality before the law, the principle of legality, the right not to be arbitrarily arrested and detained, the presumption of innocence and the right to defend oneself are enshrined. Finally, article 6 of the Constitution stipulates that the State shall respect and strive to implement all international conventions and agreements to which it is a party.

## B.  Legal framework

9.      Qatar is governed by a legal system based on a mixture of civil law and sharia (or Islamic law); sharia law is recognized in the Constitution as the principal source of legislation (article 1). British common law-inspired legislation is also applied by the institutions of the Qatar Financial Centre (see below). Some of the most fundamental pieces of legislation related to the mandate of the Special Rapporteur are listed in this section.

10.      The judiciary is governed by Law No. 10 of 2003 "on the Judicial Authority" (as amended), which establishes, inter alia, the structure, composition, jurisdiction and internal functioning of the courts; the Supreme Council of the Judiciary, its composition and competence; the recruitment conditions, appointment, promotion, tenure and retirement age of judges; and the independence, duties and accountability of judges, as well as disciplinary procedures. Law No. 10 of 2003 was complemented by Law No. 12 of 2008, which set up a Supreme Constitutional Court (not yet operational, see below).

11.      Law No. 10 of 2002 "on the Public Prosecution" (as amended) established the public prosecution as an independent judicial body headed by the Attorney-General. The law sets out the composition and hierarchy of the public prosecution; the recruitment conditions, appointment, promotion, tenure and retirement age of prosecutors; and the duties and accountability of prosecutors, as well as disciplinary procedures. The Law also determines the powers of the public prosecution, which include, among other functions prescribed by the law, the investigation of crimes and the supervision of the investigation when delegated; the initiation of criminal cases, their conduct before the courts and the launching of appeals against judgments and all procedures related thereto; and the monitoring of prisons and other places of detention.

12.      The rights and duties of lawyers are defined in Law No. 23 of 2006 "on the Code of Law Practice", which also regulates the conditions to be admitted and registered as a practicing lawyer; disciplinary proceedings and measures; the provision of free legal aid; and the allocation of licenses to practice law to international firms and permits to practice law to non-Qatari lawyers.

13.      The legal framework is further completed by the Penal Code (Law No. 11 of 2004, as amended) and the Civil Code (Law No. 22 of 2004); the Criminal Procedure Code (Law No. 23 of 2004, as amended) and the Civil and Commercial Procedures Law (Law No. 13 of 1990, as amended), both of which the Government recognized needed updating; and Law No. 12 of 2005 on Procedures in Non-penal Cassation Appeals (as amended).

14.      At the international level, Qatar is a State party to several human rights treaties, including the International Convention on the Elimination of All Forms of Racial Discrimination, the Convention on the Elimination of All Forms of Discrimination against Women and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.

A/HRC/29/26/Add.1

15.     At the regional level, Qatar ratified the Arab Charter on Human Rights, which contains a comprehensive set of binding provisions related to the mandate of the Special Rapporteur, including the right to an effective remedy for violations of the rights and freedom recognized in the Charter (article 23); the right to liberty and security of person and protection from arbitrary arrest (article 14); equality and non-discrimination before the law (article 11); recognition of all as a person before the law (article 22); equality before the courts and tribunals (article 12); the independence of the judiciary and protection from interference and threats (article 12); fair trial before and independent, impartial and competent tribunal (article 13); the principle of *nullum crimen sine lege* (article 15); a series of due process and fair trial guarantees in criminal cases, including the principle of presumption of innocence (article 16); and the principle of *ne bis in idem* (article 19).

## C.    Court structure

16.     All the courts are currently concentrated in Doha, but the Supreme Council of the Judiciary has the competence to create departments of the Court of First Instance in other cities, and hearings can take place at locations away from the home courts.

### 1.    Supreme Constitutional Court

17.     The Supreme Constitutional Court was established by Law No. 12 of 2008 but is not yet operational. The main purpose of the Court is to settle disputes over the constitutionality of laws and regulations in Qatar (article 12). The Court also has jurisdiction to, inter alia, settle disputes of competence between courts and review, upon appeal, decisions of lower courts on any matter of law or legal inference (article 12). Its judgements and decisions are final (article 27).

18.     The Constitutional Court should be composed of a president, appointed by an order of the Emir, and six judges, appointed by a decree of the Emir (article 2). A General Assembly consisting of all the members of the Court is in charge of all matters relating to regulation of the Court, internal matters and matters related to its members (article 5).

19.     The Supreme Constitutional Court was scheduled to start functioning on 1 October 2008. On 27 September 2009, the Emir reportedly appointed its president, yet at the time of writing none of the remaining six judges had been appointed and the Court was still not functioning. While administrative and logistical reasons were cited for the delay, it remains unclear why the Court is not yet operational more than five years after the enactment of the law that established it. The Special Rapporteur wishes to strongly encourage that the Court be formed, start functioning as early as possible and be provided with all the resources and guarantees necessary for its full independence and proper administration.

20.     A special chamber within the Court of Cassation reportedly used to consider constitutional issues, but its existence ceased with the enactment of Law No. 12 of 2008. The Special Rapporteur is concerned that, because of the important delay in operationalizing the Supreme Constitutional Court, it is currently impossible to appeal the constitutionality of laws in Qatar. This could create legal uncertainty and jeopardize the enforcement of human rights.

### 2.    Court of Cassation

21.     The Court of Cassation was established by Law No. 10 of 2003 as the highest court of appeal; it has competence to review both rulings and proceedings of the law. Constitutional issues can in theory be appealed to the Supreme Constitutional Court, but this Court has yet to become operational. The Court comprises different circuits or chambers to "hear appeals on the interpretation of provisions and measures enacted by law"

(article 6). The circuits are established by resolution of the Supreme Council of the Judiciary and its members are appointed by the president of the Court.

22. The Court of Cassation is composed of a president, appointed by order of the Emir, and a sufficient number of vice-presidents and judges, appointed by decree of the Emir upon proposition of the Supreme Council of the Judiciary. The Court also has a General Assembly, consisting of all of the Court's judges, which has competence to consider a number of issues, including the formation of circuits, the allocation of cases to different circuits, the organization of work during judicial vacation and other issues relating to the internal affairs of the Court.

### 3. Court of Appeal

23. The Court of Appeal was also established by Law No. 10 of 2003. It comprises different circuits or chambers set up by resolution of the Supreme Council of the Judiciary to hear appeals of orders, ruling and sentencing in *Hudud* (ordained punishment) and *Qisas* (retribution) cases, criminal cases, civil and commercial cases, family and personal status-related cases, inheritance cases and administrative or other disputes. The members of the different circuits are appointed by the president of the Court.

24. The Court of Appeal is composed of a president and a sufficient number of presidents, vice-presidents and judges appointed by decree of the Emir upon proposition of the Supreme Council of the Judiciary. The Court also has a General Assembly, consisting of all of the Court's judges, with the same competence as the General Assembly of the Court of Cassation.

### 4. Court of First Instance

25. The Court of First Instance was also established by Law No. 10 of 2003. It comprises different circuits or chambers set up by resolution of the Supreme Council of the Judiciary with jurisdiction over *Hudud* and *Qisas* cases, as well as criminal, civil, commercial, family and personal status-related, inheritance, administrative and other cases. The members of the circuits are appointed by the president of the Court.

26. The Court of First Instance is composed of a president and a sufficient number of presidents and judges appointed by decree of the Emir upon proposition of the Supreme Council of the Judiciary. The Court also has a General Assembly consisting of all the Court's judges with the same competence as the General Assemblies of the Courts of Cassation and Appeal.

### 5. Supreme Council of the Judiciary

27. The Supreme Council of the Judiciary was first established in 1999 to ensure the independence of the judiciary before being subsequently enshrined in both Law No. 10 of 2003 (chapter five) and the Constitution of 2004 (article 137). In a welcome development, the Council took over from the Ministry of Justice with regard to the administration of the courts. Its competence, as defined by the law, includes expressing its opinion on issues relating to the judiciary and studying and proposing legislation for the development of the judicial system; expressing its opinion on the appointment, promotion, transfer and assignment, secondment and retirement of judges; and considering grievances relating to judicial affairs. The Council can also exercise any other functions prescribed to it by law, as well as consider issues which the president of the Council decides to bring to its attention.

28. The Council is composed of seven members who are all judges: the president of the Court of Cassation (who is also the Council's president), its most senior vice-president (who is also the Council's vice-president) and its most senior judge; the president of the

Court of Appeal, its most senior vice-president and its most senior judge; and the president of the Court of First Instance.

## D. Qatar Financial Centre

29. Law No. 7 of 2005 created the Qatar Financial Centre (QFC), an entity with its own institutions and authorities and designed "to attract international banking, financial services, insurance activities, headquarter of businesses and other businesses" (article 5). According to the Law, the QFC's authorities can legislate on issues under QFC competence and pass regulations grounded in common law.

30. Law No. 2 of 2009 established the QFC Regulatory Tribunal (article 4) and the Civil and Commercial Court (article 5), also referred to as the Qatar International Court. Both judicial bodies are considered courts of Qatar, but they are set apart from the ordinary court structure established by Law No. 10 of 2003 and apply a different set of legal provisions and procedures.

31. The QFC Regulatory Tribunal was set up to hear appeals of decisions of any QFC authority or body. The Tribunal is composed of a president and a sufficient number of judges appointed by the Council of Ministers for a term of five years, renewable. The president is in charge of the administration of the Tribunal. The Tribunal applies the QFC law, amendments and regulations. When QFC law and regulations and the procedural rules set by the Tribunal are silent on a matter, the Tribunal will apply Qatar's Civil and Commercial Procedures Law. The decisions of the Regulatory Tribunal are enforceable and can only be appealed to the appeal circuit of the Civil and Commercial Court.

32. The Civil and Commercial Court was created as a specialized court to resolve disputes between institutions and other bodies in Qatar, as well as to serve as an appeal body from decisions of the QFC Regulatory Tribunal. The Court is composed of a president and a sufficient number of judges appointed by the Council of Ministers for a term of five years, renewable. The president is in charge of the administration of the Court. The Court comprises a first instance circuit and an appeal circuit. The Court applies QFC law and regulations if the dispute relates to a QFC matter. Where the parties consent to the Court's jurisdiction, the Court will apply the law applicable to the dispute, for example, the law chosen by the parties in a contract. Decisions of the trial circuit are enforceable and can only be appealed to the appeal circuit. Decisions of the appeal circuit are final.

33. The Qatar Financial Centre created de jure and de facto a parallel judicial system. The Special Rapporteur was informed that a rapprochement was under way between the two justice systems; a law was reportedly drafted in June 2012, but not yet passed to clarify the relationship between the Civil and Commercial Court and the QFC Regulatory Tribunal and the ordinary court system; the law would place both specialized courts under the umbrella of the Supreme Council of the Judiciary.

## III. Challenges to the independence and impartiality of the judiciary and the proper administration of justice

34. The current judicial system in Qatar was recently established and is still under development. It faces major shortcomings and challenges, which directly affect the delivery of justice and the realization of human rights. These shortcomings and challenges must be assessed and addressed in a timely fashion in order to bring the administration of justice in line with international human rights standards.

## A.  Independence and impartiality of the judiciary

### 1.  Separation of powers and interferences in the independence of the judiciary

35.     It is the principle of the separation of powers, together with the rule of law, which opens the way to an administration of justice that provides guarantees of independence, impartiality and transparency. For this reason, there should be clear demarcation between the respective competences of the different branches of power. A situation where the functions and competencies of the judiciary and the executive are not clearly distinguishable, or where the latter is able to control or direct the former, is incompatible with the notion of an independent tribunal.[1]

36.     While any direct interference in the independence of judges is extremely difficult to document, reports of pressures of the executive on the work of the judiciary, particularly in cases involving powerful persons, are a matter of concern to the Special Rapporteur. For instance, in 2009, 33 Qatari judges reportedly tendered their resignation to protest over what they had described as continued interference in their work. Regretfully, no information regarding whether or not the allegations had been appropriately investigated was provided to the Special Rapporteur.

37.     Several interlocutors expressed serious concerns regarding limitations to the jurisdiction of the courts. According to article 13 of the Law on the Judicial Authority, courts have no competence over issues related to sovereignty and nationality. Under Law No. 7 of 2007 on the Settlement of Administrative Disputes (as amended), which set up administrative circuits in the Courts of First Instance and Appeal, Emiri orders, resolutions and decrees, resolutions issued under Law No. 17 of 2002, and decisions issued under the laws on private associations and foundations, publications, the entry, residence and deportation of foreigners, inter alia, are excluded from the competence of the courts. The Special Rapporteur wishes to note that, in accordance with to the Basic Principles on the Independence of the Judiciary, the courts shall have jurisdiction over all issues of a judicial nature. The limitations set to the jurisdiction of the courts could also lead to the denial of an effective remedy.

38.     Finally, the Special Rapporteur believes that it is important to note when discussing the separation of powers that the legislative branch is not clearly separated from the executive power. Indeed, the 35 members of the current Advisory Council were appointed by the Emir and the Council has no formal legislative role. The Permanent Constitution made provision for the formation of a 45-member Advisory Council, 30 members of which would be elected by direct, general and secret ballot, with a limited legislative authority to draft and approve laws. Yet, elections were not held and the former Advisory Council remains in place. No date for these elections has been announced so far.

### 2.  Selection and appointment of judges

39.     All judges, including non-Qataris, are appointed by the Emir upon proposition of the Supreme Council of the Judiciary (as way of exception the president of the Court of Cassation is directly appointed by the Emir). Several interlocutors declared that being appointed by the Emir gave judges legitimacy and protection. Despite such affirmations, the Special Rapporteur is concerned that this current mechanism for appointing judges may expose them to undue political pressure. Appointments or nominations by the Emir can

---

[1]  See general comment 32 of the International covenant on civil and political rights, available from CCPR/C/GC/32.

have a strong influence on judges' attitudes and behaviour, particularly concerning representatives of the executive.

40.     The selection of judges is, however, under the purview of the Supreme Council of the Judiciary, composed of seven judges appointed ex officio. The basic requirements and qualifications to become a judge are listed in Law No. 10 of 2003. The selection process to join the judiciary is set in two steps. First, a candidate must be selected and be nominated as assistant judge by the Council. The position of assistant judge lasts three years, including one year of compulsory training at the Centre for Legal and Judicial Studies, where the assistant has to pass both oral and written examinations, some carried out in an anonymous manner. After this mandatory period, the application of the candidate will be considered again by the Council, which will decide whether or not to recommend the appointment.

41.     The Special Rapporteur wishes to highlight the importance of the establishment and application of clear, objective and transparent criteria, related in particular to qualifications, integrity, ability and efficiency, in the selection of judges, in order not only to identify the most suitable candidates and increase the perception of a fair selection process, but also to secure their independence. In this context, competitive examinations conducted at least partly in a written and anonymous manner can serve as an important tool in the selection process.

42.     The security of tenure of Qatari judges is guaranteed until the mandatory retirement age set forth in the law (70 years, with the possibility of exceptional extension). The Special Rapporteur is nevertheless troubled by article 63, paragraph 5, of Law No. 10 of 2003, according to which the Emir has competence to dismiss judges "in the public interest". In her view, such ground for dismissal is vague and does not comply with international standards regarding disciplinary measures against judges.

**3.    Impartiality**

43.     The Special Rapporteur is concerned by reported instances of lack of impartiality, bias and improper behaviour of judges. She heard some serious allegations, according to which not only the police and prosecutors would discriminate against non-nationals, but also judges. Among foreigners residing in Qatar, the dominant perception is that the courts do not treat Qataris in the same way. Some interlocutors also noted that this alleged discriminatory attitude against foreigners is not manifested in the same way and with the same strength, depending on the nationality of the person or his or her economic or work status in the country.

44.     It is worth noting that the State has the obligation under international human rights law to guarantee the right to a fair trial to all individuals within its jurisdiction regardless of nationality or any other status. Judges should also perform their judicial functions without favour, bias or prejudice and should not manifest, by words or conduct, bias or prejudice towards any person or group on irrelevant grounds, including race, colour, sex, religion or national origin.[2] The Special Rapporteur wishes to underline the importance of an impartial and proper behaviour of judges, including when making decisions and passing judgments, as foreigners living in Qatar already by far outnumber nationals, and such imbalance is foreseen to increase in the near future.

45.     The Special Rapporteur was told that, while judges and prosecutors have separate chambers on court premises, they often sit and chat together and enter courtrooms together. The Special Rapporteur also heard claims that judges and prosecutors discuss minutes of court hearings together. As noted in the Bangalore Principles of Judicial Conduct, in his or

---

[2]   See Bangalore Principles of Judicial Conduct.

her personal relations with individual members of the legal profession, a judge should avoid situations that might reasonably give rise to suspicion or appearance of favouritism or partiality, especially when such situations are to the detriment of the right to an adequate defence or the independence of lawyers.

## B.  Judges who are non-nationals of Qatar

46.     Many judges from other Arab countries are recruited to serve in the Qatari judiciary on a temporary basis. The salaries and allowances offered are extremely competitive and interested candidates are easily found in countries such as Egypt, Jordan, Morocco or the Sudan. Such a phenomenon is far from common throughout the world. According to the authorities, hiring non-Qatari judges became necessary to cope with the lack of qualified and interested nationals. The authorities also said that the Qatari judiciary needs the expertise of non-Qatari judges to train their less experienced Qatari colleagues and support the development of the judicial system. In the longer term, the judiciary would only be composed of nationals.

47.     The independence of these non-Qatari judges is a complex issue that requires careful consideration. The Special Rapporteur regrets that no official figures on non-Qatari judges were provided during the visit, including their number, countries of origin, years spent working in Qatar, distribution at various hierarchical levels or how they were selected.

48.     The tenure of non-Qatari judges is not guaranteed in the same way as that of national judges. According to the information received, they are recruited under temporary contracts that have to be renewed annually. The total length of the contract nevertheless depends on the rules regulating their secondment in their country of origin. Therefore, a non-Qatari judge's contract can only be renewed up to a certain number of years, which may vary depending on his country of origin. For this reason, the authorities explained that the temporary nature of non-Qatari judges' tenure is inevitable.

49.     Even if no cases were reported, the Special Rapporteur is concerned that non-Qatari judges can be dismissed at any time, which renders them extremely vulnerable to pressures from any side, including from the public prosecution, lawyers and the executive. In addition, the social benefits and allowances allocated to national and non-Qatari judges are allegedly different.

50.     While the Special Rapporteur understands the rationale behind the hiring of non-Qatari judges and its limitations, she remains concerned about their independence. She also believes that more could be done to secure the tenure of non-Qatari judges, even if only for a fixed period of time. Their conditions of work also need to be revised as no discrimination should be tolerated between national and non-Qatari judges, except that brought on by the rules of secondment of the country of origin.

51.     The Special Rapporteur would also like to note that the reduction of the number of non-Qatari judges is a legitimate path for the Qatari authorities to follow. However, such a process must only be implemented in full conformity with the international human rights obligations of the State and its national legislation.

## C.  Accountability and disciplinary measures

52.     Another shortcoming affecting the independence and impartiality of the judiciary is the absence of a written code of conduct or ethics for judges of the ordinary court system. It is important to bear in mind that the requirement of independence and impartiality does not aim at benefitting the judges themselves, but rather the court users, as part of their

inalienable right to a fair trial. Integrity and accountability are therefore essential elements of judicial independence and intrinsically linked to the implementation of the rule of law. While Law No. 10 of 2003 provides some elements on the infractions triggering disciplinary measures, detailed guidance needs to be provided to judges on the types of infractions that will give rise to disciplinary measures. Judges of the Qatar International Court and the QFC Regulatory Tribunal have their own Judicial Code of Conduct based on the principles of independence, impartiality, integrity and propriety.

## D. Fair trial, due process guarantees and administration of justice

53.     The Special Rapporteur was seriously concerned by the allegations of violations of due process and fair trial guarantees described to her during her visit, the consequences such violations have on people's lives and the respect for their human rights. Complaints of violations of due process and fair trial need to be investigated immediately and seriously by the relevant authorities and urgent measures taken to redress the situations. Such measures of redress may include the revision of judgements and sentences and/or the granting of compensations. In this context, the Special Rapporteur would like to bring to the attention of the Qatari authorities the following cases which, in her opinion, were tarnished by a series of serious violations of the right to a fair trial and/or serious breaches of due process: the case of Juan Pablo Irragori Médina; the case of Matthew and Grace Huang; the "Villagio-fire" case; and the case of Malika Alouane, Mahmoud Bouneb and Haytham Qudaih.

### 1. Arbitrary arrest and pretrial detention

54.     According to the Code of Criminal Procedure, persons who are arrested must be presented to the prosecutor within 24 hours; the prosecutor in turn has 24 hours to order the remand or release of the person. Prosecutors can order pretrial detention for up to eight days. After that period, the detention can only be prolonged by court order. No limit is provided to pretrial detention, except that it "must not exceed half of the maximum penalty established for the offence", which could result extremely problematic in cases of long sentences.

55.     The Special Rapporteur is further alarmed that the guarantees provided by the Code of Criminal Procedures against arbitrary arrest and detention do not apply to persons arrested under Law No. 17 of 2002 on the Protection of the Community,[3] Law No. 3 of 2004 on Combating Terrorism[4] and Law No. 5 of 2003 establishing the State Security Service.[5] Under these laws, persons can be detained for lengthy periods of time without charge and fundamental safeguards, including access to a lawyer or the possibility to challenge the legality of the detention before a judge.

56.     Anyone arrested without a warrant and/or detained beyond the period provided for in the law without having been presented to a judge should be released. The powers extended to the Minister of the Interior under the Law on the Protection of the Community

---

[3]  Law No. 17 of 2002 allows the Minister of Interior to order the provisional detention of anyone suspected of crimes involving State security, honour, decency or public morals for up to one year, with possibility of extension upon consent of the Prime Minister. The detention can only be appealed before the Prime Minister.

[4]  Law No. 3 of 2004 on Combating Terrorism entitles the prosecutor to order pretrial detention of a person suspected of a crime covered by the law for up to six months without judicial review.

[5]  Under Law No. 5 of 2003, persons accused of a crime falling under the purview of the State Security Service can be detained for up to 30 days by the Service before being presented to a prosecutor.

also constitute a serious interference of the executive branch in the prerogatives of the prosecution and the judiciary. In addition, the crimes falling under the purview of these three laws are vaguely defined, which is in contradiction with the principle of legality.

## 2. Transparency and access to information

57. The apparent lack of transparency during both the investigation phase and court proceedings remains a matter of great concern for the Special Rapporteur. Many interlocutors reported that it was extremely difficult to know what happens in the courts, whether you were a defendant or a victim. It was also reported to the Special Rapporteur that some hearings were held in camera without justifications based on exceptional circumstances. When hearings are held in closed sessions without proper justification, in contradiction to the right to a fair and public hearing, the fairness of the entire judicial process can be put at risk. Closed hearings also contribute to the public's lack of confidence in the courts.

58. The lack of technology used during some court hearings contributes to the lack of transparency of court hearings. Court minutes are reportedly still hand written, which more than often causes serious inaccuracies. Such practices disservice justice and open the door to further manipulation. For instance, it was reported to the Special Rapporteur that the minutes of a high-level case where the hearings were held in camera did not accurately reflect that the sessions were indeed closed. In another case, the defendant did not receive all the transcripts of the hearings. As a result, the content of the missing hearings were not taken into account in the appeal process to the detriment of the defendant and of the fair exercise of justice.

59. In some instances, lawyers also seem to be confronted with serious difficulties in gaining access to information, in particular during the investigation phase of criminal cases. Lawyers' full access to appropriate information, files and documents in the possession or control of the authorities has to be guaranteed in practice. Such access should be already accorded at the investigative stage in order to allow for the preparation of an adequate defence in conformity with the principle of equality of arms. Appropriate information includes all materials that are exculpatory or that the prosecution plans to offer in court against the accused.

60. The Special Rapporteur was disturbed to hear that, in the so-called and infamous "Villagio" case, where 19 persons, including 13 children, many of them foreigners, perished in a fire in a shopping mall, the report of the independent expert investigation carried out to establish the facts was never communicated in its entirety to the parties. In another case, the defendants, former employees of a television network, did not have access to any information during the investigation phase and were only informed of the charges pending against them at the third court hearing. It was therefore impossible for them to prepare their defence in adequate conditions, in contradiction with the principle of equality of arms.

## 3. Translation and interpretation

61. The Special Rapporteur is particularly concerned about reports that translations and interpretation in court cases involving non-Arabic speakers, while prescribed by the law, are not always provided in practice or that their quality is poor. She was alarmed to hear of several cases where non-Arabic speaking defendants were forced to sign documents in Arabic without being provided with a translation. These documents were later used against them in court, and in one of the cases the document turned out to be a confession of guilt. Several cases where the defendants were not provided with interpretation during court hearings were also reported to the Special Rapporteur. Such obvious violations of due process are unacceptable; moreover, any document or testimony given in the absence of

translation or interpretation should have no legal validity. The Special Rapporteur notes with appreciation that the Ministry of Justice prepared a draft law aiming at strengthening the capacity and quality of translation services, including with regards to court matters.

### 4. Delays in proceedings

62. Another concern related to due process guarantees are delays in judicial proceedings often caused by the postponement of hearings without clear and fair justification. For instance, the appeal hearings in the Villagio case keep being postponed because the defendants, sentenced to jail in first instance and under a travel ban, do not show up to court when summoned. Such endless postponements are unacceptable. In one instance, the absence of one of the defendants was justified by his travelling despite the travel ban against him. Such disregard for a judicial decision is also a source of great concern to the Special Rapporteur. The result of the lack of due process followed in this case is to deny victims their right to an effective remedy. It also robs them of the possibility to come to closure with their loss.

63. Delays in court procedures can also have particular dire consequences on migrant workers, who are in a particular vulnerable situation. Lengthy procedures in labour cases more than often will leave migrant workers living in inhuman conditions. The Special Rapporteur was told that, since judges are often not sensitized to the particular situation of migrant workers and their plight, the consequences of postponing or prolonging trials may not be taken into account.

## E. Access to justice and the situation of migrant workers

64. The Special Rapporteur is particularly concerned about access to justice of vulnerable sectors of the population, such as migrant workers in the construction industry or domestic workers, for whom obstacles to access justice in cases where their rights have been violated seem to be almost insurmountable. In this context, it is important to note that a system of sponsorship (or *Kafala*) is used in Qatar to regulate the relationship between migrants and their employers. According to the Special Rapporteur on the human rights of migrants, such system "enables unscrupulous employers to exploit employees".[6]

65. Institutionalized legal aid is only available in criminal cases when the defendant does not have the financial means to pay for a lawyer. The budget comes directly from the courts' budget. Private actors, such as charity organizations, provide legal counselling, but it is insufficient. The National Human Rights Committee also provides assistance to migrant workers free of charge and, when necessary, can put them in contact with lawyers. The Special Rapporteur notes with appreciation that a special office for labour disputes created within the Ministry of Labour also provides information and quasi-legal support to migrant workers free of charge.

66. Migrant workers, including domestic workers, face a series of serious obstacles to access justice. Despite genuine and laudable efforts of both the authorities and the National Human Rights Committee, the majority of migrant workers do not know how or where to file a complaint. Language is also a barrier to getting adequate information and registering a complaint. Migrant workers also very frequently fear the police, institutions and retaliation from their employers.

67. Most importantly, migrant workers are unable to support themselves without an income through the court process, which at best means they were suspended from their job.

---

[6] See A/HRC/26/35/Add.1.

While a transfer of sponsorship to allow them to work for another employer is possible in theory, such transfers are very rarely accepted in practice. Under the sponsorship system, migrant workers cannot leave the country without the approval of their employer.

68. Finally, in the rare cases where migrant workers reach the courts, they have to pay both court fees and expert fees. Court fees are requested to register a complaint, although in labour cases migrant workers should be exempted. Expert fees have to be paid by the complainant to obtain the expert financial report that is necessary to prove their case and take it further in the judicial process. Expert fees can be as high as 600 Riyals (approximately $165). Even in cases where the complaint is the same against the same employer, each complainant has to pay the expert fees, which prevents migrant workers from pooling money to present their cases collectively. Expert fees can reportedly be waived, but it is rarely done in practice. Yet, one of the major grounds for complaints is the non-payment of salaries. Courts need to be made aware of the plight of migrant workers and the burden that these fees represent for them.

69. The Special Rapporteur is also concerned about the administrative detention of migrant workers. According to the sponsorship law, the detention of migrant workers awaiting deportation can be ordered for up to 30 days, renewable. Lengthy periods of administrative detention before deportation seem unnecessary to the Special Rapporteur and may amount to inhuman treatment; she wishes to note that the right not to be arbitrarily detained also applies to migrant workers. In the case that migrant workers are detained under criminal charges, all the safeguards against arbitrary detention should apply to them.

70. The Special Rapporteur welcomes the announcements in May, July and November 2014 according to which reforms to improve the situation of migrant workers and replace the *Kafala* with a system of contract between worker and employer would be announced in early 2015. In addition to improving the working and living conditions of migrant workers in Qatar, she hopes that the future reforms will also contribute to facilitating migrant workers' access to justice.

## F.  Women in the justice system

71. During her visit, the Special Rapporteur paid attention to the integration of a gender perspective and women's rights in the justice system. She is concerned about the poor representation of women on the bench. According to numbers received, out of a total of 198 judges, only 2 are women (1 in the family circuit and 1 in the civil circuit) and 1 female assistant judge out of 14. The Special Rapporteur was nevertheless encouraged to hear that professors were encouraging more female law students to pursue a judicial career and that more women were presenting their candidacies to become judges.

72. It seems that women, however, are still faced with institutionalized gender discrimination at many stages of the justice system, including when filing complaints with the police or appearing before the courts. Both the composition and behaviour of the judiciary and prosecution services seem to reflect the traditional and patriarchal societal structure of the country. Gender biases and discriminatory attitudes and practices against women are reproduced within the judiciary and the administration of justice.

73. In this context, the Special Rapporteur is concerned that domestic and sexual violence against women, in particular against female migrant domestic workers, is still prevalent in Qatar.[7] Women are subjected to strong social and institutional pressure and stigma when trying to report cases of domestic and sexual violence. Such pressure and

---

[7]  See CAT/C/QAT/CO/2, para. 19, and CEDAW/C/QAT/CO/1, para. 23.

stigmatizing attitudes often prevent them from denouncing the violations they have suffered, thereby representing a major obstacle to access justice. Migrant domestic workers whose rights have been violated are in an extremely vulnerable position, as they have to face compounded discrimination on the basis of their gender and their migrant status. The Special Rapporteur regrets the lack of statistical data on the number of complaints, investigations, prosecutions and convictions in cases of violence against women.

74.     The Special Rapporteur firmly believes that a more representative and gender-sensitive judiciary can play a determining role in empowering women to gain access to justice, claim their human rights and break patterns of discrimination and impunity for cases of violence against women.

## G.    Prosecution services

75.     The public prosecution was established as an independent judicial body by Law No. 10 of 2002; it is headed by an Attorney-General, appointed by the Emir, and composed of prosecutors of different ranks appointed by the Emir upon recommendation of the Attorney-General. Prosecutors' security of tenure is guaranteed until the mandatory retirement set forth by the law (70 years old). The Special Rapporteur is nevertheless troubled by article 44(5) of Law No. 10 of 2002, according to which the Emir has competence to dismiss prosecutors "for reasons of public interest". In her view, such ground for dismissal is vague and does not comply with international standards regarding disciplinary measures against prosecutors.

76.     The Special Rapporteur was concerned to receive information according to which the prosecution services were influenced by high-level persons or powerful businesses. For this reason, a clear distinction must be drawn between public and State interests. Acting on behalf of the public interest should not be confused with protecting the interests of the Government or any other State institution.

77.     The Special Rapporteur was also particularly concerned to hear allegations about the complicity of prosecution services in the fabrication of facts or tempering of evidence in certain cases. The prosecution office also seems to have complete discretion when it comes to the cases it takes up or not. This has led to irrational instances where the prosecution was pursued even when the evidence pointed to the fact that no crime had been committed. The Special Rapporteur is further troubled by the reported lack of judicial oversight of the work of prosecutors. Judicial oversight is important to ensure the legality of the actions of the prosecution, whether during the investigative or trial phases. Finally, the Special Rapporteur must underline the absence of clear guidelines of procedure and of a written code of conduct or ethics as a serious deficit, which may jeopardize the impartiality and independence of prosecutors, as well as the quality and consistency of their work.

## H.    Lawyers

78.     Like judges and prosecutors, lawyers also play an essential role in ensuring the independence of the judiciary and upholding the rule of law and, while they are not expected to be impartial in the same way as judges, they must be free from external pressures and interference. The Special Rapporteur is concerned about the absence of an independent self-regulating bar association that oversees the process of admitting candidates to the legal profession, provides for a uniform code of ethics and conduct and

enforces disciplinary measures, including disbarment.[8] The establishment of such an organized legal profession is a key element to the independence of lawyers.

79.     The conditions of admission to the bar are set out in article 23 of Law No. 23 and include six months of compulsory training at the Centre for Judicial and Legal Studies and 18 months of training at a law firm. While at the time of the visit no uniform written bar examination was in place, the Special Rapporteur welcomes the establishment at the end of 2014 of such an examination, which she hopes will contribute to addressing the current unequal competence between lawyers.

80.     The Lawyers' Admission Committee established in the Ministry of Justice is in charge of the admission of lawyers and their registration in one of the rolls set forth by the law.[9] Its decisions can be appealed before the Court of Appeal. While she acknowledges the presence of three lawyers in the Committee, the Special Rapporteur is concerned about the extensive involvement of the executive in the admission and registration of lawyers, which, in her view, is incompatible with the Basic Principles on the Role of Lawyers as it undermines lawyers' independence. She also notes with concerns that an application of enrolment renewal has to be submitted by practicing lawyers every year. The Special Rapporteur notes with appreciation that a draft law was prepared by the Ministry of Justice to modify the composition of the Committee and hopes to receive more information on its content.

81.     In the same vein, the Special Rapporteur is concerned about the implication of the executive branch in disciplinary procedures against and the disbarment of lawyers. Indeed, the Department of Legal Advice and Contracts at the Ministry of Justice receives and investigates disciplinary complaints against lawyers. If evidence of misbehaviour is found, the Department presents a disciplinary claim before the Disciplinary Board,[10] which will consider the case and make a decision. Decisions can be challenged before the Court of Appeal. Lawyers' rights and duties are listed in Law No. 23 of 2006, but at the time of the visit there was no comprehensive code of conduct or ethics that clearly defines what constitutes an infraction and how such infractions are sanctioned. The Special Rapporteur welcomes information according to which the association of lawyers is preparing a draft code of conduct to present to the Admission Committee.

82.     The Special Rapporteur was further concerned to hear about the difficulties that lawyers have had in discharging their professional functions, in particular regarding access to information, including expert reports and other essential documents, and the case file of their client during both investigation and trial phases. The Special Rapporteur also heard reports of lawyers being arbitrarily banned from entering court hearings where they were to represent a client or arbitrarily replaced by another lawyer upon order of the court and against the will of their client. She is also worried that some Qatari lawyers were reported to behave in a discriminatory way in front of non-Qatari judges, without being sanctioned.

---

[8]   There is an association of lawyers but it has no official competence.

[9]   The Lawyers' Admission Committee is composed of three representatives of the Ministry of Justice (including the Minister himself), two judges from the Court of Appeal, a public prosecutor and three lawyers elected by the Minister of Justice.

[10]   The Disciplinary Board is composed of one judge from the Court of Appeal, two judges selected by the President of the Court of Cassation, one jurist from the Ministry of Justice and one lawyer admitted before the Court of Cassation.

## I.   Education, training and capacity-building

83.     All stakeholders met during the visit were unanimous in recognizing the importance of high-quality education and professional training for judges, prosecutors and lawyers in order to ensure an independent, impartial and effective administration of justice; they also acknowledged the current deficits of Qatar in this domain and the efforts of the authorities in pursuing avenues to remedy the situation. The lack of continuing or on-the-job training was also underlined.

84.     The Special Rapporteur was informed of the urgent need to further strengthen training in international law, in particular human rights law and the conventions and treaties ratified by Qatar. In one particular case, a lawyer made references to the Convention on the Rights of the Child in his pleadings, which were ignored by the judge, who had never heard of the Convention.

85.     Qatar has a faculty of law and a faculty of sharia. There are also campuses of several international universities, and the authorities have set up study programmes in European and American universities to stimulate enrolment in legal studies. For instance, the Special Rapporteur was told that staff members of the Ministry of Justice are encouraged and offered specific opportunities to study abroad. There is also the Centre for Legal and Judicial Studies, which was established by Law No. 8 of 2001 (amended) as a separate legal entity under the authority of the Ministry of Justice to provide training for judges, prosecutors, legal assistants, law enforcement officers and lawyers. The National Human Rights Committee has also provided specific training to future judges and prosecutors, and that practice should be further encouraged.

86.     The authorities seem particularly aware that efforts are urgently needed to continue to build education and training capacities in Qatar in order to improve the expertise of judges, prosecutors and lawyers and the quality of their work. In this context, the Special Rapporteur welcomes innovative initiatives like the "Development of Professional Legal and Judicial Education in Qatar", led by the Qatar International Court and Dispute Resolution Centre. This initiative aims at establishing an International Judicial and Legal Education Institute in Qatar, thereby creating a system of professional legal and judicial education that works to international standards and is tailor-made for the development of Qatari judges, prosecutors and lawyers.

## IV.   Conclusions

87.     **Qatar has come a long way in a short time in terms of developing its justice system. The country's recent dramatic population growth has put pressure on its institutions, which will need to adapt and promote reforms in order to be able to deal with the challenges that will continue to arise with the influx of foreigners and the country's tremendous ongoing economic development.**

88.     **The Special Rapporteur commends the recognition of the principle of separation of powers and the independence of the judiciary in the Constitution. The acknowledgement of these principles, which are essential to the rule of law, was indispensable to provide for a healthy foundation upon which to build a new judicial system in line with the international principles of independence and impartiality and guarantees of due process and fair trial. The unification of the courts under Law No. 10 of 2003 also constituted a welcome development that largely contributed to consolidating the administration of justice in Qatar.**

89.     **In spite of such progress, the Special Rapporteur is concerned that the challenges and shortcomings she identified in the present report negatively affect the**

independence and impartiality of the justice system, as well as the enjoyment of human rights in Qatar. Some of the cases mentioned in the report as way of examples are seriously worrying; they tarnish the genuine efforts undertaken by many to set up a justice system that is independent, impartial and competent in Qatar. Cases should be given all the attention they deserve, and violations of due process remedied as soon as possible to provide for positive examples and guide the improvements needed. If left unaddressed, these challenges and shortcomings will also undermine positive reform efforts.

90.     The authorities have assured the Special Rapporteur of their determination to improve the system where needed. Qatar shows great potential in this sense as, unlike many other countries, Qatar has the financial means to support reforms and implement a wide range of measures. Ten years after the adoption of the Permanent Constitution, Qatar should not miss the opportunity to launch the reforms necessary to reinforce its institutions, in particular those related to the justice system. Against this background, the Special Rapporteur strongly encourages Qatar to continue to engage with all human rights mechanisms and to spare no efforts in implementing their recommendations.

## V.    Recommendations

91.     The International Covenant on Civil and Political Rights and its Optional Protocols should be ratified.

92.     The Supreme Constitutional Court should be formed and be provided with all the resources and guarantees necessary for its full independence and proper administration so as to become operational as soon as possible.

93.     Free and fair elections to the Advisory Council should be held in conformity with the provisions of the Constitution of Qatar; women should be encouraged to run.

94.     Limitations to the competence of the courts, including regarding nationality-related issues, should be removed as the courts should have jurisdiction over all issues of a judicial nature.

**Independence and impartiality of the judiciary**

95.     Measures should be taken to guarantee the independence of the judiciary. In particular, alleged cases of improper influences, pressures, threats and interferences, direct or indirect, should be promptly investigated and, if confirmed, perpetrators should be held accountable.

96.     The appointment mechanism should be reviewed to limit the involvement of the executive.

97.     Clear, objective and transparent criteria should be applied in the selection of judges, so as to ensure that such selection be based on merit only.

98.     Article 63(5) of Law 10 of 2003 should be amended. All disciplinary measures taken against judges should be in line with international standards.

99.     Complaints related to discriminatory attitudes and other improper behaviour of the judiciary should be promptly investigated and, if necessary, appropriate measures should be taken.

**Non-national judges**

100.    Non-Qatari judges should be provided with all the guarantees given to national judges, as long as these are in line with the rules of secondment of their home country. Their contracts should not have to be renewed annually, but rather they should last for the whole duration of the secondment allowed by the home country.

101.    A transparent and clear strategy, accompanied by a sufficiently resourced programme, should be adopted to progressively reduce the number of non-Qatari judges in full conformity with international human rights obligations; in the longer term, the goal should be to fully nationalize membership of the judiciary.

102.    Lawyers, prosecutors and other stakeholders should show the same level of respect to non-Qatari judges as shown to national judges.

**Accountability and disciplinary measures**

103.    A written code of conduct or ethics for judges should be adopted in line with the Bangalore Principles of Judicial Conduct.

**Fair trial, due process and administration of justice**

104.    The Code of Criminal Procedure should be amended to prescribe a limit for pretrial detentions. The authorities should take measures to ensure that all due process safeguards are provided in practice to all detainees.

105.    The Laws on the Protection of the Community, on Combating Terrorism and establishing the State Security Service should be amended in line with international and domestic safeguards against arbitrary arrest and detention. Activities prohibited by these laws should be clearly defined.

106.    The uniformity of court procedures should be ensured, in particular with regard to public hearings.

107.    Judicial decisions and judgements should be published and available to the public.

108.    Modern technology tools should be adopted urgently and all hearings should be recorded to ensure the proper, adequate and transparent administration of justice. Video streaming should also be available to enable victims who are abroad to follow judicial proceedings effectively.

109.    Safeguards should be established to ensure that lawyers can represent and defend their clients appropriately in full respect of the principle of equality of arms. Access to information during investigation and trial should be ensured.

110.    Quality interpretation and translation for non-Arabic speakers should be provided at all stages of judicial proceedings, including during the investigation phase.

111.    Urgent measures should be taken to prevent delays in court proceedings. In particular, the postponement of hearings should be avoided and justified on reasonable grounds. The particular situation of vulnerable sectors of the population, such as migrant workers, should also be taken into account.

**Access to justice and the situation of migrant workers**

112.    Urgent measures should be taken to lift both court and expert fees for all migrant workers and other vulnerable sectors of the population. Access to legal aid and interpreters should also be guaranteed.

113.    The administrative detention of migrant workers should be subjected to judicial review.

114.    Policies, procedures and practices to promote equal access to justice for all, in particular vulnerable groups, such as migrant and domestic workers, should be developed and implemented.

**Women in the justice system**

115.    Gender-based bias, stereotypes and discrimination persisting in the justice system should be addressed and eliminated urgently. To that end, training on gender equality and women's rights, including violence against women, and related international human rights standards, in particular the Convention on the Elimination of All Forms of Discrimination against Women, should be set up and made compulsory for judges, prosecutors and lawyers. The study of gender equality, women's rights and relevant international standards should also form an integral part of the legal education.

116.    Measures to improve the representation of women in the judiciary should be taken. Women should be encouraged to undertake legal studies and consider legal and judicial careers. A clear policy to this intent should be adopted.

117.    Gender-tailored procedures, policies and practices to promote women's equal access to justice should be developed.

118.    Disaggregated statistical data on the number of complaints, investigations, prosecution and convictions in cases of violence against women should be compiled.

**Prosecution services**

119.    Prosecutors should conduct themselves in a professional manner at all times and strive to be, and be seen to be, independent and impartial. They should perform their duties fairly and respect and protect human dignity and uphold human rights; they should not be subjected to improper interference.

120.    A written code of ethics for prosecutors should be established and compliance with its provisions should be monitored and taken into account. Clear guidelines with objective criteria for ordering investigations and prosecuting cases should also be established by the office of the Attorney-General.

121.    Judicial oversight of prosecutors' actions should be instituted.

122.    Article 44(5) of Law No. 10 of 2002 should be amended. All disciplinary measures taken against prosecutors should be in line with international standards.

**Lawyers**

123.    An independent self-regulating bar association with statutes that comply with international standards should be established, inter alia, to oversee the process of

admitting candidates to the bar and enforce disciplinary measures, including disbarment. The official status of the association should be recognized. Law No. 12 of 2004 on freedom of association should in no way represent an obstacle to establish this association.

124.    The draft code of conduct prepared by the association of lawyers should provide for the applicable disciplinary procedure and give detailed guidance on the infractions that would trigger disciplinary measures against lawyers, in line with international standards.

125.    An impartial disciplining body should be established by the legal profession and a pre-established procedure should be adopted for the conduct of disciplinary proceedings in line with international standards.

**Education, training and capacity-building**

126.    Access to high-quality education and professional training, including on-the-job and specialized training, for judges, prosecutors and lawyers should be fostered. Training in human rights law should be reinforced.

127.    The capacities of the Centre for Legal and Judicial Studies should continue to be strengthened and the range of professional and on-the-job training should be expanded.

————————